ORAL ARGUMENT NOT YET SCHEDULED
No. 24-5262

# In the United States Court of Appeals for the District of Columbia Circuit

JAZZ PHARMACEUTICALS, INC.,

*Plaintiff-Appellant*,

v.

XAVIER BECERRA, *et al*.,

*Defendants-Appellees,*

AVADEL CNS PHARMACEUTICALS, LLC,

*Intervenor for Defendants-Appellees,*

On Appeal from the United States District Court
for the District of Columbia, No. 1:18-cv-1819 (Mehta, J.)

## BRIEF FOR APPELLANT JAZZ PHARMACEUTICALS

Kwaku A. Akowuah
  *Counsel of Record*
Sean C. Griffin
Peter A. Bruland
Anna C. Burke
David H. Kinnaird
SIDLEY AUSTIN LLP
1501 K Street, NW
Washington, DC 20005
202.736.8000
kakowuah@sidley.com

*Counsel for Appellant*

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

**a.    Parties.** Appellant Jazz Pharmaceuticals, Inc. (Jazz), was plaintiff below. Appellees Xavier Becerra, Secretary of the Department of Health and Human Services; the Department of Health and Human Services; Robert M. Califf, Commissioner of Food and Drugs; and the United States Food and Drug Administration (collectively, FDA) were defendants below. Avadel CNS Pharmaceuticals, Inc. (Avadel) intervened in support of appellees below.

**b.    Ruling Under Review.** Jazz appeals from the United States District Court for the District of Columbia's October 30, 2024 order denying Jazz's motion for summary judgment and granting summary judgment to appellees and intervenor. *Jazz Pharmaceuticals, Inc. v. Becerra*, 2024 WL 4625731 (D.D.C. Oct. 30, 2024) (Mehta, J.) (ECF No. 105).

***c.*    Related Cases.** The following case involved the same parties and similar issues, and was treated as a related case in the district court: *Avadel CNS Pharmaceuticals, LLC v. Becerra*, 638 F. Supp. 3d 23 (D.D.C. 2022) (Mehta, J.).

## DISCLOSURE STATEMENT

Appellant Jazz Pharmaceuticals, Inc. is a corporation in which Jazz Pharmaceuticals plc holds a 10% or greater ownership interest.

# TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES...i

DISCLOSURE STATEMENT....................................................................ii

TABLE OF CONTENTS ....................................................................... iii

TABLE OF AUTHORITIES.................................................................vi

GLOSSARY ...........................................................................................xiv

INTRODUCTION...................................................................................1

JURISDICTIONAL STATEMENT .........................................................3

STATEMENT OF ISSUES.....................................................................3

PERTINENT STATUTES.......................................................................4

STATEMENT OF THE CASE ...............................................................4

    A.    Legal background...................................................................5

        1.    The Orphan Drug Act of 1983......................................5

        2.    FDA's 1992 regulation ..................................................8

        3.    The 2017 amendments................................................ 11

    B.    Factual background .......................................................... 16

        1.    In 2020, Jazz won approval for a new narcolepsy treatment, triggering a seven-year approval moratorium ................................................................. 16

        2.    In 2023, FDA approved a competing narcolepsy treatment, despite the moratorium. ........................... 17

    C.    Procedural history............................................................. 18

SUMMARY OF ARGUMENT ................................................ 20

STANDING ...................................................................... 20

STANDARD OF REVIEW.................................................... 24

ARGUMENT ...................................................................... 25

I.      FDA lacked statutory authority to approve Lumryz.................... 25

        A.      The Orphan Drug Act barred FDA from approving Lumryz
                during the seven-year moratorium....................................... 25

                1.      During the moratorium, FDA may not approve a
                        follow-on application to treat the same condition
                        using the designated drug. ........................................ 26

                2.      Avadel's follow-on application treats the same
                        condition using the designated drug.. ......................... 27

                3.      By its plain terms, the moratorium includes no
                        loophole for "clinically superior" treatments............... 28

        B.      Congress did not create a hidden loophole when it changed
                "such" to "the same." ........................................................ 34

                1.      Subsection (a) lacks the hallmarks of legislative
                        ratification.............................................................. 36

                        a.      Courts infer legislative ratification only under
                                narrow circumstances ....................................... 36

                        b.      Ratification is not a plausible inference here..... 41

                2.      FDA's ratification theory is inconsistent with the
                        statute as a whole. .................................................. 48

                        a.      Congress did not ratify FDA's approach
                                wholesale. ........................................................ 48

    b. FDA's ratification theory violates first principles of statutory interpretation. ............... 49

    c. FDA's interpretation would undermine the prioperty right created by the Act. ..................... 53

   3. History and purpose do not suggest otherwise. .......... 57

 C. The district court's interpretation can't save FDA's approval order. ...................................................... 60

II. FDA's error warrants vacatur ........................................ 63

 A. FDA cannot salvage its approval order on remand. ............. 64

 B. No potential consequences warrant remand. ...................... 64

CONCLUSION ........................................................... 66

STATUTORY ADDENDUM

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Akridge v. Alfa Ins. Co.,*
    93 F.4th 1181 (11th Cir. 2024) ........................................................ 59

*Ali v. Fed. Bureau of Prisons,*
    552 U.S. 214 (2008) .............................................................. 30, 37

*Allied-Signal, Inc. v. U.S. Nuclear Regul. Comm'n,*
    988 F.2d 146 (D.C. Cir. 1993) ............................................... 64

*Am. Great Lakes Ports Ass'n v. Schultz,*
    962 F.3d 510 (D.C. Cir. 2020) ............................................... 65

*Bragdon v. Abbott,*
    524 U.S. 624 (1998) ............................................................ 39

*Bridgeport Hosp. v. Becerra,*
    108 F.4th 882 (D.C. Cir. 2024) ............................................. 65

*Brown v. Gardner,*
    513 U.S. 115 (1994) ............................................................ 52

* *Bruesewitz v. Wyeth LLC,*
    562 U.S. 223 (2011) .......................................................... 40, 43

*Burlington Truck Lines, Inc. v. United States,*
    371 U.S. 156 (1962) ............................................................ 61

*Carpenters Indus. Council v. Zinke,*
    854 F.3d 1 (D.C. Cir. 2017) ................................................. 24

* *Catalyst Pharms., Inc. v. Becerra,*
    14 F.4th 1299 (11th Cir. 2021) ..................................... 27, 46, 63

*Authorities chiefly relied upon are marked with asterisks

vi

*Chevron U.S.A., Inc. v. Nat. Res. Def. Council,*
  467 U.S. 837 (1984) ............................................................... 9

*Comcast Corp. v. FCC,*
  579 F.3d 1 (D.C. Cir. 2009) ............................................... 65

*Cook v. FDA,*
  733 F.3d 1 (D.C. Cir. 2013) ............................................... 29

\* *CSX Corp. v. United States,*
  18 F.4th 672 (11th Cir. 2021) ................................. 40, 41, 45

*Depomed, Inc. v. HHS,*
  66 F. Supp. 3d 217 (D.D.C. 2014) ....................... 1, 6, 12, 14

*Dole v. Williams Enters., Inc.,*
  876 F.2d 186 (D.C. Cir. 1989) ........................................... 55

*Eagle Pharms., Inc. v. Azar,*
  952 F.3d 323 (D.C. Cir. 2020) ...................... 5, 6, 11, 12, 14

*Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg.*
  *& Constr. Trades Council,*
  485 U.S. 568 (1988) ............................................................ 56

*Env't Def. Fund v. FERC,*
  2 F.4th 953 (D.C. Cir. 2021) ....................................... 65, 66

\* *Env't Def. v. Duke Energy Corp.,*
  549 U.S. 561 (2007) ..................................................... 41, 42

*FDA v. Brown & Williamson Tobacco Corp.,*
  529 U.S. 120 (2000) ............................................................ 33

*Freeman v. Quicken Loans, Inc.,*
  566 U.S. 624 (2012) ............................................................ 60

*George v. McDonough,*
  596 U.S. 740 (2022) ..................................................... 39, 43

vii

*Goldstein v. SEC*,
    451 F.3d 873 (D.C. Cir. 2006) ............................................................. 10

*Green Rock LLC v. IRS*,
    104 F.4th 220 (11th Cir. 2024) ........................................................ 59

*Hallstrom v. Tillamook County*,
    493 U.S. 20 (1989) ............................................................................ 29

*Hikvision USA, Inc. v. FCC*,
    97 F.4th 938 (D.C. Cir. 2024) ......................................................... 39

*Jama v. ICE*,
    543 U.S. 335 (2005) .......................................................................... 30

*Jeffries v. Volume Servs. Am., Inc.*,
    928 F.3d 1059 (D.C. Cir. 2019) ....................................................... 24

*Jones v. Hendrix*,
    599 U.S. 465 (2023) .......................................................................... 29

*Kaiser Aetna v. United States*,
    444 U.S. 164 (1979) .......................................................................... 54

*Kennecott Corp. v. EPA*,
    684 F.2d 1007 (D.C. Cir. 1982) ....................................................... 59

*Ky. Dep't. of Corr. v. Thompson*,
    490 U.S. 454 (1989) .......................................................................... 53

*Long Island Power Auth. v. FERC*,
    27 F.4th 705 (D.C. Cir. 2022) ......................................................... 64

*Loper Bright Enters. v. Raimondo*,
    144 S. Ct. 2244 (2024) ..................................................................... 25

*Loretto v. Teleprompter Manhattan CATV Corp.*,
    458 U.S. 419 (1982) .......................................................................... 54

*MCI Telecomms. Corp. v. AT&T Co.*,
    512 U.S. 218 (1994) .......................................................................... 34

viii

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
  463 U.S. 29 (1983) ................................................................. 58

*Murray Energy Corp. v. EPA*,
  936 F.3d 597 (D.C. Cir. 2019) ............................................... 64

*In re N. Am. Coal & Min. Co.*,
  109 N.W. 1116 (Minn. 1906) ................................................. 54

*Nat'l Ass'n of Home Builders v. Defs. of Wildlife*,
  551 U.S. 644 (2007) ............................................................... 29

*New York v. EPA*,
  413 F.3d 3 (D.C. Cir. 2005) ........................................... 38, 42

*NRDC v. EPA*,
  489 F.3d 1364 (D.C. Cir. 2007) ............................................ 64

*Oracle Int'l Corp. v. Rimini St., Inc.*,
  123 F.4th 986 (9th Cir. 2024) ............................................... 54

*Otsuka Pharm. Co. v. Price*,
  869 F.3d 987 (D.C. Cir. 2017) .............................................. 62

*Republic of Argentina v. NML Capital, Ltd.*,
  573 U.S. 134 (2014) ............................................................... 29

*Rodriguez v. United States*,
  480 U.S. 522 (1987) ............................................................... 58

*Russello v. United States*,
  464 U.S. 16 (1983) ................................................................. 30

*In re Sorah*,
  163 F.3d 397 (6th Cir. 1998) ................................................ 55

*Spectrum Pharms., Inc. v. Burwell*,
  824 F.3d 1062 (D.C. Cir. 2016) .............................................. 5

*Sugar Cane Growers v. Veneman*,
  289 F.3d 89 (2d. Cir. 2002) .................................................. 65

*Terrett v. Taylor,*
  13 U.S. (9 Cranch) 43 (1815) ............................................................. 54

*Town of Castle Rock v. Gonzales,*
  545 U.S. 748 (2005) ............................................................................ 53

*United States v. Bd. of Comm'rs,*
  435 U.S. 110 (1978) ............................................................................ 38

*United States v. Palomar-Santiago,*
  593 U.S. 321 (2021) ............................................................................ 29

*United States v. Sineneng-Smith,*
  590 U.S. 371 (2020) ............................................................................ 61

*Univ. of Tenn. Rsch. Found. v. Caelum Biosciences, Inc.,*
  667 F. Supp. 3d 734 (E.D. Tenn. 2023) ............................................. 55

*W. Va. Univ. Hosps., Inc. v. Casey,*
  499 U.S. 83 (1991) .............................................................................. 50

*Wash. All. of Tech. Workers v. Dep't of Homeland Sec.,*
  50 F.4th 164 (D.C. Cir. 2022) ............................................................ 39

*West Virginia v. EPA,*
  597 U.S. 697 (2022) ............................................................................ 34

* *Whitman v. Am. Trucking Ass'ns, Inc.,*
  531 U.S. 457 (2001) ...................................................................... 22, 55

**Statutes**

5 U.S.C. § 706 ....................................................................................... 24

21 U.S.C. § 353a(b)(1)(A) ..................................................................... 37

21 U.S.C. § 355 ....................................................................................... 6

21 U.S.C. § 355(a) ........................................................................... 62, 63

21 U.S.C. § 355(c)(3)(E)(ii) .............................................................. 37, 41

21 U.S.C. § 355(o)(4) ........................................................................ 37, 43

21 U.S.C. § 360bb(a)(1) ............................................................................. 5

* 21 U.S.C. § 360cc(a) ........................ 1–3, 6, 17, 20, 25–28, 37, 52, 62, 64

21 U.S.C. § 360cc(b) ..................................................................... 7, 8, 18

21 U.S.C. § 360cc(b)(1) ...................................................... 1, 7, 22, 31, 54

21 U.S.C. § 360cc(b)(2) .......................................................... 1, 8, 44, 54

21 U.S.C. § 360cc(c)(1) ..................................................... 13, 25, 51, 52

21 U.S.C. § 360cc(d) ............................................................... 14, 49

21 U.S.C. § 360cc(e) .............................................................. 15, 53

21 U.S.C. § 360ff(a)(3) ............................................................. 36, 37

21 U.S.C. § 360ff(a)(4)(B) ............................................................. 37

21 U.S.C. § 360n(a)(4)(C)(i) .......................................................... 37

21 U.S.C. § 360ccc(a)(3)(A)(ii) ..................................................... 43

28 U.S.C. § 1291 ........................................................................ 3

28 U.S.C. § 1331 ........................................................................ 3

42 U.S.C. § 256b(d)(3)(B)(vi) ...................................................... 43

* FDA Reauthorization Act of 2017,
    Pub. L. No. 115-52, 131 Stat. 1005 (2017) ....... 13, 15–16, 34, 42, 44, 45

Bankruptcy Amendments & Federal Judgeship Act of 1984,
    Pub. L. No. 98-353, 98 Stat. 333 (1984) ............................................ 43

Medicare Catastrophic Coverage Act of 1988,
    Pub. L. No. 100-360, 102 Stat. 683 (1988) ........................................ 44

Orphan Drug Act OF 1983,
    Pub. L. No. 97-414, 96 Stat. 2049 (1983) ................................. 5, 6, 31

xi

## Regulations

21 C.F.R. § 314.72(a) .................................................................... 54

21 C.F.R. § 316.3(b)(12) ............................................................... 47

21 C.F.R. § 316.3(b)(14) ........................................................... 51, 52

21 C.F.R. § 316.27(a) .................................................................... 54

21 C.F.R. § 316.31(a) .................................................................... 47

21 C.F.R. § 316.36 ................................................................... 31, 54

56 Fed. Reg. 3,338 (Jan. 29, 1991) ........................................... 9, 10

57 Fed. Reg. 62,076 (Dec. 29, 1992) .................................... 2, 10, 11

## Legislative Authorities

H.R. 386, 107th Cong. (2001) ........................................................ 32

H.R. 3091, 113th Cong. (2013) ...................................................... 33

H.R. 3116, 113th Cong. (2013) ...................................................... 33

H.R. 3930, 102nd Cong. (1991) ..................................................... 32

H.R. 4160, 103rd Cong. (1994) ...................................................... 32

H.R. 4242, 106th Cong. (2000) ...................................................... 32

H.R. 4638, 101st Cong. (1990) ..................................................... 8, 9

H.R. 4865, 103rd Cong. (1994) ...................................................... 32

H.R. 4959, 102nd Cong. (1992) ..................................................... 32

H.R. Rep. No. 103-476 (1994) ....................................................... 32

S. 2060, 102 Cong. (1992) ............................................................. 32

S. Rep. No. 102-358 (1992) ..................................................... 32

163 Cong. Rec. H5483 (July 12, 2017) ............................................. 16, 42

*Anticompetitive Abuse of the Orphan Drug Act: Invitation to High Prices: Hearing on S. 2060 Before the Subcomm. on Antitrust, Monopolies, and Bus. Rights of the Comm. on the Judiciary*, 102nd Cong. 206 (1992)................................................. 8

*Orphan Drug Act: Hearing Before the Subcomm. on Health and the Env't of the H. Comm. on Energy and Com.*, 101st Cong. 151 (1990) ......................................................... 8

## Other Authorities

Antonin Scalia & Bryan A. Garner, *Reading Law*: *The Interpretation of Legal Texts* (2012) .................... 51

Congressional Research Service, *FDA Reauthorization Act of 2017* (Sept. 21, 2017) ........................... 16

*Collins English Dictionary* 1750 (12th ed. 2016)................................... 27

FDA, *Clinical Superiority Findings* (last visited Jan. 6, 2025) ....... 25, 26

16A Fletcher Cyclopedia of the Law of Corporations § 7976 (2024)......................................................................... 54

Memorandum of Disapproval for the Orphan Drug Amendments of 1990, 26 Weekly Comp. Pres. Doc. 1796 (Nov. 8, 1990) ..................... 6, 9, 31

Restatement (Second) of Torts § 402A (1963–1964)............................... 40

Stephan E. Lawton, *Controversy Under the Orphan Drug Act: Is Resolution on the Way?*, 46 Food Drug Cosm. L.J. 327, 341–43 (1991)............................................................... 56

United States Senate, *Legislative Drafting Manual* (1997) .................................................. 44

# GLOSSARY

FDA                          Food and Drug Administration

## INTRODUCTION

For decades, FDA has refused to accept that the Orphan Drug Act of 1983 means what it says. The statute says that when FDA first designates, and then approves, a drug as a treatment for a specified rare disease, FDA "may not approve" a follow-on application seeking to use the designated drug to treat the rare disease for seven years. 21 U.S.C. § 360cc(a). That moratorium, which "incentivizes investment" by allowing pioneering drugmakers to recoup their development costs, *Depomed, Inc. v. HHS*, 66 F. Supp. 3d 217, 221 (D.D.C. 2014), comes with only two exceptions. Once the moratorium is triggered, FDA loses its discretion to approve competing drug applications unless (i) the initial drugmaker consents or (ii) FDA concludes, after a hearing, that the designated drug is in shortage. *See* 21 U.S.C. § 360cc(b)(1)–(2).

In the late 1980s, controversy arose when the moratorium temporarily blocked a follow-on treatment that some thought might work better than the initial treatment. After failing to obtain a legislative fix, FDA created a regulatory loophole—a *de facto* third exception to the statutory moratorium. Specifically, FDA promulgated regulations allowing itself to approve a competing application despite the moratorium whenever the

agency determines, in its discretion and without a hearing, that the follow-on treatment would be "clinically superior" to the initial treatment. *See* 57 Fed. Reg. 62,076, 62085 (Dec. 29, 1992) (creating 21 C.F.R., Part 316).

That is what happened here. FDA designated the drug oxybate to treat narcolepsy, a rare sleep disorder. It then approved Jazz's application for an oxybate product, Xywav®, as a treatment for narcolepsy. The agency expressly recognized that this approval triggered the seven-year moratorium. But just three years later, FDA approved intervenor Avadel's follow-on application for a competing oxybate product, Lumryz™. That approval was based solely on the regulatory loophole: FDA opined that it could approve Lumryz despite the moratorium on the theory that, for some patients, Lumryz is clinically superior to Xywav. FDA reached that determination despite conceding that the higher "sodium content of Lumryz" raises a "safety concern … that is not present with Xywav." JA458.

Below, neither FDA nor the district court seriously disputed that the ordinary meaning of the words in 21 U.S.C. § 360cc(a) prohibited FDA from acting as it did. But the district court refused to follow that ordinary

meaning, instead finding that two words transformed the statute and authorized FDA to disregard the approval moratorium. In its view, Congress quietly ratified FDA's "clinical superiority" loophole in 2017 by replacing the adjective "such" with the adjectival phrase "the same." That is wrong, and FDA's unlawful approval order must be vacated.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction under 28 U.S.C. § 1331. It entered final judgment on October 30, 2024, *see* JA592, and Jazz timely appealed on November 15, 2024, *see* JA593–94. This Court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF ISSUES

Whether FDA violated 21 U.S.C. § 360cc(a)'s command that after approving a drug application that is entitled to exclusive approval, the agency "may not approve another application … for the same drug for the same disease or condition … until the expiration of seven years from the date of the approval of the approved application."

## PERTINENT STATUTES

Pertinent statutes are reproduced in the addendum.

## STATEMENT OF THE CASE

Congress made a promise to drugmakers like Jazz. To incentivize investment, the Orphan Drug Act offers seven years of marketing exclusivity to companies that pioneer new treatments for rare diseases—forbidding FDA to "approve another application … for the same drug for the same disease or condition" during that timeframe. Jazz answered Congress's call by developing Xywav, a groundbreaking product that uses the drug oxybate to treat narcolepsy, while dramatically reducing (by 92%) the elevated sodium burden of earlier oxybate treatments. FDA approved Xywav in 2020 and later recognized that Jazz was entitled to seven years of marketing exclusivity because Xywav's reduced sodium made it safer than, and therefore clinically superior to, prior oxybate treatments. This case concerns FDA's decision to approve Avadel's follow-on oxybate treatment for narcolepsy in 2023, less than halfway through Xywav's exclusivity period.

4

A.     **Legal background**

1.     **The Orphan Drug Act of 1983**

Starting in the late 1970s, Congress set out to spur investment in "orphan" drugs—treatments for rare diseases and conditions. *See Eagle Pharms., Inc. v. Azar,* 952 F.3d 323, 325 (D.C. Cir. 2020). Such drugs "historically received little attention from pharmaceutical companies, and hence became 'orphaned' because the comparatively small demand for treatment left little motive for research and development." *Spectrum Pharms., Inc. v. Burwell*, 824 F.3d 1062, 1064 (D.C. Cir. 2016). The Orphan Drug Act of 1983 aimed to change that by increasing drugmakers' incentives to invest in new treatments for rare diseases. Pub. L. No. 97-414, 96 Stat. 2049 (1983).

The statute did two main things. First, it authorized FDA to "designate" a given drug "as a drug for a rare disease or condition." 96 Stat. 2050, *codified as amended at* 21 U.S.C. § 360bb(a)(1). This "orphan-drug designation" carries tax benefits and other incentives for development. *Eagle Pharms.,* 952 F.3d at 325, 327. With respect to small-molecule drugs like oxybate, FDA has always used its authority at this stage of the

5

process to designate a class of drugs based on "active moiety rather than a particular formulation." *Id.* at 336.

Second, as originally enacted, the statute provided that once FDA approves "a drug designated … for a rare disease or condition," the agency "may not approve another application under section 355 of this title … for such drug for such disease or condition" for "seven years." 96 Stat. at 2051, *codified, as amended,* at 21 § U.S.C. § 360cc(a).

"Generally, before any drug can be sold or marketed in interstate commerce, FDA must certify the drug's safety and efficacy" under 21 U.S.C. § 355. *Eagle*, 952 F.3d at 325 (cleaned up). Thus, the practical effect of barring FDA from approving the "same drug for the same disease or condition" under section 355 is that no rival treatment can enter the market during the seven-year moratorium. This creates a time-limited exclusive market (or "orphan-drug exclusivity," in FDA-speak), which serves as "the Act's chief 'financial incentiv[e],'" *Depomed*, 66 F. Supp. 3d at 221, and has spurred the development of numerous treatments for rare diseases. *See* Memorandum of Disapproval for the Orphan Drug Amendments of 1990, 26 Weekly Comp. Pres. Doc. 1796, 1796–97 (Nov. 8, 1990) ("By any measure, the Orphan Drug Act has been a tremendous success"

6

due "in large measure to the existence of the 'market exclusivity' provision. … The certainty of this 7-year period is the basis of the economic incentive to attract drug firms to invest in orphan drugs."). Indeed, the incentive often creates a race to approval among firms developing competing treatments. When such races occur, the statute dictates that the first drug to successfully cross the finish line should block competing products for seven years.

The Act creates two express exceptions to this approval moratorium. *See* 21 U.S.C. § 360cc(b). The first addresses the risk that the exclusivity-holder will fail to adequately supply the market. *Id.* After "providing the holder of exclusive approval … notice and opportunity for the submission of views," FDA "may approve" a competing drug only if the agency "finds" that the exclusivity-holder "cannot ensure the availability of sufficient quantities of the drug to meet the needs of persons with the disease or condition for which the drug was designated." *Id.* § 360cc(b)(1). The second exception allows newcomers to negotiate with the exclusivity-holder. If that drugmaker "provides the Secretary in writing the consent of such holder for the approval of other applications or

the issuance of other licenses before the expiration of such seven-year period," then FDA may proceed. *Id.* § 360cc(b)(2).

## 2. FDA's 1992 regulation

For years, FDA implemented the statute according to its terms. In 1989, for instance, an aerosolized pentamidine product earned orphan-drug exclusivity running through 1996 for the treatment of *pneumocystis carinii* pneumonia, a side effect of HIV infection. *Orphan Drug Act: Hearing Before the Subcomm. on Health and the Env't of the H. Comm. on Energy and Com.*, 101st Cong. 151 (1990). Applying the statute's first-across-the-finish-line approach, FDA determined that it could not approve a competing aerosolized pentamidine product that some deemed superior. *Anticompetitive Abuse of the Orphan Drug Act: Invitation to High Prices: Hearing on S. 2060 Before the Subcomm. on Antitrust, Monopolies, and Bus. Rights of the Comm. on the Judiciary*, 102nd Cong. 206–07 (1992).

FDA's decision generated controversy, and Congress responded with the Orphan Drug Amendments of 1990, which would have amended 21 U.S.C. § 360cc(b) to include two new, express exceptions to the moratorium. H.R. 4638, 101st Cong. (1990). The first exception would have

8

ended the moratorium early if FDA determined that the rare disease was no longer rare. *Id.* § 2(b). The other would have allowed FDA to proceed with approval if it determined, after a hearing, that a competing drug was "developed simultaneously" with the drug that had triggered the moratorium. *Id.* § 3(a). President Bush pocket vetoed the legislation in November 1990, and it never became law. *See* Memorandum of Disapproval, 26 Weekly Comp. Pres. Doc. 1796.

Two months later—in *Chevron*'s heyday—FDA abandoned its efforts to pursue legislative change and instead proposed its first regulations interpreting the Orphan Drug Act. *See* 56 Fed. Reg. 3,338 (Jan. 29, 1991); *see generally Chevron U.S.A., Inc. v. Nat. Res. Def. Council*, 467 U.S. 837 (1984). In the proposal, FDA floated an idea found nowhere in the statute: that "a drug considered the 'same' drug" could "become a 'different' drug for these purposes by showing clinical superiority," and thus could be approved despite Congress's moratorium. 56 Fed. Reg. at 3,342. According to FDA, such a policy would "protect the integrity of the chief incentive for orphan drug development that Congress created while allowing clinically superior drugs with similar chemical structures to be marketed." *Id.* at 3,343. To that end, FDA proposed rules under which a

9

"subsequent drug" that "can be shown to be clinically superior to the first drug … will not be considered to be the same drug." *Id*. at 3,346.

FDA adopted that interpretation without material change in its final rule. 57 Fed. Reg. 62,076 (Dec. 29, 1992). Responding to a commenter who "argued that the concept of clinical superiority is [not] supported by the act," the agency claimed to have discovered a statutory gap. *Id*. at 62,078. In its telling, Congress had "provided no guidance on the meaning" of "such drug," so it was up to the agency to "define what is the 'same' and what is a 'different' drug." *Id. Contra Goldstein v. SEC*, 451 F.3d 873, 878 (D.C. Cir. 2006) (emphasizing that "[t]he lack of a statutory definition of a word does not necessarily render the meaning of a word ambiguous").

Brandishing *Chevron*, FDA then declared that "[c]linical superiority" was a "rational and permissible means of making th[at] distinction." 57 Fed. Reg. at 62,078. FDA never grappled with the ordinary meaning of "such" or considered whether "such drug" might refer to the only drug mentioned in section 360cc(a): the "drug designated." FDA did, however, admit that a clinical-superiority loophole augmented the agency's power, granting it new authority to disregard the moratorium by approving

10

treatments that would "not have been approvable prior to the promulgation of [its] rule." 57 Fed. Reg. at 62,076.

### 3.    The 2017 amendments

In 2017, Congress amended the Orphan Drug Act in response to litigation about "serial" exclusivity—a different legal issue from the one posed here.

**a.**    Questions about serial exclusivity arise when a drugmaker seeks exclusivity for a drug product that is chemically similar to another drug product that FDA previously approved. The 1992 regulations stated that such serial exclusivity requires proof that the new product is clinically superior to all predecessors.

This Court grappled with such questions in *Eagle Pharmaceuticals, Inc. v. Azar*, 952 F.3d 323 (D.C. Cir. 2020). There, FDA had approved an application for a small-molecule drug (bendamustine) to treat two forms of rare cancer in 2008, triggering a moratorium that lasted until 2015. At the end of 2015, another manufacturer obtained FDA's approval for a different bendamustine product and sought its own seven-year exclusivity period. The agency refused to recognize a further exclusivity because the

11

second manufacturer had not shown that its bendamustine product was clinically superior to the first. *See id.* at 328–29.

FDA's approach repeatedly failed in court. When a drugmaker challenged FDA's clinical superiority requirement for serial exclusivity, then-Judge Jackson rejected the agency's bid for *Chevron* deference and held that the statute was clear. She explained that the Orphan Drug Act "employs the familiar and readily diagrammable formula, 'if x and y, then z.'" *Depomed*, 66 F. Supp. 3d at 230. Namely: if "a drug … has been designated for a rare disease or condition" and FDA "approv[es] … a marketing application for that drug," then the Orphan Drug Act "*forb[ids]* the FDA from granting any further approvals." *Id.* at 230, 233. Thus, by the plain terms of the moratorium, FDA was bound to recognize exclusivity "without … imposing any additional conditions," such as the "clinical superiority" requirement invented in FDA's regulations. *Id.* at 237.

When FDA continued to apply its regulation despite that rebuke, further litigation ensued. Ultimately, this Court reached the same conclusion as Judge Jackson, holding that the Act left "no room for FDA to add an after-the-fact requirement." *Eagle Pharms.*, 952 F.3d at 340–41 (reviewing FDA determination made before 2017 amendments).

12

**b.**     Congress responded to these disputes with new and measured legislation. In 2017, it passed the FDA Reauthorization Act of 2017, Pub. L. No. 115-52, § 607, 131 Stat. 1005, 1049 (2017), which amended the Orphan Drug Act in several ways. *See* Addendum B.

**i.**     To address serial exclusivity, Congress enacted a new subsection (c). That provision adds a further condition to the "if x and y, then z" formulation that Judge Jackson described. Now, if a proposed drug "is otherwise the same, as determined by the Secretary, as an already approved or licensed drug," then exclusivity no longer automatically follows designation and approval. Instead, "the Secretary shall require such sponsor, as a condition of such exclusive approval or licensure, to demonstrate that such drug is clinically superior to any already approved or licensed drug that is the same drug." 21 U.S.C. § 360cc(c)(1).

FDA has recognized that subsection (c) "does not address" the question raised here: "whether a subsequent drug's approval is blocked by another drug's [orphan-drug exclusivity]." *See* JA433; Tr. of Oral Arg., ECF No. 83, at 41 ("We just view (c) as addressing the separate question of when an applicant can obtain their own period of orphan drug exclusivity, which is different from the question addressed by the 'same drug'

13

language in (a), which is when an applicant may obtain approval not-withstanding someone else's [exclusivity]"); FDA MSJ, ECF No. 58, at 21.

    **ii.**    The 2017 statute also amended the Act in four other ways.

First, Congress addressed FDA's rulemaking authority. Both this Court and Judge Jackson had noted that FDA lacked rulemaking author-ity with respect to section 360cc. *See Eagle Pharms.*, 952 F.3d at 334 n.14; *Depomed*, 66 F. Supp. 3d at 222. Congress responded by enacting a new subsection (d) authorizing FDA to write regulations "for the implementa-tion of *subsection (c)*." 21 U.S.C. § 360cc(d) (emphasis added). The statute contains no parallel grant of authority to issue regulations interpreting subsection (a) (the moratorium) or subsection (b) (the exceptions thereto). Congress further authorized FDA to use its preexisting regulations until it writes new rules under subsection (d) (which it still has not done)— subject to two express limitations. First, FDA may only use the "*defini-tions* set forth in" its prior regulations. *Id.* (emphasis added). Second, FDA may use those definitions only "to the extent such definitions are not inconsistent with the terms" of the amended statute. *Id.*

Second, the 2017 amendments also added a new subsection (e). De-signed "[t]o assist sponsors in demonstrating clinical superiority as

14

described in subsection (c)," subsection (e) requires FDA, following designation of an orphan drug, to provide written notice to the drug sponsor of "the basis for the designation, including, as applicable, any plausible hypothesis offered by the sponsor and relied upon by [FDA] that the drug is clinically superior to a previously approved drug," and, following the grant of serial exclusivity to a follow-on designated drug, to "publish a summary of the clinical superiority findings." 21 U.S.C. § 360cc(e).

Third, Congress revised the exceptions provision, subsection (b), in several ways. For instance, it replaced the phrase "the holder of the approved application" with "the holder of the exclusive approval or licensure." § 607(a)(2)(B), 131 Stat. at 1049. Congress also struck "*such* holder provides" and inserted "*the* holder provides." § 607(a)(2)(C), 131 Stat. at 1049 (emphases added).

Finally, Congress amended the moratorium provision, subsection (a), in a modest way. *See* Addendum B. It struck the word "such" that FDA had deemed ambiguous and replaced it with the phrase "the same." Thus, "*such* drug for *such* disease or condition," became "*the same* drug for *the same* disease or condition." § 607(a)(1), 131 Stat. at 1049 (emphases added). A congressional agency summarizing the 2017 amendments

assigned no meaning to this change. *See* Congressional Research Service, *FDA Reauthorization Act of 2017* (Sept. 21, 2017), bit.ly/CRS_Analysis.

Little legislative history accompanied these amendments. No legislative history explains, for instance, why Congress replaced "such" with "the" in subsection (b) or why it replaced "such" with "the same" in subsection (a). In fact, the only legislative history identified by anyone below is a floor statement that appears to explain that subsection (c) was meant to "limit the number of drugs that are automatically entitled to seven years of exclusivity, while maintaining incentives for the development of innovative treatments for rare diseases." 163 Cong. Rec. H5483 (July 12, 2017) (statement of Rep. Walters).

## B.    Factual background

### 1.    In 2020, Jazz won approval for a new narcolepsy treatment, triggering a seven-year approval moratorium.

Jazz has spent years developing treatments for narcolepsy: a rare, chronic, and debilitating sleep condition. People with narcolepsy often experience excessive daytime sleepiness, JA513, and cataplexy, a sudden loss of muscle tone while awake, which leads to a loss of voluntary muscle

control, JA514. While narcolepsy has no known cure, JA525, a drug called oxybate has been shown to effectively treat these symptoms. JA526.

At the request of Jazz's predecessor, FDA designated oxybate under 21 U.S.C. § 360bb as a treatment for narcolepsy. *See* JA548. Then, in 2020, it approved Jazz's oxybate product Xywav to treat narcolepsy. *See* JA548–49. Soon thereafter, FDA recognized that Xywav was entitled to a serial exclusivity under 21 U.S.C. § 360bb(c) based on clinical superiority. Specifically, FDA found that Xywav was safer than any other oxybate treatment because it contains 92% less sodium than existing products, *see* JA442, an improvement "very likely to be clinically meaningful in all patients with narcolepsy," JA484. That finding triggered the statutory moratorium. As a result, FDA "may not approve … the same drug for the same disease or condition" until 2027. 21 U.S.C. § 360cc(a).

## 2. In 2023, FDA approved a competing narcolepsy treatment, despite the moratorium.

Less than halfway through the moratorium, FDA approved Avadel's application for Lumryz, a follow-on oxybate product that also is intended to treat narcolepsy. JA551. In approving Lumryz, FDA acknowledged that both Xywav and Lumryz contain the designated

17

drug—oxybate. JA428–29. FDA further conceded that both Xywav and Lumryz were approved to treat narcolepsy. *Id.*

The agency nonetheless reasoned that the moratorium did not bar it from approving Lumryz. In doing so, FDA did not invoke either of the statutory "[e]xceptions," 21 U.S.C. § 360cc(b). Instead, the agency relied on the clinical-superiority loophole in its 1992 regulation. JA433. Applying that loophole here, FDA deemed Lumryz "clinically superior" to Xywav—and hence not "the same drug" as Xywav. That was so (reasoned FDA) because Lumryz is taken only once at bedtime, whereas Xywav is approved for twice-per-night dosing in narcolepsy patients, with one dose taken at bedtime and a second dose taken during the night. FDA reached that conclusion even though it conceded that Lumryz is less safe than Xywav because Lumryz exposes patients to the same elevated sodium burden as older oxybate treatments. *See* JA443.

## C.   Procedural history

Jazz challenged FDA's order under the Administrative Procedure Act. Relevant here, it argued that the plain language of the Orphan Drug Act forbade FDA to approve follow-on drugs (like Lumryz) that use oxybate to treat narcolepsy. As for FDA's clinical-superiority argument,

18

Jazz explained that the agency may not invent an atextual loophole, beyond the two statutory exceptions that Congress itself enacted.

The district court rejected Jazz's challenge. It concluded that when Congress changed "such" to "the same" in subsection (a), it must have "meant to ratify and incorporate the FDA's existing definition of 'same drug'"—and with it the agency's clinical-superiority loophole. JA558. (It did not address the subsection (b) amendment that changed "such" to "the.") Along the way, the court conceded that "reading [FDA's] definition of 'same drug' into each location that the term appears in § 360cc would arguably create a hash of [the statute]." JA564 (quotation marks omitted). It reasoned, however, that "context matters" and therefore accepted that "same drug" could have one meaning in subsection (a) and a different one in subsection (c). According to the district court, "[t]he reference to 'same drug' at the end of subsection (c)(1) thus refers to the approved drug, without regard to 'clinical superiority,'" JA564–65, whereas the phrase "same drug" *does* incorporate clinical superiority in subsection (a). JA555–58. The district court deemed this reading, whereby "same drug" sometimes incorporates the concept of clinical superiority and sometimes does not, to be "straightforward." JA565.

19

## SUMMARY OF ARGUMENT

**I.** FDA's order approving Lumryz violated the Orphan Drug Act.

**A.** The Orphan Drug Act barred FDA from approving Lumryz until the statutory moratorium expired. When FDA "designate[s]" a drug to treat a "rare disease or condition" and then "approves an application" for the designated drug, the agency "may not approve another application … for the same drug for the same disease or condition" for "seven years." 21 U.S.C. § 360cc(a). In context, the phrase "the same drug" plainly refers to the only "drug" mentioned in subsection (a): the "drug designated under section 360bb." 21 U.S.C. § 360cc(a) (When FDA "approves an application … for a *drug designated* under section 360bb of this title for a rare disease or condition, [FDA] may not approve another application … for *the same drug* for the same disease or condition …." (emphases added)).

Here, FDA designated the drug oxybate to treat the rare condition narcolepsy and then approved the application for Jazz's oxybate product Xywav. As FDA acknowledged, the Xywav approval triggered the Act's moratorium—barring FDA from approving "the same drug for the same disease or condition" for the next seven years. Yet FDA then approved an application for Lumryz, which uses "the same drug" FDA designated

20

under section 21 U.S.C. § 360bb (oxybate) to treat the "same disease or condition" (narcolepsy). That is exactly what the statute on its face prohibits.

**B.**    The district court concluded that Congress in 2017 ratified FDA's preexisting regulatory view (that the moratorium does not block approval of clinically superior drugs) when it replaced the adjective "such" with the adjectival phrase "the same." That theory is wrong, and the Court should reject it.

**1.**    For one thing, that small change bears none of the usual hallmarks of ratification. Congress did not expressly incorporate FDA's regulation. No legislative history suggests that Congress meant to ratify the agency's loophole. And "the same" is an everyday phrase—not the kind of unusual phrase that shows Congress was drawing on an extrinsic source.

**2.**    FDA's theory is also inconsistent with the statutory text.

First, there is no force to the district court's presumption that Congress must have meant to ratify FDA's clinical-superiority policy wholesale. That ignores both Congress's historical practice of sometimes adopting agency policy only in part, and the specific evidence that Congress specifically did so in other parts of the 2017 amendments.

21

Second, FDA's ratification theory also conflicts with first principles of statutory interpretation. It requires believing that Congress *implicitly* ratified the regulatory meaning of "same drug" in subsection (a)—then turned around and used a different understanding of "the same" when it *expressly* addressed clinical superiority in subsection (c). That violates the presumption of consistent usage, and it also renders part of subsection (a) superfluous, violating the canon against surplusage.

Finally, FDA's theory requires accepting that by changing "such" to "the same," Congress authorized FDA to disregard the moratorium based on "clinical superiority," without moving through the mandatory due-process procedures that apply when FDA finds a shortage under section 360cc(b)(1). *But see Whitman v. Am. Trucking Ass'ns, Inc.*, 531 U.S. 457, 468 (2001) ("Congress, we have held, does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions—it does not, one might say, hide elephants in mouseholes.").

None of that is sound. The right way to read subsection (a) is to follow the ordinary meaning of its words. And under an ordinary-language construction, FDA had no authority to approve a second oxybate treatment for the same disease during the seven-year moratorium.

22

**C.**     The district court's alternative reading of subsection (c) is also wrong. After embracing FDA's ratification theory, the district court "wish[ed] to express" a "better way" to "reach the same result"—by reading subsection (c) to provide the same moratorium-breaking authority that the district court had just located in subsection (a). This was a theory "[n]either the FDA nor Avadel has advanced," and that FDA had affirmatively rejected, both in its administrative decision and in litigation. JA567–69. And for good reason. Subsection (c) has a narrow remit. It *limits* when a serial exclusivity will be granted by requiring sponsors to demonstrate clinical superiority as a precondition to earning such exclusivity. What subsection (c) does not do is describe the scope or effect of exclusivity once earned. As the statute's text makes clear, that is the domain of subsections (a) and (b) alone.

**II.**     FDA's error warrants vacatur. Vacatur is the normal remedy under the Administrative Procedure Act, and nothing warrants a different outcome here. Because the agency lacks statutory authority to approve Lumryz until the moratorium expires, FDA's approval order is *ultra vires*, and the agency would have no discretion to reinstate it on

remand. This case thus falls squarely within the general rule that vacatur is the proper remedy for unlawful agency action.

## STANDING

Jazz has standing to challenge FDA's order approving Lumryz because that order denied Jazz the proper scope and effect of a statutorily conferred "exclusive approval." That subjected Jazz to competitive injury and lost profits. "Economic harm to a business clearly constitutes an injury-in-fact," *Carpenters Indus. Council v. Zinke*, 854 F.3d 1, 5 (D.C. Cir. 2017), as does the deprivation of a valuable statutory right, *see Jeffries v. Volume Servs. Am., Inc.*, 928 F.3d 1059, 1063–67 (D.C. Cir. 2019). A decision vacating the approval order would provide partial redress for Jazz's injury.

## STANDARD OF REVIEW

This Court "shall hold unlawful and set aside agency action" that is "not in accordance with law," or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A), (C). In doing so, the Court must exercise its "independent judgment" to find "the best reading of the statute." *Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244, 2266 (2024).

24

# ARGUMENT

## I.  FDA lacked statutory authority to approve Lumryz.

### A.  The Orphan Drug Act barred FDA from approving Lumryz during the seven-year moratorium.

Congress spoke clearly. A medicine like Xywav triggers the approval moratorium whenever (i) FDA has "designated" a drug "for a rare disease or condition" under 21 U.S.C. § 360bb; (ii) FDA has approved a new drug application "for" that drug; and (iii) the drugmaker shows that its proposed treatment "is clinically superior to any already approved … drug that is the same drug." 21 U.S.C. § 360cc(a), (c)(1). When those three conditions are met, FDA "may not approve another application … for the same drug for the same disease or condition" until seven years have elapsed. *Id.* § 360cc(a).

Here, FDA designated the drug oxybate to treat the rare disease narcolepsy and then, in 2020, approved a new drug application for Jazz's oxybate product Xywav. FDA also recognized that Xywav was safer than (and thus clinically superior to) all prior oxybate treatments. JA442; JA480; JA496–97; JA502; FDA, *Clinical Superiority Findings*, bit.ly/4fOYhrk (last visited Jan. 6, 2025). By the statute's plain terms, then, FDA is forbidden to approve Avadel's competing oxybate product as

25

a treatment for narcolepsy until Jazz's exclusivity has expired, unless one of the exceptions listed in subsection (b) applies. FDA did not rely on those exceptions (which are plainly inapplicable) and instead relied on the "clinical superiority" loophole found in its 1992 regulation. In doing so, the agency violated the Orphan Drug Act.

> **1.    During the moratorium, FDA may not approve a follow-on application to treat the same condition using the designated drug.**

When FDA "approves an application … *for a drug designated* under section 360bb of this title for a rare disease or condition," the agency "may not approve another application" that is "*for the same drug* for the same disease or condition" for seven years. 21 U.S.C. § 360cc(a) (emphases added). This case turns on whether Avadel's application for Lumryz counts as "another application … for the same drug for the same disease or condition." *Id*. If so, the statute barred FDA from approving Lumryz until the moratorium expired.

The key statutory language is "for the same drug." While "same" can have a range of meanings in different contexts, here it clearly means "the one previously referred to; aforesaid." *Collins English Dictionary* 1750 (12th ed. 2016). In other words, "for the same drug" calls back to the

26

only other "drug" mentioned in subsection (a)—the "drug designated" by FDA as a treatment for a rare disease.

Context confirms this. The Eleventh Circuit correctly construed the immediately following phrase ("for the same disease or condition") to also refer back to an antecedent in subsection (a). Specifically, it held that "same" in that phrase "is being used in the sense of 'being the one under discussion or already referred to,'" and thus refers back to "[t]he only 'disease or condition' already referred to in § 360cc(a)": the "'rare disease or condition' for which the drug was designated under § 360bb." *Catalyst Pharms., Inc. v. Becerra*, 14 F.4th 1299, 1308 (11th Cir. 2021). This Court should give a parallel reading to the phrase "for the same drug." In short, "the same" refers back to the only drug "already referred to in § 360cc(a)," *id.*—the "drug designated under section 360bb," 21 U.S.C. § 360cc(a).

### 2.   Avadel's follow-on application treats the same condition using the designated drug.

When FDA approved Xywav, the moratorium forbade the agency to approve follow-on applications for seven years. At the request of Jazz's predecessor, FDA designated "oxybate" as a treatment for "narcolepsy." JA440. Then, in 2020, FDA "approved an application" (Jazz's application

for Xywav) "for a drug designated" (oxybate) "for a rare disease or condition" (narcolepsy). 21 U.S.C. § 360cc(a). Finally, it recognized that Xywav was clinically superior to Jazz's first-generation drug Xyrem and thus entitled to serial exclusivity. *See* JA442. That triggered subsection (a)'s moratorium. As a result, the agency "may not approve another application for the same drug" (oxybate) "for the same disease or condition" (narcolepsy) for "seven years" (until 2027). *Id.*

But that's exactly what the agency did. At the request of Avadel, FDA again designated "oxybate" as a treatment for "narcolepsy." JA203. Then, in 2023, FDA approved Avadel's application for Lumryz, which contains "oxybate" and is intended to treat "narcolepsy." JA433, JA471. That was unlawful.

> ### 3. By its plain terms, the moratorium includes no loophole for "clinically superior" treatments.

**a.** Nothing on the face of the statute creates a clinical-superiority exception to the approval moratorium. Start with the obvious: the words "clinical superiority" appear nowhere in subsection (a), which defines the moratorium, or in subsection (b), which enumerates the

exceptions to it. Read most naturally, the statute does not authorize FDA to approve "clinically superior" drugs despite the moratorium.

That conclusion is buttressed by Congress's use of the "mandatory language" *may not*. *United States v. Palomar-Santiago*, 593 U.S. 321, 326 (2021). Such language "indicates a command that admits of no discretion on the part of the person instructed to carry out the directive." *Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 661 (2007).

Moreover, Congress qualified that "may not" command with the phrase "[e]xcept as provided in subsection (b)." That means Congress considered the need "to make an exception," *Cook v. FDA*, 733 F.3d 1, 8 (D.C. Cir. 2013), and determined that only two were necessary. Where Congress provides for a general rule, but "enumerate[s] two—and only two—conditions in which" the general rule does not apply, that gives rise to a "strong negative inference" that the enumerated exceptions are exclusive. *Jones v. Hendrix*, 599 U.S. 465, 477–78 (2023); *Republic of Argentina v. NML Capital, Ltd.*, 573 U.S. 134, 142–46 (2014); *see also Hallstrom v. Tillamook County*, 493 U.S. 20, 27 (1989) ("[W]e are not at liberty to create an exception where Congress has declined to do so.").

29

Congress "easily could have written," *Ali v. Fed. Bureau of Prisons*, 552 U.S. 214, 227 (2008), a statute giving FDA discretionary authority to disregard the moratorium and approve treatments it deems clinically superior. But it did not, despite numerous opportunities. *See infra* § I.A.3.d.

**b.** Although not part of subsections (a) or (b), clinical superiority is explicitly part of subsections (c) and (e). Those provisions address clinical superiority in the context of serial exclusivity—without qualifying the moratorium imposed by subsection (a). And subsection (d) says that FDA may (temporarily) continue to use its preexisting regulatory definitions, but only "for the implementation of subsection (c)," not subsection (a). All of this suggests that Congress intentionally limited the concept of clinical superiority to the serial exclusivity question and chose not to enact a clinical-superiority loophole to the approval moratorium. *See Russello v. United States*, 464 U.S. 16, 23 (1983). Because "Congress has shown elsewhere in the same statute that it knows how to make [clinical-superiority provisions] manifest," the Court should "not lightly assume that Congress has omitted from its adopted text requirements that it nonetheless intends to apply." *Jama v. ICE*, 543 U.S. 335, 341 (2005).

**c.** Subsection (b) also shows that Congress protects drugmakers with due-process procedures when it authorizes FDA to disregard the moratorium on the basis of an agency factual finding. Specifically, subsection (b)(1) allows FDA to break through the moratorium if the agency "finds" that the exclusivity holder "cannot ensure the availability of sufficient quantities of the drug to meet the needs of persons with the disease or condition for which the drug was designated." 21 U.S.C. § 360cc(b)(1). But FDA can only make that finding "after providing the holder of exclusive approval … notice and opportunity for the submission of views." *Id*; *see also* 21 C.F.R. § 316.36 (implementing requirement). Those due-process protections have been part of the Act since 1983. *See* 96 Stat. at 2051. Had Congress wanted to add a further exception, it very likely would have addressed the attendant procedural safeguards expressly, just as it has in subsection (b).

**d.** Time and again, the political branches have considered, but rejected, proposals to create additional exceptions to orphan-drug exclusivity. One example is the pocket-vetoed 1990 bill discussed above. *See* Memorandum of Disapproval, 26 Weekly Comp. Pres. Doc. 1796; *see also supra* Statement of the Case § A.2. But other examples abound. In 1991

31

and 1992, a trio of bills was introduced to create a third exception that would have cut the moratorium short when domestic sales of the protected drug exceeded certain thresholds. *See* H.R. 3930, 102nd Cong. (1991); S. 2060, 102nd Cong. (1992); H.R. 4959, 102nd Cong. (1992); S. Rep. No. 102-358 (1992). None progressed to a vote.

In 1994, another trio of bills was introduced. These proposals would have shortened the moratorium to four years, while giving FDA discretion to extend it, and also added an express exception for competing drugs that were simultaneously developed—the same exception that had been pocket vetoed in 1990. *See* H.R. 4160, 103rd Cong. (1994), S. 1981, 103rd Cong. (1994); H.R. 4865, 103rd Cong. (1994); H.R. Rep. No. 103-476, at 4–5 (1994). Again, none progressed to a vote.

In 2000 and 2001, bills were introduced that would have expressly provided for a clinical-superiority exception to the moratorium. *See* H.R. 4242, 106th Cong. (2000); H.R. 386, 107th Cong. (2001). Both would have amended subsection (a) to state that the moratorium applied "[e]xcept as provided in subsections (b) *and (c)*." *Id.* (emphasis added) They then added a new exception in a new subsection (c) addressing how "the seven-year period of prohibition against approval described in subsection (a)"

32

would apply to clinically superior drugs. *Id.* Neither of these bills progressed to a vote either.

Finally, in 2013, bills were introduced to create a new form of exclusivity that would apply in lieu of orphan-drug exclusivity for so-called "dormant therapy." *See* H.R. 3091, 113th Cong. (2013); H.R. 3116, 113th Cong. (2013). These bills provided that, once FDA approved a drug designated as a dormant therapy, FDA could not approve a follow-on application for the same active moiety for 15 years. But the bills contained an express exception that would have allowed FDA to approve follow-on applications during that period if "clinical testing establishes clinical superiority … in one or more of the following ways: (i) Greater effectiveness on a clinically meaningful endpoint[;] (ii) Greater safety in a substantial portion of the target populations[;] or (iii) Where neither greater safety nor greater effectiveness has been shown, a demonstration that the drug otherwise makes a major contribution to patient care."

These failed legislative proposals show two things. First, creating exceptions to orphan-drug exclusivity is a contentious undertaking, one that "Congress [has] considered and rejected" a number of times over the years. *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 144

(2000). And second, because the exceptions to exclusive approval go to "the heart" of the statute, it is "highly unlikely" that Congress would have either left it up to agency discretion to develop further exceptions to exclusivity or added one "through such a subtle device" as implied ratification. *MCI Telecomms. Corp. v. AT&T Co.*, 512 U.S. 218, 229–31 (1994); *see also West Virginia v. EPA*, 597 U.S. 697, 731 (2022) (explaining that an agency's failure "to secure from Congress an express grant of [the challenged] authority" is evidence that no such authority exists (quoting *FTC v. Bunte Bros.*, 312 U.S. 349, 352 (1941))).

**B.    Congress did not create a hidden loophole when it changed "such" to "the same."**

Against all that, FDA cites a single line from the 2017 amendments. In its view, Congress authorized the agency to approve clinically superior treatments despite the moratorium by enacting the following sentence: "21 U.S.C. 360cc[] is amended … in subsection (a) … by striking '*such* drug for *such* disease or condition' and inserting '*the same* drug for *the same* disease or condition' …." § 607(a)(1), 131 Stat. at 1049 (emphases added); *see* Addendum B. According to FDA, that Congress replaced the adjective "such" with the adjectival phrase "the same" shows that it

34

intended to ratify FDA's preexisting regulatory framework, including the clinical-superiority loophole that FDA invented in its 1992 regulation.

FDA is wrong. For one thing, the sentence just quoted bears none of the typical hallmarks of legislative ratification. It does not expressly incorporate FDA's regulations, the legislative history provides no evidence of intent to ratify, and "the same drug" is not the kind of unusual phrasing that creates a strong inference that Congress must have been borrowing from another source of law.

FDA's ratification theory also runs aground on the statutory text. The district court assumed that Congress ratified FDA's approach across the board, but two provisions of the 2017 amendments show that Congress was slicing more finely. Instead of ratifying wholesale, it adopted some aspects of the agency's practice (like FDA's approach to serial exclusivity) while rejecting others (like FDA's regulatory phrase "use or indication"), and modifying still others (allowing FDA to use its prior regulations only in part, and only temporarily). Still more, FDA's reading would violate the presumption of consistent usage—making a mess of the 2017 amendments—and create surplusage. And it also gives rise to constitutional concerns by suggesting that Congress empowered FDA to

35

diminish property rights without providing notice of the agency's proposed factual findings and an opportunity to be heard with respect to those proposed findings. These problems are all the more reason to adopt an ordinary-language reading.

### 1. Subsection (a) lacks the hallmarks of legislative ratification.

#### a. Courts infer legislative ratification only under narrow circumstances.

Courts do not assume that Congress ratified an agency's approach whenever it legislates in an area where the agency has already expressed views. Instead, courts generally require the proponents of ratification to show express incorporation, decisive legislative history, or compelling linguistic evidence.

***Express incorporation.*** Express incorporation is the best evidence that Congress ratified an agency's views. The rare-pediatric-disease priority-review statute, which adopts FDA's regulatory definition of the term "active moiety," is a good example of how Congress writes when it intends to incorporate a preexisting regulation. Like the Orphan Drug Act, the rare-pediatric-disease priority-review statute creates special incentives to spur innovation for the treatment of rare disease. *See* 21

36

U.S.C. § 360ff(a)(3). In defining the drug applications eligible for this in-
centive, the statute uses unmistakable language to ratify FDA's defini-
tion of "active moiety." It states that "active moiety" shall carry the mean-
ing "defined by the Secretary in section 314.3 of title 21, Code of Federal
Regulations (or any successor regulations)." 21 U.S.C. § 360ff(a)(4)(B).

Congress has likewise expressly ratified FDA regulations in a num-
ber of other settings. *See, e.g.*, 21 U.S.C. § 353a(b)(1)(A) ("bulk drug sub-
stances, as defined in regulations of the Secretary published at section
207.3(a)(4) of title 21 of the Code of Federal Regulations"); 21 U.S.C.
§ 355(c)(3)(E)(ii) ("active moiety (as defined by the Secretary in section
314.3 of title 21, Code of Federal Regulations (or any successor regula-
tions))"); 21 U.S.C. § 360n(a)(4)(C)(i) (similar); 21 U.S.C. § 355(o)(4)(I)
("in accordance with existing requirements, including subpart B of part
201 and sections 314.70 and 601.12 of title 21, Code of Federal Regula-
tions (or any successor regulations)."). Had Congress meant to "ratify and
incorporate the FDA's existing definition of 'same drug' in § 360cc(a)," as
the district court concluded, JA558, it "easily could have" followed that
well-worn path, *Ali*, 552 U.S. at 227.

37

***Legislative history.*** Short of express incorporation, courts have sometimes inferred ratification from "legislative history and other related aids to ascertaining congressional intent." *United States v. Bd. of Comm'rs*, 435 U.S. 110, 129 (1978). *Board of Commissioners* illustrates that approach. The question there was whether section 5 of the Voting Rights Act required a city that had "never conducted voter registration" to seek federal preclearance. *Id.* at 113. The Court held that it did, deeming the "legislative background of the 1975 re-enactment … conclusive of the question." *Id.* at 134. In particular, the Court observed that "the Attorney General's longstanding construction" that section 5 "require[d] *all* political units in designated jurisdictions to preclear proposed voting changes" was "reported to Congress … in connection with the 1975 extension of the Act." *Id.* at 131–32 (emphasis added). "Both the House and Senate Hearings on the bill reflect[ed] that th[is] assumption … was widely shared and unchallenged"—suggesting that Congress "agreed with" and "ratified" the Attorney General's views. *Id.* at 134–36.

In these and other circumstances, courts look for strong, affirmative evidence of congressional intent and do not infer ratification from inconclusive legislative materials. *Compare New York v. EPA*, 413 F.3d 3, 19

38

(D.C. Cir. 2005) (rejecting reliance on unilluminating committee report) *with Wash. All. of Tech. Workers v. Dep't of Homeland Sec.*, 50 F.4th 164, 181 (D.C. Cir. 2022) (relying on Senate Report that arose from a canonical "two-year study" by the Senate Judiciary Committee and became the "genesis" of the modern Immigration and Naturalization Act); *see also Bragdon v. Abbott,* 524 U.S. 624, 645 (1998) ("All indications [in the legislative record] are that Congress was well aware of the position taken by OLC when enacting the ADA and intended to give that position its active endorsement.").

***Linguistic evidence.*** Courts have also inferred ratification when Congress enacts verbatim a unique phrase that it would not likely have used unless it was borrowing from a regulation. Take *George v. McDonough*, 596 U.S. 740, 746 (2022). There the Supreme Court deemed it "obvious" that Congress had "transplanted" an "unusual" phrase— "clear and unmistakable error"—that "appear[ed] nowhere else in the entire United States Code" yet "had a long regulatory history," "dating back to 1928." *Id.*; *see also Hikvision USA, Inc. v. FCC*, 97 F.4th 938, 946 (D.C. Cir. 2024) (finding ratification where Congress expressly ordered FCC to

create a "Covered List" in earlier legislation, then referenced the Covered

List in a later act).

By contrast, courts decline to infer ratification based on ubiquitous

language or incomplete overlap. Take *Bruesewitz v. Wyeth LLC*, 562 U.S.

223, 233–35 (2011). There the Court rejected an argument that "the word

'unavoidable' in [42 U.S.C. § 300aa-22(b)(1)] is a term of art that incorpo-

rates comment *k* to Restatement (Second) of Torts § 402A (1963–1964),"

since "'[u]navoidable' is hardly a rarely used word" and the Restatement

used "unavoidably" rather than "unavoidable." Or consider *CSX Corp. v.*

*United States*, 18 F.4th 672, 681 (11th Cir. 2021) (Pryor, C.J.), where the

Eleventh Circuit rejected the government's argument that the statutory

language at issue was "obvious[ly] … transplanted":

| Statute: | "[A]n amount paid specifically—either as an advance, as reimbursement or *allowance*—for traveling or other bona fide and necessary expenses incurred or reasonably expected to be incurred in the business of the employer …." |
|---|---|
| Regulation: | "[A]mounts paid specifically—either as advances or reimbursements—for traveling or other bona fide *ordinary* and necessary expenses incurred or reasonably expected to be incurred in the business of the employer." |

40

*Id.* 679, 681 (first emphasis added). Despite the overlap, the court reasoned that the words "allowance" (found only in the statute) and "ordinary" (found only in the regulation), cut against ratification. *Id.* at 681.

### b.  Ratification is not a plausible inference here.

Subsection (a) bears none of those hallmarks. Congress didn't mention the portion of FDA's 1992 regulation at issue here. Nothing in the legislative history explains why Congress replaced "such drug" with "the same drug." And that small switch, from one ordinary English phrase to another, isn't the kind of linguistic evidence from which courts have inferred ratification.

***Express incorporation.*** Subsection (a) doesn't expressly incorporate FDA's 1992 regulation. That's especially telling given how often Congress *does* expressly incorporate FDA regulations. *E.g.*, 21 U.S.C. § 355(c)(3)(E)(ii) (adopting the definition of "active moiety" from 21 C.F.R. § 314.3). "Congress's failure to use such an express incorporation of prior regulations … cuts against any suggestion that Congress intended to incorporate into the Act the preexisting regulatory definition." *Env't Def. v. Duke Energy Corp.*, 549 U.S. 561, 576 (2007) (cleaned up).

41

The district court criticized Jazz's reliance on *Duke Energy*, stating that the rule is more appropriately described in this Court's *New York* decision. JA559. *New York*, however, says exactly the same thing as *Duke Energy* (which actually borrowed the language from *New York*). *See New York*, 413 F.3d at 19 ("Elsewhere in the Act, moreover, Congress did incorporate regulatory provisions expressly by reference. Congress's failure to use such an express incorporation of prior regulations for 'modification' cuts against the proposed inference."). There is no daylight between the Supreme Court and this Court on this point. The district court was wrong to suggest otherwise.

***Legislative history.*** As to legislative history, judges who consult that source will find no evidence that Congress had FDA's clinical-superiority loophole in mind when replacing "such drug for such disease or condition" with "the same drug for the same disease or condition." 131 Stat. at 1049. The only pertinent legislative history appears to be a floor statement apparently discussing the serial exclusivity issue addressed in subsection (c). 163 Cong. Rec. H5483 (July 12, 2017) (statement of Rep. Walters). Even if that statement were attributed to Congress as a whole,

it does not discuss the "such" for "the same" swap or suggest that Congress intended to ratify FDA's approach.

*Linguistic evidence.* Finally, this case is unlike *McDonough*, where the Court inferred that an "unusual" phrase taken "verbatim" from a regulation was "obviously transplanted." 596 U.S. at 746.

i.    "The same" is too ubiquitous a phrase to support FDA's ratification theory. Congress has enacted "the same" countless times throughout the Public Laws. It has also repeatedly used the phrase "the same drug." *E.g.*, 21 U.S.C. § 355(*o*)(4)(A) ("the same drug approved under subsection (b)"); *id.* § 360ccc(a)(3)(A)(ii) ("the same drug in the same dosage form"); 42 U.S.C. § 256b(d)(3)(B)(vi) ("overcharges by the same manufacturer for the same drug"). That makes this case closer to *Bruesewitz*, where the Supreme Court rejected a ratification argument based on "unavoidable," which it observed (with some understatement) is "hardly a rarely used word," 562 U.S. at 235.

That is particularly true because Congress has made this very linguistic switch—subbing in "the same" for "such"—in other statutes. *E.g.*, Bankruptcy Amendments and Federal Judgeship Act of 1984, Pub. L. No. 98-353, § 522, 98 Stat. 333, 388 ("Section 1171(b) of title 11 of the United

43

States Code is amended by striking out 'such' and inserting in lieu thereof 'the same'."); Medicare Catastrophic Coverage Act of 1988, Pub. L. No. 100-360, § 411(e)(3), 102 Stat. 683, 775 (amending 42 U.S.C. § 1320c-3(d) "by striking 'at such time' … and inserting 'on the same date ….'"). That squares with the guidance now given to congressional staffers, who are told "[d]o not use 'such' if 'the' or 'that' works equally well." *See* United States Senate, *Legislative Drafting Manual* § 324 (1997).

In fact, the 2017 amendments at issue here made similar changes to neighboring provisions of the Orphan Drug Act. In subsection (a), Congress replaced "*such* disease or condition" with "*the same* disease or condition." § 607(a)(2), 131 Stat. at 1049 (revising 21 U.S.C. § 360cc(a)) (emphases added). And in subsection (b), it replaced "*such holder* provides" with "*the holder* provides." *Id.* (revising 21 U.S.C. § 360cc(b)(2) (emphases added)). No one suggests those parallel changes were intended to do anything more than clarify the modified phrases.

**ii.**     The differences between FDA's regulation and the 2017 statute also make this case more like *Bruesewitz* and *CSX Corp.* than *McDonough*. When Congress amended subsection (a), it didn't pluck language from FDA's regulation and transplant it verbatim into the statute.

44

Instead, it struck the entire phrase "such drug for such disease or condition" and replaced it with "the same drug for the same disease or condition." § 607(a)(1), 131 Stat. at 1049. The resulting provision retains most of the original statutory language ("drug for … disease or condition"), adds an adjectival phrase found in FDA's regulation ("the same"), and rejects the disjunctive noun phrase that the agency had adopted ("disease or condition" versus "use or indication"):

| | |
|---|---|
| 1983 statute: | "such drug for such disease or condition" |
| 1992 regulation: | "the same drug for the same use or indication" |
| 2017 statute: | "the same drug for the same disease or condition" |

Given the linguistic variation between the 2017 statute and FDA's regulation, "[i]t is not obvious that [the phrase at issue] was transplanted" from FDA's regulation—and ratification should not be inferred. *CSX Corp.*, 18 F.4th at 681 (quotation marks omitted).

**iii.**   The district court dismissed this linguistic variation for two reasons. First, it suggested that the phrase "same drug for the same use or condition" was not relevant at all because it "appears not in the FDA's definitions of 'same drug' or 'clinically superior' but in the term 'orphan-exclusive approval.'" JA561. That cannot be correct. As noted, Congress

struck and replaced an entire phrase: "*such* drug for *such* disease or condition" came out, and "*the same* drug for *the same* disease or condition" went in. In considering whether the new statutory phrase was intended to ratify FDA's old scheme, the whole congressional phrase is relevant, as are all of Congress's divergences from the regulator's words.

Second, the district court reasoned that Congress's refusal to borrow the full regulatory phrase does not cut against the ratification theory because Congress had good reason to use its own language for the second half: "Congress used the phrase 'same drug for the same disease or condition' (instead of 'use or indication')" to "ensure consistency" with respect to "a key term that appears" throughout the Orphan Drug Act. JA561.

There are at least two problems with that response. For one thing, it requires accepting that, when Congress changed "such" to "the same" twice in a single short phrase, it was ratifying FDA's regulations the first time ("the same drug") and using ordinary language to refer back to an antecedent part of the statute the second time ("the same disease or condition"). *See Catalyst*, 14 F.4th at 1308 (holding that Congress had used "the same disease or condition" in its ordinary sense to refer back to the rare disease identified in the drug designation). The far simpler

46

conclusion is that Congress used ordinary language both times to refer to prior antecedents. In other words, "the same drug" is the drug designated under section 360bb and then referenced again in section 360cc(a), while the "same disease or condition" is the "rare disease or condition" designated under section 360bb and then referenced again in section 360cc(a). The way to ensure consistency of meaning in the statute is to look *inside* the statute for the meaning of "the same drug"—not *outside* the statute as FDA contends.

The district court's response also fails because "same use or indication" was an integral part of FDA's regulatory effort to circumscribe the blocking effect of the moratorium—one that its regulations consistently used in tandem with "same drug." *See* 21 C.F.R. § 316.31(a) ("Scope of orphan-drug exclusive approval": "Unless FDA previously approved the *same drug for the same use or indication*, FDA will not approve another sponsor's marketing application *for the same drug for the same use or indication* before the expiration of 7 years from the date of such approval as stated in the approval letter from FDA") (emphasis added); *id.* § 316.3(b)(12) (similar, defining "Orphan-drug exclusive approval or exclusive approval").

47

What is the evidence that Congress intended to impliedly ratify the first half of that phrase while rejecting the second half? None—other than the overlap between the words "the same drug" in the regulation and the words "the same drug" in the statute. *Bruesewitz* and *CSX Corp.* show that this is not enough, and the district court cited no case to the contrary.

### 2. FDA's ratification theory is inconsistent with the statute as a whole.

Other aspects of the statute confirm that Congress was charting its own course in the 2017 amendments, not ratifying FDA's clinical-superiority loophole.

### a. Congress did not ratify FDA's approach wholesale.

Two provisions in the 2017 amendments show that Congress did not intend to embrace FDA's regulatory approach across the board. *Contra* JA558 (assuming that Congress would not have codified only part of FDA's approach). One (discussed above, *see supra* § I.B.1.b.ii.) is subsection (a), where Congress rejected the "same use or indication" language from FDA's regulation.

The other is subsection (d). That provision authorizes FDA to promulgate regulations only with respect to subsection (c) and to apply its

48

existing regulatory definitions only "to the extent such definitions are not inconsistent with" the amended statute. 21 U.S.C. § 360cc(d). That language plainly shows Congress anticipated conflicts between the 1992 regulations and the 2017 amendments—and wanted to make clear that its statutory amendments would control. Subsection (d) thus demonstrates that while Congress was writing against the backdrop of FDA's prior actions, it was not *ratifying* FDA's entire body of work. Congress was charting its own course, sometimes (but only sometimes) agreeing with FDA. That requires reviewing courts to analyze Congress's words, not assume that Congress meant to endorse all that FDA had done before.

### b. FDA's ratification theory violates first principles of statutory interpretation.

At a minimum, the Court should expect that Congress used the concept of clinical superiority consistently throughout section 360cc, without enacting redundant language. But FDA's theory flouts the presumption of consistent usage twice over and would render part of subsection (a) superfluous. That is further reason to reject the agency's interpretation. *See W. Va. Univ. Hosps., Inc. v. Casey*, 499 U.S. 83, 101 (1991) ("[I]t is our role to make sense rather than nonsense out of the *corpus juris*.").

49

**i.** FDA needs this Court to conclude that the 2017 Congress approached the concept of clinical superiority in radically different ways in subsections (a) and (c). That doesn't wash.

Start with Congress's drafting choices. In subsection (c), Congress addressed clinical superiority expressly, creating a reticulated scheme complete with a definitions provision, an effective date, and detailed instructions to the agency. Meanwhile—per FDA and the district court—the same Congress silently slipped the concept of clinical superiority into subsection (a) without any instruction, merely by changing "such" to "the same."

Now consider Congress's policy choices. Subsection (c) confines the grant of serial exclusivity to circumstances where the sponsor demonstrates that its drug is clinically superior to "any already approved or licensed drug that is the same drug." In that context, a clinically superior drug is "the same drug" as the inferior predecessor. In other words, clinical superiority *presupposes* sameness in subsection (c): the statute doesn't even call for a clinical-superiority inquiry unless two drugs are "the same drug." Not so under FDA's 1992 regulation. There, "if the subsequent drug can be shown to be clinically superior to the first drug, it

50

will not be considered to be the same drug." 21 C.F.R. § 316.3(b)(14). In short, clinical superiority *destroys* sameness under FDA's regulation. If subsection (a) "incorporate[s] the FDA's existing definition of 'same drug,'" JA558, then the very same Congress used clinical superiority in fundamentally different ways in related subsections of the same statute. *But see* Antonin Scalia & Bryan A. Garner, *Reading Law*: *The Interpretation of Legal Texts* 170 (2012) ("A word or phrase is presumed to bear the same meaning throughout a text.").

**ii.** The agency's reading also makes a hash of subsection (c). That provision requires a drugmaker to prove that its treatment is "clinically superior to any already approved or licensed drug that is the same drug." 21 U.S.C. § 360cc(c)(1). If "the same" actually meant "the same, excluding a clinically superior drug," then subsection (c) would require drugmakers to prove that their treatments are "clinically superior to any already approved or licensed drug that is the same drug, excluding a clinically superior drug."

The district court conceded that this "circularity makes no sense." JA564. To escape the problem, the court concluded that the phrase "'same drug' at the end of subsection (c)(1)" must refer to "the approved drug,

51

without regard to clinical superiority." *Id.* In other words: the district court concluded that even within the same sentence, "same drug" sometimes incorporates clinical superiority per FDA's regulations (*e.g.*, "drug that is … otherwise the same") and sometimes doesn't (*e.g.*, "that is the same drug"). *Id.* But that is not how courts are supposed to read statutes. *See Brown v. Gardner*, 513 U.S. 115, 118 (1994) (The "presumption that a given term is used to mean the same thing throughout a statute" is "surely at its most vigorous when a term is repeated within a given sentence.").

**iii.**     Finally, FDA's ratification theory also makes part of subsection (a) redundant. 21 U.S.C. § 360cc(a). Under the regulation that Congress purportedly ratified, "same drug" means "a drug that … is intended for the same use as the previously approved drug." 21 C.F.R. 316.3(b)(14). When that definition is plugged into the statutory phrase "the same drug for the same disease or condition," 21 U.S.C. § 360cc(a), the latter half of that phrase becomes superfluous: "a drug that … is intended for the same use as the previously approved drug" "for the same disease or condition."

52

c.    **FDA's interpretation would undermine the property right created by the Act.**

FDA's clinical-superiority loophole also undermines the property right that the Orphan Drug Act creates, allowing FDA to divest orphan-drug exclusivity without notice and a hearing. That is yet another reason to doubt that Congress adopted the agency's approach.

i.    The Orphan Drug Act creates a property interest protected by due process.

The statute "mandat[es] the outcome to be reached upon a finding that the relevant criteria have been met," creating a "legitimate claim of entitlement" to a benefit. *Ky. Dep't. of Corr. v. Thompson*, 490 U.S. 454, 460–62 (1989) (elaborating on the test for "whether there exists a liberty or property interest" for purposes of "procedural due process"); *Town of Castle Rock v. Gonzales*, 545 U.S. 748, 756 (2005) (same). That benefit takes the form of an expressly "exclusive" approval, 21 U.S.C. § 360cc(e), and the right to exclude has long been recognized as "one of the most essential sticks in the bundle of rights that are commonly characterized as property." *Kaiser Aetna v. United States*, 444 U.S. 164, 176 (1979).

An orphan-drug designation is transferrable, *see* 21 C.F.R. § 316.27(a), as is an approved application that earned exclusive approval, *see id* § 314.72(a), another key hallmark of property. *See Oracle Int'l Corp. v. Rimini St., Inc.*, 123 F.4th 986, 997 (9th Cir. 2024) ("The right to transfer is one of the most essential sticks in the bundle of rights that are commonly characterized as property." (quoting *Shackleford v. United States*, 262 F.3d 1028, 1032 (9th Cir. 2001)); *accord Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 435 (1982).

And the only means that Congress expressly provided for divesting the exclusive approval are consent or forfeiture for nonuse (which can only be found after notice and a hearing). *See* 21 U.S.C. § 360cc(b)(1)–(2); 21 C.F.R. § 316.36 (implementing requirement). These were precisely the grounds for divestiture of a government-granted franchise at common law. *See, e.g.*, *In re N. Am. Coal & Min. Co.*, 109 N.W. 1116, 1116 (Minn. 1906); *Terrett v. Taylor*, 13 U.S. (9 Cranch) 43, 51 (1815); *see also* 16A Fletcher Cyclopedia of the Law of Corporations § 7976 (2024).

All told, Congress used the sort of mandatory language associated with the creation of a property right. It styled the benefit it conferred as an exclusive approval, thereby increasing the value of the transferrable

54

asset. And it further provided for divestiture of exclusivity by methods traditionally associated with other forms of government-granted intangible property. "[I]f something looks like a duck, walks like a duck, and quacks like a duck, then it is probably a duck," *In re Sorah*, 163 F.3d 397, 401 (6th Cir. 1998); *accord Dole v. Williams Enters., Inc.*, 876 F.2d 186, 188 n.2 (D.C. Cir. 1989) ("wholeheartedly embrac[ing]" the "duck test"). *Cf. Univ. of Tenn. Rsch. Found. v. Caelum Biosciences, Inc.*, 667 F. Supp. 3d 734, 748 (E.D. Tenn. 2023) (assuming that orphan-drug designation is a form of "intangible property").

**ii.**     FDA's clinical-superiority loophole undermines that property interest by allowing FDA to destroy it through informal, discretionary determinations. Congress would not vest FDA with authority over property rights in "vague terms." *Whitman*, 531 U.S. at 468.

A necessary implication of FDA's ratification theory is that Congress authorized the agency to destroy drugmakers' property rights without first (i) telling them why the agency proposed to approve a follow-on application or (ii) granting them a prior opportunity to be heard as to those reasons. Consider this case. Jazz became aware of Avadel's plans to violate Jazz's exclusivity not through notice from FDA, but through

55

Avadel's public statements. Jazz sought to engage with the agency to the best of its ability, but Jazz never knew what Avadel told FDA or what FDA was considering during its deliberations. Jazz only received meaningful notice of FDA's position only a few *hours* before FDA approved Avadel's application, giving it no practical opportunity to engage with the agency about whether the factual underpinnings of its clinical superiority determination were sound.

That absence of process not only departs from Congress's approach in subsection (b) but also raises due-process concerns—still more reason to reject the agency's reading of the statute. *See Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568, 575 (1988) ("[W]here an otherwise acceptable construction of a statute would raise serious constitutional problems, the Court will construe the statute to avoid such problems unless such construction is plainly contrary to the intent of Congress."); *see also* Stephan E. Lawton, *Controversy Under the Orphan Drug Act: Is Resolution on the Way?*, 46 Food Drug Cosm. L.J. 327, 341–43 (1991) (noting that DOJ officials "argued for a veto [of the 1991 bill that would have created a statutory clinical superiority exception] on the basis of constitutional problems," as well as

56

"Executive Order 12630," which counseled Executive Branch officials to avoid actions that could create unanticipated takings).

### 3.    History and purpose do not suggest otherwise.

The district court contended that "the history and purpose of the 2017 amendments further supports [FDA's] reading of § 360cc(a)." JA557. It began with the premise that Congress amended the Orphan Drug Act in response to the *Depomed* decision, granting FDA authority that Judge Jackson had found lacking to limit serial exclusivity to only those follow-on drugs that are "clinically superior" to predecessors. To that extent, Jazz agrees. Subsection (c) of the amended statute directly and expressly grants FDA authority to limit serial exclusivity.

But the contrast is telling. The 2017 amendments contain no similarly express grant of authority to disregard the moratorium and approve new drugs based on clinical superiority. Rather, both before and after the amendment, subsection (a) contains a single, straightforward command: when the moratorium applies, FDA "may not approve" competing drug applications "[e]xcept as provided in subsection (b)," which says nothing about clinical superiority. While FDA historically used the clinical superiority concept for *two* purposes—to limit the grant of serial exclusivity

57

(as in *Depomed*) and to break through unexpired periods of exclusivity (as here)—Congress in 2017 endorsed only *one* of them.

The district court thought it "an odd result for Congress to have codified only the FDA's discretion as to exclusivity periods, but not approvals." JA558. But the court never explained why it would have been odd for Congress to adopt one of FDA's "clinical superiority" policies and not the other. Congress makes such policy calls so often that the Supreme Court has deemed them "the very essence of legislative choice": "[d]eciding what competing values will or will not be sacrificed to the achievement of a particular objective." *Rodriguez v. United States*, 480 U.S. 522, 526 (1987). For a prime example, look no further than the statute at issue in *State Farm*, which rejected the National Highway Traffic Safety Administration's "ignition interlock" passive-restraint requirement but otherwise accepted the agency's seatbelt rules. *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 34–36 (1983).

Congress exercises this prerogative to pick and choose among agency policies all the time, as this Court and others have recognized. *See, e.g., Kennecott Corp. v. EPA*, 684 F.2d 1007, 1010–14 (D.C. Cir. 1982) (holding that Clean Air Act Amendments of 1977 ratified the

58

Administrator's practice of allowing certain nonferrous smelters to use "dispersion techniques" instead of "constant control technology" to meet air quality standards, but not the agency's "pre-1977 practice of authorizing the use of dispersion techniques when the only alternatives are permanent production curtailment, shutdown or delays in attainment of the national standards" in favor of an economic-reasonableness test); *Green Rock LLC v. IRS*, 104 F.4th 220, 227 (11th Cir. 2024) (rejecting argument that "because Congress was aware of the regulation and adopted parts of its language, Congress must have also intended to endorse" another part). That Congress did not incorporate FDA's clinical-superiority exception to exclusivity into the Orphan Drug Act "ought to give a court pause before doing so itself." *Akridge v. Alfa Ins. Co.*, 93 F.4th 1181, 1202 (11th Cir. 2024) (quoting *Lewis v. Humboldt Acquisition Corp.*, 681 F.3d 312, 319 (6th Cir. 2012) (en banc)).

Nor does anything in this context make it implausible that Congress could have decided to grant FDA authority to limit serial exclusivity and stop there. To the contrary, Congress easily could have concluded that orphan-drug exclusivity must be fully respected when granted, as subsection (a) provides, and *also* that the availability of further

59

exclusivity should be limited, as subsection (c) provides. The district court should have followed that textual instruction, rather than presuming that Congress must have endorsed what the agency had done before. *See Freeman v. Quicken Loans, Inc.*, 566 U.S. 624, 637 (2012) ("[E]very statute purposes, not only to achieve certain ends, but also to achieve them by particular means." (quoting *Dir., Off. of Workers' Comp. Programs v. Newport News Shipbuilding & Dry Dock Co.*, 514 U.S. 122, 136 (1995)).

## C. The district court's interpretation can't save FDA's approval order.

The district court concluded its statutory analysis with an unusual sidebar. Acknowledging that no party had advanced the argument, and that FDA had affirmatively disavowed it, the district court nonetheless offered what it called a "better way" to "reach the same result." JA567–69. No doubt recognizing that federal courts "follow the principle of party presentation," *United States v. Sineneng-Smith*, 590 U.S. 371, 375 (2020), and that its theory is *Chenery*-barred, *e.g.*, *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168–69 (1962), the district court was careful to state that it "had not rested its decision" on this theory. JA567. Still, the district court's theory merits a response, in part because it may

60

well have swayed the district court's analysis of the arguments that FDA did raise.

1.     The district court thought that subsection (c) lets FDA approve new drug applications for follow-on products based on "'clinical superiority,' regardless of whether there is an ongoing period of exclusivity." JA569. That is so (it reasoned) because subsection (c)(1) applies when "a subsequent drug that is otherwise the same as an already approved drug is seeking *exclusive approval* described in subsection (a)." JA567 (cleaned up). Here, "[b]ecause Avadel sought *exclusive approval* based on Lumryz's clinical superiority, subsection (c) authorized the FDA to grant Avadel's *application* upon making that showing." JA569 (emphases added).

2.     The district court misunderstood the statutory scheme. To lawfully market Lumryz, Avadel needed FDA to "approve [its] new drug application certifying the drug's safety and efficacy." *Otsuka Pharm. Co. v. Price*, 869 F.3d 987, 989 (D.C. Cir. 2017). As subsection (a) itself recognizes, FDA approves such applications "under section 355 of this title." 21 U.S.C. § 360cc(a); *see also id.* § 355(a) ("No person shall introduce or deliver for introduction into interstate commerce any new drug," unless

61

FDA approves "an application … with respect to such drug."). But the moratorium in subsection (a) bars FDA from approving applications under section 355. In other words, once the moratorium is triggered by FDA's approval of an application that is entitled to orphan-drug exclusivity, FDA must wait seven years before "approv[ing] another application under section 355 … for the same drug for the same disease or condition for a person who is not the holder of such approved application." 21 U.S.C. § 360cc(a).

The district court thought that subsection (c) contains an "exceptio[n]" allowing FDA to approve new drugs despite the moratorium. JA568. FDA disagrees. *See supra* Statement of the Case § A.3.b. And for good reason. Nothing in subsection (c) authorizes FDA to approve any new drug *application*, whether under section 355 or otherwise. And nothing in subsection (c) purports to create an additional exception to the moratorium on approving *applications* imposed by subsection (a). As the text states, exceptions are the domain of subsection (b).

The district court erred by equating the "exclusive approval … described in subsection (a)" with the approval of a new-drug application under section 355. But those are different statutory concepts. An approved

new drug application permits the sponsor to introduce its product into interstate commerce. *See* 21 U.S.C. § 355(a). Moreover, an approved application is a *condition precedent* to the grant of "exclusive approval," *see id.* § 360cc(a)(1). And an "exclusive approval," when in effect, bars FDA from approving additional applications under section 355. So authority to grant "exclusive approval" under subsection 360cc(a) does not equal authority to approve an application under section 355.

It is true, as the district court observed, that *Catalyst* also described subsection (c) as a third exception. But that was a mistake and it was dicta—there was no clinical superiority issue in *Catalyst*, 14 F.4th at 1312, and the Eleventh Circuit did not analyze the question. Unfortunately, it may well have led the district court astray.

## II. FDA's error warrants vacatur.

The Court should reverse and remand with instructions to vacate FDA's approval order. "Vacatur is the normal remedy under the APA," *Long Island Power Auth. v. FERC*, 27 F.4th 705, 717 (D.C. Cir. 2022), and both of the relevant factors—(i) the "seriousness of the order's deficiencies" and (ii) the likelihood of "disruptive consequences"—favor

63

vacatur here. *Allied-Signal, Inc. v. U.S. Nuclear Regul. Comm'n*, 988 F.2d 146, 150–51 (D.C. Cir. 1993).

## A.    FDA cannot salvage its approval order on remand.

As Jazz has shown, FDA "trespass[ed] beyond the bounds of its statutory authority" by violating the moratorium. *Murray Energy Corp. v. EPA*, 936 F.3d 597, 623 (D.C. Cir. 2019). That error "could not be more serious insofar as [the agency] acted unlawfully, which is more than sufficient reason to vacate the rul[e]." *NRDC v. EPA*, 489 F.3d 1364, 1374 (D.C. Cir. 2007). Nor is this the sort of error that FDA could fix by "shoring up its reasoning." *Id.* Because Xywav and Lumryz use "the same drug for the same disease or condition," FDA "may not approve" Lumryz until the moratorium expires, absent shortage or consent. 21 U.S.C. § 360cc(a). Neither exception applies, so nothing that FDA could say on remand would grant it the statutory authority to approve Lumryz.

## B.    No potential consequences warrant remand.

Nor do any "significant disruptive consequences" counsel remand without vacatur. For starters, potential disruption matters "only insofar as the agency may be able to rehabilitate its rationale." *Comcast Corp. v. FCC*, 579 F.3d 1, 9 (D.C. Cir. 2009); *see also Bridgeport Hosp. v. Becerra*,

108 F.4th 882, 890 (D.C. Cir. 2024). Yet "[b]ecause an agency can't 'cure' the fact that it lacks authority to take a certain action, remand-without-vacatur is unavailable here." *Bridgeport Hosp.*, 108 F.4th at 890.

In all events, the "quintessential disruptive consequence arises when an agency cannot easily unravel a past transaction in order to impose a new outcome." *Am. Great Lakes Ports Ass'n v. Schultz*, 962 F.3d 510, 519 (D.C. Cir. 2020). That is not this case. FDA can withdraw its order approving Lumryz, "restor[ing] the status quo ante." *Sugar Cane Growers v. Veneman,* 289 F.3d 89, 97 (2d. Cir. 2002). On the other hand, "remanding without vacatur under these circumstances would give [FDA] incentive" to defy Congress's moratorium in the future. *Env't Def. Fund v. FERC*, 2 F.4th 953, 976–77 (D.C. Cir. 2021). If FDA could issue unlawful approval orders and then plead "disruption" to ward off vacatur,

it would have a free pass to flout the Act. This Court should not "encourage such an approach." *Id.*

## CONCLUSION

The Court should reverse and remand with instructions to enter summary judgment for Jazz and vacate FDA's approval order.

Dated: January 31, 2025          Respectfully submitted,

*/s/ Kwaku A. Akowuah*

Kwaku A. Akowuah
  *Counsel of Record*
Sean C. Griffin
Peter A. Bruland
Anna C. Burke
David H. Kinnaird
SIDLEY AUSTIN LLP
1501 K Street, NW
Washington, DC 20005
202.736.8000
kakowuah@sidley.com

*Counsel for Appellant*

66

## CERTIFICATE OF COMPLIANCE

This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Century Schoolbook font.

This brief complies with the type-volume requirements of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 12,718 words, not counting the parts excluded by Federal Rule of Appellate Procedure 32(f) and Circuit Rule 32(e)(1).

*/s/ Kwaku A. Akowuah*

## CERTIFICATE OF SERVICE

I certify that on January 31, 2025, I electronically filed the foregoing brief and following addenda with the Clerk of the Court using the CM/ECF System, which will send notice to all registered CM/ECF users.

*/s/ Kwaku A. Akowuah*

# ADDENDUM A:
# Statutory Addendum

## <u>TABLE OF CONTENTS</u>

21 U.S.C. § 360bb ............................................................. Add-1

Orphan Drug Act,
　　Pub. L. No. 97-414, § 527, 96 Stat. 2049, 2050–51 (1983) .......... Add-3

FDA Reauthorization Act of 2017,
　　Pub. L. No. 115-52, § 607, 131 Stat. 1005, 1048–50 (2017) ......... Add-5

21 U.S.C. § 360cc ............................................................. Add-8

## <u>21 U.S.C. § 360bb</u>

Designation of drugs for rare diseases or conditions

**(a)  Request by sponsor; preconditions; "rare disease or condition" defined**

(1)  The manufacturer or the sponsor of a drug may request the Secretary to designate the drug as a drug for a rare disease or condition. A request for designation of a drug shall be made before the submission of an application under section 355(b) of this title for the drug, or the submission of an application for licensing of the drug under section 262 of Title 42. If the Secretary finds that a drug for which a request is submitted under this subsection is being or will be investigated for a rare disease or condition and--

    (A)  if an application for such drug is approved under section 355 of this title, or

    (B)  if a license for such drug is issued under section 262 of Title 42,

  the approval, certification, or license would be for use for such disease or condition, the Secretary shall designate the drug as a drug for such disease or condition. A request for a designation of a drug under this subsection shall contain the consent of the applicant to notice being given by the Secretary under subsection (b) respecting the designation of the drug.

(2)  For purposes of paragraph (1), the term "rare disease or condition" means any disease or condition which (A) affects less than 200,000 persons in the United States, or (B) affects more than 200,000 in the United States and for which there is no reasonable expectation that the cost of developing and making available in the United States a drug for such disease or condition will be recovered from sales in the United States of such drug. Determinations under the preceding sentence with respect to any drug shall be made on the basis of the facts and circumstances as of the date the request for designation of the drug under this subsection is made.

**(b) Notification of discontinuance of drug or application as condition**

A designation of a drug under subsection (a) shall be subject to the condition that--

(1)    if an application was approved for the drug under section 355(b) of this title or a license was issued for the drug under section 262 of Title 42, the manufacturer of the drug will notify the Secretary of any discontinuance of the production of the drug at least one year before discontinuance, and

(2)    if an application has not been approved for the drug under section 355(b) of this title or a license has not been issued for the drug under section 262 of Title 42 and if preclinical investigations or investigations under section 355(i) of this title are being conducted with the drug, the manufacturer or sponsor of the drug will notify the Secretary of any decision to discontinue active pursuit of approval of an application under section 355(b) of this title or approval of a license under section 262 of Title 42.

**(c) Notice to public**

Notice respecting the designation of a drug under subsection (a) shall be made available to the public.

**(d) Regulations**

The Secretary shall by regulation promulgate procedures for the implementation of subsection (a).

# ORPHAN DRUG ACT,
## PUBLIC LAW NO. 97-414, 96 STAT. 2049 (1983)
### (Excerpt of Section 527)

[96 STAT. 2049]

Public Law 97-414
97th Congress

## AN ACT

To amend the Federal Food, Drug, and Cosmetic Act to facilitate the development of drugs for rare diseases and conditions, and for other purposes.

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,*

## SHORT TITLE; FINDINGS

SECTION 1. (a) This Act may be cited as the "Orphan Drug Act".

\* \* \*

[96 STAT. 2050]

## PROTECTION FOR UNPATENTED DRUGS FOR RARE DISEASES OR CONDITIONS

"SEC. 527. (a) Except as provided in subsection (b), if the Secretary—

"(1) approves an application filed pursuant to section 505(b), or

"(2) issues a license under section 351 of the Public Health Service Act

[96 STAT. 2051]

for a drug designated under section 526 for a rare disease or condition and for which a United States Letter of Patent may not be issued, the Secretary may not approve another application under section 505(b) or issue another license under section 351 of the Public Health Service Act

Add-3

for such drug for such disease or condition for a person who is not the holder of such approved application or of such license until the expiration of seven years from the date of the approval of the approved application or the issuance of the license. Section 505(c)(2) does not apply to the refusal to approve an application under the preceding sentence.

"(b) If an application filed pursuant to section 505(b) is approved for a drug designated under section 526 for a rare disease or condition or a license is issued under section 351 of the Public Health Service Act for such a drug and if a United States Letter of Patent may not be issued for the drug, the Secretary may, during the seven-year period beginning on the date of the application approval or of the issuance of the license, approve another application under section 505(b), or, if the drug is a biological product, issue a license under section 351 of the Public Health Service Act, for such drug for such disease or condition for a person who is not the holder of such approved application or of such license if—

   "(1) The Secretary finds, after providing the holder notice and opportunity for the submission of views, that in such period the holder of the approved application or of the license cannot assure the availability of sufficient quantities of the drug to meet the needs of persons with the disease or condition for which the drug was designated; or

   "(2) such holder provides the Secretary in writing the consent of such holder for the approval of other applications or the issuance of other licenses before the expiration of such seven year period."

* * *

**FDA AUTHORIZATION ACT OF 2017,
PUBLIC LAW NO. 115-52, 131 STAT. 1005 (2017)
<u>(Excerpt of Section 607)</u>**

[131 STAT. 1005]

Public Law 115–52
115th Congress

## AN ACT

To amend the Federal Food, Drug, and Cosmetic Act to revise and extend the user-fee programs for prescription drugs, medical devices, generic drugs, and biosimilar biological products, and for other purposes.

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,*

## SECTION 1. SHORT TITLE.

This Act may be cited as the "FDA Reauthorization Act of 2017".

\* \* \*

[131 STAT. 1048]

## TITLE VI—REAUTHORIZATIONS AND IMPROVEMENTS RELATED TO DRUGS

\* \* \*

[131 STAT. 1049]

## SEC. 607. ORPHAN DRUGS.

(a) IN GENERAL.—Section 527 of the Federal Food, Drug, and Cosmetic Act (21 U.S.C. 360cc) is amended—

(1) in subsection (a), in the matter following paragraph (2), by striking "such drug for such disease or condition" and inserting "the same drug for the same disease or condition";

(2) in subsection (b)—

> (A) in the matter preceding paragraph (1), by striking "If an application" and all that follows through "such license if" and inserting "During the 7-year period described in subsection (a) for an approved application under section 505 or license under section 351 of the Public Health Service Act, the Secretary may approve an application or issue a license for a drug that is otherwise the same, as determined by the Secretary, as the already approved drug for the same rare disease or condition if";

> (B) in paragraph (1), by striking "notice" and all that follows through "assure" and inserting "of exclusive approval or licensure notice and opportunity for the submission of views, that during such period the holder of the exclusive approval or licensure cannot ensure"; and

> (C) in paragraph (2), by striking "such holder provides" and inserting "the holder provides"; and

(3) by adding at the end the following:

"(c) CONDITION OF CLINICAL SUPERIORITY.—

> "(1) IN GENERAL.—If a sponsor of a drug that is designated under section 526 and is otherwise the same, as determined by the Secretary, as an already approved or licensed drug is seeking exclusive approval or exclusive licensure described in subsection (a) for the same rare disease or condition as the already approved drug, the Secretary shall require such sponsor, as a condition of such exclusive approval or licensure, to demonstrate that such drug is clinically superior to any already approved or licensed drug that is the same drug.

> "(2) DEFINITION.—For purposes of paragraph (1), the term 'clinically superior' with respect to a drug means that the drug provides a significant therapeutic advantage over and above an already approved or licensed drug in terms of greater efficacy, greater safety, or by providing a major contribution to patient care.

"(d) REGULATIONS.—The Secretary may promulgate regulations for the implementation of subsection (c). Beginning on the date of enactment of the FDA Reauthorization Act of 2017, until such

[131 STAT. 1050]

time as the Secretary promulgates regulations in accordance with this subsection, the Secretary may apply any definitions set forth in regulations that were promulgated prior to such date of enactment, to the extent such definitions are not inconsistent with the terms of this section, as amended by such Act.

"(e) DEMONSTRATION OF CLINICAL SUPERIORITY STANDARD.—

To assist sponsors in demonstrating clinical superiority as described in subsection (c), the Secretary—

"(1) upon the designation of any drug under section 526, shall notify the sponsor of such drug in writing of the basis for the designation, including, as applicable, any plausible hypothesis offered by the sponsor and relied upon by the Secretary that the drug is clinically superior to a previously approved drug; and

"(2) upon granting exclusive approval or licensure under subsection (a) on the basis of a demonstration of clinical superiority as described in subsection (c), shall publish a summary of the clinical superiority findings.".

(b) RULE OF CONSTRUCTION.—Nothing in the amendments made by subsection (a) shall affect any determination under sections 526 and 527 of the Federal Food, Drug, and Cosmetic Act (21 U.S.C. 360bb, 360cc) made prior to the date of enactment of the FDA Reauthorization Act of 2017.

## 21 U.S.C. § 360cc

Protection for drugs for rare diseases or conditions

**(a)   Exclusive approval, certification, or license**

Except as provided in subsection (b), if the Secretary—

**(1)**   approves an application filed pursuant to section 355 of this title, or

**(2)**   issues a license under section 262 of Title 42

for a drug designated under section 360bb of this title for a rare disease or condition, the Secretary may not approve another application under section 355 of this title or issue another license under section 262 of Title 42 for the same drug for the same disease or condition for a person who is not the holder of such approved application or of such license until the expiration of seven years from the date of the approval of the approved application or the issuance of the license. Section 355(c)(2) of this title does not apply to the refusal to approve an application under the preceding sentence.

**(b)   Exceptions**

During the 7-year period described in subsection (a) for an approved application under section 355 of this title or license under section 262 of Title 42, the Secretary may approve an application or issue a license for a drug that is otherwise the same, as determined by the Secretary, as the already approved drug for the same rare disease or condition if--

**(1)**   the Secretary finds, after providing the holder of exclusive approval or licensure notice and opportunity for the submission of views, that during such period the holder of the exclusive approval or licensure cannot ensure the availability of sufficient quantities of the drug to meet the needs of persons with the disease or condition for which the drug was designated; or

**(2)**   the holder provides the Secretary in writing the consent of such holder for the approval of other applications or the

issuance of other licenses before the expiration of such seven-year period.

**(c)** Condition of clinical superiority

**(1)  In general**

If a sponsor of a drug that is designated under section 360bb of this title and is otherwise the same, as determined by the Secretary, as an already approved or licensed drug is seeking exclusive approval or exclusive licensure described in subsection (a) for the same rare disease or condition as the already approved drug, the Secretary shall require such sponsor, as a condition of such exclusive approval or licensure, to demonstrate that such drug is clinically superior to any already approved or licensed drug that is the same drug.

**(2)  Definition**

For purposes of paragraph (1), the term "clinically superior" with respect to a drug means that the drug provides a significant therapeutic advantage over and above an already approved or licensed drug in terms of greater efficacy, greater safety, or by providing a major contribution to patient care.

**(3)  Applicability**

This subsection applies to any drug designated under section 360bb of this title for which an application was approved under section 355 of this title or licensed under section 262 of Title 42 after August 18, 2017, regardless of the date on which such drug was designated under section 360bb of this title.

**(d)** Regulations

The Secretary may promulgate regulations for the implementation of subsection (c). Beginning on August 18, 2017, until such time as the Secretary promulgates regulations in accordance with this subsection, the Secretary may apply any definitions set forth in regulations that were promulgated prior to such date, to the extent such definitions are not inconsistent with the terms of this section, as amended by such Act.

**(e)**    Demonstration of clinical superiority standard

To assist sponsors in demonstrating clinical superiority as described in subsection (c), the Secretary--

> **(1)**    upon the designation of any drug under section 360bb of this title, shall notify the sponsor of such drug in writing of the basis for the designation, including, as applicable, any plausible hypothesis offered by the sponsor and relied upon by the Secretary that the drug is clinically superior to a previously approved drug; and
>
> **(2)**    upon granting exclusive approval or licensure under subsection (a) on the basis of a demonstration of clinical superiority as described in subsection (c), shall publish a summary of the clinical superiority findings.

# ADDENDUM B:

**Orphan Drug Act of 1983, Pub. L. No. 97-414, 96 Stat. 2049 (1983) *as amended by* FDA Reauthorization Act of 2017, Pub. L. No. 115-52, 131 Stat. 1005 (2017) (Redline)**

**ORPHAN DRUG ACT,**
**PUBLIC LAW NO. 97-414, 96 STAT. 2049 (1983)**
*as amended by* **FDA REAUTHORIZATION ACT,**
**PUBLIC LAW NO. 115-52, 131 STAT. 1005 (2017)**
**(Redline) (Excerpt of Section 527)**

[96 STAT. 2049]

Public Law 97-414
97th Congress

## AN ACT

To amend the Federal Food, Drug, and Cosmetic Act to facilitate the development of drugs for rare diseases and conditions, and for other purposes.

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,*

## SHORT TITLE; FINDINGS

SECTION 1. (a) This Act may be cited as the "Orphan Drug Act".

\* \* \*

[96 STAT. 2050]

## PROTECTION FOR UNPATENTED DRUGS FOR RARE DIS-EASES OR CONDITIONS

"SEC. 527. (a) Except as provided in subsection (b), if the Secretary—

"(1) approves an application filed pursuant to section 505(b), or

"(2) issues a license under section 351 of the Public Health Service Act

[96 STAT. 2051]

for a drug designated under section 526 for a rare disease or condition and for which a United States Letter of Patent may not be issued, the Secretary may not approve another application under section 505(b) or issue another license under section 351 of the Public Health Service Act for ~~such drug for such disease or condition~~ the same drug for the same disease or condition for a person who is not the holder of such approved application or of such license until the expiration of seven years from the date of the approval of the approved application or the issuance of the license. Section 505(c)(2) does not apply to the refusal to approve an application under the preceding sentence.

"(b) ~~If an application filed pursuant to section 505(b) is approved for a drug designated under section 526 for a rare disease or condition or a license is issued under section 351 of the Public Health Service Act for such a drug and if a United States Letter of Patent may not be issued for the drug, the Secretary may, during the seven-year period beginning on the date of the application approval or of the issuance of the license, approve another application under section 505(b), or, if the drug is a biological product, issue a license under section 351 of the Public Health Service Act, for such drug for such disease or condition for a person who is not the holder of such approved application or of such license if~~ During the 7-year period described in subsection (a) for an approved application under section 505 or license under section 351 of the Public Health Service Act, the Secretary may approve an application or issue a license for a drug that is otherwise the same, as determined by the Secretary, as the already approved drug for the same rare disease or condition if—

"(1) The Secretary finds, after providing the holder ~~notice and opportunity for the submission of views, that in such period the holder of the approved application or of the license cannot assure~~ of exclusive approval or licensure notice and opportunity for the submission of views, that during such period the holder of the exclusive approval or licensure cannot ensure the availability of sufficient quantities of the drug to meet the needs of persons with the disease or condition for which the drug was designated; or

"(2) ~~such holder provides~~ the holder provides the Secretary in writing the consent of such holder for the approval of other applications

or the issuance of other licenses before the expiration of such seven year period."

"(c) CONDITION OF CLINICAL SUPERIORITY.—

"(1) IN GENERAL.—If a sponsor of a drug that is designated under section 526 and is otherwise the same, as determined by the Secretary, as an already approved or licensed drug is seeking exclusive approval or exclusive licensure described in subsection (a) for the same rare disease or condition as the already approved drug, the Secretary shall require such sponsor, as a condition of such exclusive approval or licensure, to demonstrate that such drug is clinically superior to any already approved or licensed drug that is the same drug.

"(2) DEFINITION.—For purposes of paragraph (1), the term 'clinically superior' with respect to a drug means that the drug provides a significant therapeutic advantage over and above an already approved or licensed drug in terms of greater efficacy, greater safety, or by providing a major contribution to patient care.

"(d) REGULATIONS.—The Secretary may promulgate regulations for the implementation of subsection (c). Beginning on the date of enactment of the FDA Reauthorization Act of 2017, until such

[131 STAT. 1050]

time as the Secretary promulgates regulations in accordance with this subsection, the Secretary may apply any definitions set forth in regulations that were promulgated prior to such date of enactment, to the extent such definitions are not inconsistent with the terms of this section, as amended by such Act.

"(e) DEMONSTRATION OF CLINICAL SUPERIORITY STANDARD.—

To assist sponsors in demonstrating clinical superiority as described in subsection (c), the Secretary—

"(1) upon the designation of any drug under section 526, shall notify the sponsor of such drug in writing of the basis for the designation, including, as applicable, any plausible hypothesis offered by the

Add-14

sponsor and relied upon by the Secretary that the drug is clinically superior to a previously approved drug; and

"(2) upon granting exclusive approval or licensure under subsection (a) on the basis of a demonstration of clinical superiority as described in subsection (c), shall publish a summary of the clinical superiority findings.".

* * *