**[ORAL ARGUMENT NOT SCHEDULED]**

No. 24-5262

_____

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

_____

JAZZ PHARMACEUTICALS, INC.,
                                 *Plaintiff-Appellant,*

v.

ROBERT F. KENNEDY, JR., et al.,
                                 *Defendants-Appellees,*

AVADEL CNS PHARMACEUTICALS, LLC,
                                 *Intervenor-Appellee.*

_____

On Appeal from the United States District Court
for the District of Columbia

_____

## BRIEF FOR DEFENDANTS-APPELLEES

_____

*Of Counsel:*

SEAN R. KEVENEY
    *Acting General Counsel, HHS*

ROBERT FOSTER
    *Deputy General Counsel, HHS*
    *Chief Counsel for Food, Research,*
    *and Drugs*

WENDY VICENTE
    *Deputy Chief Counsel, Litigation*

LEAH A. EDELMAN
    *Associate Chief Counsel*
    *U.S. Food and Drug Administration*

YAAKOV M. ROTH
    *Acting Assistant Attorney*
    *General*

MELISSA N. PATTERSON
BRIAN J. SPRINGER
    *Attorneys, Appellate Staff*
    *Civil Division, Room 7537*
    *U.S. Department of Justice*
    *950 Pennsylvania Avenue NW*
    *Washington, DC 20530*
    *(202) 616-5446*

**CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES**

Pursuant to D.C. Circuit Rule 28(a)(1), the undersigned counsel certifies as follows:

**A.     Parties and Amici**

Plaintiff-appellant is Jazz Pharmaceuticals, Inc.

Defendants-appellees are Robert F. Kennedy, Jr., in his official capacity as Secretary of the Department of Health and Human Services; U.S. Department of Health and Human Services; Sara Brenner, in her official capacity as Acting Commissioner of Food and Drugs; and U.S. Food and Drug Administration.

Intervenor-appellee is Avadel CNS Pharmaceuticals, LLC.

Generation Patient, U.S. PIRG, Mary H. Bell, Wendy E. Braun, Kristen Gouthro, Andrea K. Gunter, Kristina Henry, Helaine Kastner Kinslow, Daniel Liss, Katie O'Connell, Tara O'Connor, Jane E. Powell, Sarah Reiff, Amanda Shah, Debra Turk, Jennifer Yeatts, Thomas Stern, Michael A. Carrier, Bernard Chao, Charles Duan, Stacey M. Lantagne, and S. Sean Tu participated as amici in district court.

**B.     Rulings Under Review**

The rulings under review were entered in *Jazz Pharmaceuticals, Inc. v. Becerra*, No. 23-cv-1819 (D.D.C.), by the Honorable Amit P. Mehta. They

are the October 30, 2024, order and opinion granting summary judgment to defendants-appellees and intervenor-appellee (Dkt. Nos. 104, 105).  The district court's opinion is available at *Jazz Pharmaceuticals, Inc. v. Becerra*, No. 23-cv-1819, 2024 WL 4625731 (D.D.C. Oct. 30, 2024).

### C.      Related Cases

This case was not previously before this Court.  An appeal raising a different statutory issue under the Orphan Drug Act, *Neurelis Inc. v. Brenner*, No. 25-5031 (D.C. Cir. filed Feb. 18, 2025), is pending in this Court. Counsel is not aware of any other pending related cases.


 */s/ Brian J. Springer*
Brian J. Springer

**TABLE OF CONTENTS**

**Page**

GLOSSARY

INTRODUCTION ................................................................................. 1

STATEMENT OF JURISDICTION ..................................................... 3

STATEMENT OF THE ISSUE ............................................................ 3

PERTINENT STATUTES AND REGULATIONS ....................................... 4

STATEMENT OF THE CASE ............................................................ 4

    A.    Statutory and Regulatory Background ........................................... 4

        1.    Orphan Drug Act Framework ................................................. 4

        2.    Original 1983 Version of the Orphan Drug Act and
            Agency Regulations ................................................. 7

        3.    2017 Amendments to the Orphan Drug Act ....................... 11

    B.    Factual Background and Agency Proceedings ........................... 14

    C.    District Court Proceedings .............................................. 20

SUMMARY OF ARGUMENT ........................................................... 22

STANDARD OF REVIEW ................................................................ 24

ARGUMENT ........................................................................................ 25

The District Court Correctly Upheld FDA's Approval of Avadel's Drug
    to Treat Narcolepsy .................................................................. 25

    A.    Avadel's Drug Is Different than Jazz's Drug and the
        Orphan Drug Act Does Not Block Its Approval. ................... 26

1.     Consistent with the Agency's Longstanding View, the Statute Permits FDA to Approve Avadel's Clinically Superior Drug...............................................26

2.     Jazz Lacks Support for Its View that Exclusivity Blocks Any Drug with the Same Active Moiety.................36

B.     Congress Endorsed FDA's Regulatory Definition When It Amended the Orphan Drug Act in 2017. ........................................44

1.     Congress Modified the Statutory Language to Incorporate the Term "Same Drug" from FDA's Regulations. ............................................................44

2.     Jazz Misunderstands the Nature of the Changes that Congress Made to the Statute...............................48

CONCLUSION.......................................................................54

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

ADDENDUM

# TABLE OF AUTHORITIES

**Cases:**                                                          **Page(s)**

*Baker Norton Pharm., Inc. v. FDA,*
    132 F. Supp. 2d 30 (D.D.C. 2001) ........................................................ 11

*Blackman v. District of Columbia,*
    456 F.3d 167 (D.C. Cir. 2006) ............................................................ 24

*Bragdon v. Abbott,*
    524 U.S. 624 (1998) .......................................................................... 46

*Bruesewitz v. Wyeth LLC,*
    562 U.S. 223 (2011) .......................................................................... 51

*Catalyst Pharm., Inc. v. Becerra,*
    14 F.4th 1299 (11th Cir. 2021) .............................................. 38, 39, 50

*Commodity Futures Trading Comm'n v. Schor,*
    478 U.S. 833 (1986) .......................................................................... 45

*CSX Corp. v. United States,*
    18 F.4th 672 (11th Cir. 2021) ............................................................ 51

*Depomed, Inc. v. U.S. Dep't of Health & Human Servs.,*
    66 F. Supp. 3d 217 (D.D.C. 2014) ................................... 11, 12, 47, 50

*Eagle Pharm., Inc. v. Azar*:
    952 F.3d 323 (D.C. Cir. 2020) ............................ 11, 13, 35, 36, 37, 47
    No. 16-cv-790, 2018 WL 3838265 (D.D.C. June 8, 2018),
       *aff'd*, 952 F.3d 323 ................................................................... 12

*Environmental Def. v. Duke Energy Corp.,*
    549 U.S. 561 (2007) ..................................................................... 51, 52

*FDA v. Brown & Williamson Tobacco Corp.,*
    529 U.S. 120 (2000) ..................................................................... 35, 42

*Loper Bright Enters. v. Raimondo,*
    603 U.S. 369 (2024) .......................................................................... 37

*New York v. U.S. Envtl. Prot. Agency,*
    413 F.3d 3 (D.C. Cir. 2005) (per curiam) .......................................... 49

v

*Pension Benefit Guar. Corp. v. LTV Corp.*,
   496 U.S. 633 (1990) ................................................................ 42

*Republic of Argentina v. NML Capital, Ltd.*,
   573 U.S. 134 (2014) ................................................................ 42

*Sigma-Tau Pharm., Inc. v. Schwetz*,
   288 F.3d 141 (4th Cir. 2002) ................................................. 40

*Spectrum Pharm., Inc. v. Burwell*,
   824 F.3d 1062 (D.C. Cir. 2016) ...................................... 4, 40

*United States v. Wise*,
   370 U.S. 405 (1962) ................................................................ 42

*Washington All. of Tech. Workers v. U.S. Dep't of Homeland Sec.*,
   50 F.4th 164 (D.C. Cir. 2022) ......................................... 46, 48

*Zenith Radio Corp. v. United States*,
   437 U.S. 443 (1978) ................................................................ 45

**Statutes:**

Consolidated Appropriations Act, 2021,
   Pub. L. No. 116-260, div. BB, tit. III, subtitle C, § 323,
   134 Stat. 1182, 2933 (2020) ................................................48

FDA Reauthorization Act of 2017,
   Pub. L. No. 115-52, 131 Stat. 1005 ....................................12
      § 607(a)(1) .........................................................................12

Food and Drug Administration Modernization Act of 1997,
   Pub. L. No. 105-115, § 125(b)(2)(J)-(K),
   111 Stat. 2296, 2326 .............................................................48

Orphan Drug Act,
   Pub. L. No. 97-414, 96 Stat. 2049 (1983) .............................5
      § 1(b)(2) .......................................................................35, 36
      § 1(b)(4) ............................................................................35
      § 1(b)(5) ........................................................................5, 35
      § 1(b)(6) ........................................................................5, 35

§ 2(a) ....................................................................................5

§ 4(a) ....................................................................................6

§ 5(a) ....................................................................................6

21 U.S.C. § 360bb(a) ..........................................................5

21 U.S.C. § 360bb(a)(1) .................................................5, 40

21 U.S.C. § 360bb(a)(2) .....................................................40

21 U.S.C. § 360cc(a) ..........................1, 3, 12, 22, 25, 26, 38, 45

21 U.S.C. § 360cc(a) (1983) ............................................7, 44

21 U.S.C. § 360cc(b) ..........................................................13

21 U.S.C. § 360cc(b) (1983) ...............................................12

21 U.S.C. § 360cc(b)(1) (1983) ............................................8

21 U.S.C. § 360cc(b)(2) (1983) ............................................8

21 U.S.C. § 360cc(c) ..........................................................17

21 U.S.C. § 360cc(c)(1) .................................................13, 33

21 U.S.C. § 360cc(c)(2) .................................................13, 41

21 U.S.C. § 360cc(c)(3) .......................................................13

21 U.S.C. § 360cc(d) ....................................................13, 53

21 U.S.C. § 360cc(e)(1) ...................................................6, 33

21 U.S.C. § 360ee ................................................................6

21 U.S.C. § 360ff ...............................................................37

21 U.S.C. § 360ff(a)(4)(B)(i)(I) ............................................38

Rare Diseases Orphan Product Development Act of 2002,
    Pub. L. No. 107-281, § 4, 116 Stat. 1992, 1993 ................48

5 U.S.C. § 706(2)(A) ..........................................................24

21 U.S.C. § 355(b) .......................................................7, 29, 40

21 U.S.C. § 355(c)(3)(E)(ii) .................................................29

21 U.S.C. § 379h(a)(1)(F) .....................................................6

21 U.S.C. § 393(d)(2) ...........................................................5

26 U.S.C. § 45C ...................................................................6

28 U.S.C. § 1291 ..................................................................3

28 U.S.C. § 1331 ..................................................................3

**Regulations:**

21 C.F.R. § 314.50 ................................................ 29

21 C.F.R. § 314.50(a) ........................................... 40

21 C.F.R. § 316.3(b)(3) (1992) ............................... 11, 13, 41

21 C.F.R. § 316.3(b)(12) (1992) ............................. 10

21 C.F.R. § 316.3(b)(13)(i) (1992) ......................... 10, 32, 44

21 C.F.R. § 316.3(b)(14)(i) .................................. 28, 32

21 C.F.R. § 316.20(a) .......................................... 6, 33

21 C.F.R. § 316.20(b)(4) ...................................... 6

21 C.F.R. § 316.29(c) .......................................... 14

21 C.F.R. § 316.31(a) .......................................... 26

21 C.F.R. § 316.31(b) .......................................... 27

**Legislative Material:**

H.R. Rep. No. 97-840, pt. 1 (1982), *as reprinted in*
    1982 U.S.C.C.A.N. 3577 ................................... 4

**Other Authorities:**

Clarification of Orphan-Drug Exclusivity Following
    Catalyst Pharms., Inc. v. Becerra; Notification,
    88 Fed. Reg. 4086 (Jan. 24, 2023) ................... 39

FDA, *Adaptive Perfusion: A Novel In Vitro Drug Release
    Testing Method for Complex Drug Products*,
    https://perma.cc/WXC8-PNHS ....................... 15

FDA, *Clinical Superiority Findings*,
    https://perma.cc/W3LZ-HKUL ....................... 30

FDA, *Frequently Asked Questions (FAQ) About Designating an Orphan Product*, https://perma.cc/9LR7-NPWL .....................................6

FDA, *Guidance for Industry: Extended Release Oral Dosage Forms: Development, Evaluation, and Application of In Vitro/In Vivo Correlations*, https://perma.cc/Z5L3-8A4L ...........................................................15

Final Rule, Orphan Drug Regulations, 57 Fed. Reg. 62,076 (Dec. 29, 1992) ........................................... 10, 43

Label for OFIRMEV (acetaminophen) Injection, https://perma.cc/XW99-3AG5 ...........................................................9

Orphan Drug Regulations, 78 Fed. Reg. 35,117 (June 12, 2013) ............................................... 29

Proposed Rule, Orphan Drug Regulations, 56 Fed. Reg. 3338 (Jan. 29, 1991) ............................................... 8, 9

James W. Wheless et al., *A Clinician's Guide to Oral Extended-Release Drug Delivery Systems in Epilepsy*, 23 J. Pediatric Pharmacology & Therapeutics 277 (2018) ...........................15

# GLOSSARY

| | |
|---|---|
| Act | Orphan Drug Act |
| Avadel | Avadel CNS Pharmaceuticals, LLC |
| FDA | Food and Drug Administration |
| J.A. | Joint Appendix |
| Jazz | Jazz Pharmaceuticals, Inc. |
| Secretary | Secretary of Health and Human Services |

**INTRODUCTION**

In the Orphan Drug Act, Congress created a series of economic incentives to promote the development of so-called orphan drugs to treat rare medical conditions.  This case concerns one such incentive, orphan-drug exclusivity.  Under the Act, drugs that are designated for a rare disease or condition and subsequently approved by the Food and Drug Administration (FDA) are afforded a seven-year period of orphan-drug exclusivity.  During that period, FDA generally may not approve another application "for the same drug for the same disease or condition."  21 U.S.C. § 360cc(a).

In this case, FDA approved an application by plaintiff-appellant Jazz Pharmaceuticals, Inc. (Jazz) to market a drug designated for the treatment of narcolepsy.  Because Jazz's drug is an immediate-release formulation, patients must take one dose before sleep and another dose several hours later.  FDA separately approved an application by intervenor-appellee Avadel CNS Pharmaceuticals, LLC (Avadel) to market a drug for the treatment of narcolepsy.  Although the core molecule in Jazz's and Avadel's drugs is the same, Avadel's drug is different than Jazz's: it is an extended-release formulation that need only be taken once at bedtime.  FDA found that Avadel's drug provides a significant therapeutic advantage over Jazz's

because it does not require narcoleptic patients to awaken in the night to take a second dose. Jazz does not contest the agency's clinical superiority finding on appeal.

Jazz nonetheless seeks to remove Avadel's drug from the market, depriving narcolepsy patients of a different—and undisputedly clinically superior—drug that does not require the intentional disruption of normal sleep cycles. Jazz asserts that despite the differences between its drug and Avadel's drug, they are the "same drug" for purposes of the Orphan Drug Act and thus FDA's prior approval of Jazz's drug blocked FDA from approving Avadel's drug. By Jazz's logic, drugs that share an active moiety would be considered the "same drug" no matter how immense, groundbreaking, or innovative the differences between them—even where those differences make one drug vastly more effective, vastly safer, or vastly better for patient care in some other respect. That claim is contrary to the ordinary meaning of "same drug" and FDA's decades-old construction of that term. Congress removed any doubt when it amended the statute in 2017 to incorporate the "same drug" terminology from FDA's regulations. The district court correctly rejected Jazz's counterintuitive reading of the statute and upheld FDA's approval of Avadel's clinically superior drug.

2

## STATEMENT OF JURISDICTION

In this action brought under the Administrative Procedure Act, Jazz invoked the district court's jurisdiction under 28 U.S.C. § 1331. J.A. 52. The district court granted summary judgment to the government and intervenor Avadel on October 30, 2024. J.A. 592. Jazz filed a timely notice of appeal on November 15, 2024. J.A. 593-94. This Court has appellate jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUE

Under the Orphan Drug Act, where a drug company receives approval to market a drug designated to treat a rare disease or condition, FDA may not approve another application from a different sponsor for the "same drug" to treat the same disease or condition for a period of seven years. 21 U.S.C. § 360cc(a). Jazz has approval to market two immediate-release narcolepsy medications, both of which must be taken twice per night. Avadel sought approval to market an extended-release narcolepsy medication that need only be taken once at bedtime. Applying its longstanding regulatory definition of "same drug"—a term Congress has now entrenched in the statute—FDA determined that Jazz's marketing exclusivity does not bar approval of Avadel's differently formulated and clinically superior drug

3

because the two drugs are not the same.  The question presented is whether

FDA properly approved Avadel's clinically superior drug.

## PERTINENT STATUTES AND REGULATIONS

Pertinent statutes and regulations are reproduced in the addendum to

this brief.

## STATEMENT OF THE CASE

### A.    Statutory and Regulatory Background

#### 1.    Orphan Drug Act Framework

Decades ago, Congress identified a problem in the development of new

drugs.  Whereas diseases "affect[ing] tens of millions of people" attracted

substantial private investment to create "drugs for such prevalent diseases

because of the tremendous return of investment," diseases affecting "a small

number of persons" did not offer the same commercial promise.  H.R. Rep.

No. 97-840, pt. 1, at 6 (1982), *as reprinted in* 1982 U.S.C.C.A.N. 3577, 3578.

Instead, it was "not financially feasible" for manufacturers "to expend

research and development funds" on so-called orphan drugs for these rare

diseases.  *Id.*; *see Spectrum Pharm., Inc. v. Burwell*, 824 F.3d 1062, 1064

(D.C. Cir. 2016) (noting that orphan drugs "historically received little

attention from pharmaceutical companies" because "the comparatively small

demand for treatment left little motive for research and development").

4

Congress responded to this drug-development problem by enacting the Orphan Drug Act, Pub. L. No. 97-414, 96 Stat. 2049 (1983).  The Act promotes the public interest in the development of orphan drugs by "reduc[ing] the costs of developing [orphan] drugs" and by "provid[ing] financial incentives to develop such drugs."  *Id.* § 1(b)(5), (6).

The Orphan Drug Act's framework for encouraging the development of orphan drugs begins with a procedure for the "designation of drugs for rare diseases or conditions."  Orphan Drug Act § 2(a) (creating 21 U.S.C. § 360bb).  Drug manufacturers may request that FDA "designate" a drug that "is being or will be investigated for" a rare disease.  21 U.S.C. § 360bb(a)(1).[1]  Based on "the facts and circumstances as of the date [of] the request for designation of the drug," FDA "shall" designate a drug which, upon approval, would be used for a disease affecting less than 200,000 persons in the United States.  *Id.* § 360bb(a).  A manufacturer must also present a "plausible hypothesis" that its drug would be "clinically superior"

---

[1] The Act assigns various responsibilities to the Secretary of Health and Human Services.  The Secretary carries out these responsibilities through the Commissioner of Food and Drugs.  *See* 21 U.S.C. § 393(d)(2). This brief refers to the Secretary and FDA interchangeably.

5

to any drug that is otherwise the same and has already been approved to treat that disease. *Id.* § 360cc(e)(1); 21 C.F.R. § 316.20(a).

Designation triggers financial benefits, including a tax credit for certain clinical testing expenses. Orphan Drug Act § 4(a); 26 U.S.C. § 45C. Designation also may help sponsors secure grants and contracts to "defray[] the costs" of developing orphan drugs. Orphan Drug Act § 5(a); *see* 21 U.S.C. § 360ee. And sponsors seeking approval of designated drugs are exempt from the significant application fee. 21 U.S.C. § 379h(a)(1)(F). Designation also makes a drug eligible for the incentive at issue in this case: a seven-year period of market exclusivity if FDA approves the drug.

As a matter of agency practice, "[o]rphan drug designation is generally granted to the active moiety"—that is, the core molecule responsible for physiological or pharmacological action—"rather than the product formulation." FDA, *Frequently Asked Questions (FAQ) About Designating an Orphan Product*, https://perma.cc/9LR7-NPWL; *see* J.A. 141 n.84 (noting that designation "applies to the active moiety"). This practice reflects that drug manufacturers often seek designation early in the development process when the "physical and chemical properties" of the drug may not yet be known. 21 C.F.R. § 316.20(b)(4). It is not until the manufacturer later seeks

6

approval to market the developed drug that the manufacturer must submit

studies and data about the drug, its active and inactive components, its

dosing, and its mechanism of action. *See* 21 U.S.C. § 355(b). As discussed

below, exclusivity attaches at the time a drug is approved.

### 2. Original 1983 Version of the Orphan Drug Act and Agency Regulations

When Congress passed the Orphan Drug Act in 1983, the exclusivity

provision's language was slightly different than it is today. Congress

specified that the predicate for exclusivity was that FDA "approves an

application . . . for a drug designated under section 360bb of this title for a

rare disease or condition." 21 U.S.C. § 360cc(a) (1983). If that condition was

met, then FDA could "not approve another application . . . for such drug for

such disease or condition" for someone else "until the expiration of seven

years from the date of the approval." *Id.*

In the next subsection, Congress set out two exceptions to the

exclusivity that would otherwise attach under § 360cc(a). FDA could approve

another application "for such drug for such disease or condition" that would

otherwise be blocked during the exclusivity period if the agency found "that

in such period the holder of the approved application . . . cannot assure the

availability of sufficient quantities of the drug to meet the needs of persons

7

with the disease or condition for which the drug was designated." 21 U.S.C. § 360cc(b)(1) (1983).  FDA could also approve another application with written "consent of [the] holder for the approval of other applications." *Id.* § 360cc(b)(2) (1983).

Soon after the Act's passage, FDA undertook consideration of when "one drug is the same as another" such that it could not be approved during the seven-year exclusivity period.  Proposed Rule, Orphan Drug Regulations, 56 Fed. Reg. 3338, 3341 (Jan. 29, 1991).  While reciting "several alternative scientifically reasonable sets of criteria for identifying drugs as different" for these purposes, FDA explained that drugs could be distinct not only chemically or structurally, but also "therapeutically" or "pharmacologically." *Id.*  FDA observed that a later drug would be "quite advantageous" as compared to an earlier drug if, for example, the later drug "lack[s] a particular adverse effect" or "ha[s] different pharmacokinetics." *Id.*

FDA thus determined to distinguish drugs based on both chemical structure and physical features.[2]  As for chemical structure, two drugs would

---

[2] For purposes of this brief, the term "physical features" includes, but is not limited to, features that may be relevant to a clinical superiority analysis like dosage form (e.g., tablet, capsule, or solution), route of administration (e.g., intravenous or oral), and formulation (e.g., immediate-, extended-, or delayed-release).

not be considered the same "if they differ with respect to the chemical structure of their active moieties." 56 Fed. Reg. at 3341. To take a familiar example outside the orphan-drug context, Tylenol and Advil have a different molecule responsible for each drug's pharmacological action (acetaminophen for the former and ibuprofen for the latter).

As for physical features, "drugs with similar chemical structure" would not be regarded as the same if the later drug is "clinically superior." 56 Fed. Reg. at 3343. Even when drugs contain the same active moiety, one may exhibit "a gain in safety and/or effectiveness" or make "a major contribution to patient care," such as "the development of an oral dosage form where the first drug was available only in a . . . form" that had to be injected or infused into the body by a healthcare practitioner. *Id.* (quotation marks omitted). Considering the Tylenol example again, Tylenol is an acetaminophen drug taken orally for pain relief, while Ofirmev is an acetaminophen drug injected intravenously for pain relief. *See* Label for OFIRMEV (acetaminophen) Injection, https://perma.cc/XW99-3AG5. Although acetaminophen is the active moiety in each drug and both drugs treat pain and fever, they are available in different forms (oral and intravenous) that can carry different consequences for patient care.

9

Thus, as a general matter, two drugs can share the same active moiety and still differ in significant ways that can be consequential for patients. Accordingly, in the orphan-drug context, FDA has recognized that a later drug may exhibit greater safety or greater effectiveness than an earlier drug with the same active moiety.  Final Rule, Orphan Drug Regulations, 57 Fed. Reg. 62,076, 62,079 (Dec. 29, 1992).  And depending on the circumstances, factors like "convenient treatment location; duration of treatment; patient comfort; improvements in drug efficiency; advances in the ease and comfort of drug administration; longer periods between doses; and potential for self administration" could provide a basis to find that a later drug makes a major contribution to patient care.  *Id.*

FDA finalized its orphan-drug regulations in 1992.  Pursuant to those regulations, where FDA approved a designated orphan drug, the agency would not grant approval "to a subsequent sponsor of the same drug product for the same indication for 7 years."  21 C.F.R. § 316.3(b)(12) (1992).  As relevant here, the regulations defined "same drug" as "a drug that contains the same active moiety as a previously approved drug," "except that if the subsequent drug can be shown to be clinically superior to the first drug, it will not be considered to be the same drug."  *Id.* § 316.3(b)(13)(i) (1992).  And

10

a drug would be considered "clinically superior" where it was "shown to provide a significant therapeutic advantage over and above that provided by an approved orphan drug (that is otherwise the same drug)" through "[g]reater effectiveness," "[g]reater safety," or other "major contribution to patient care." *Id.* § 316.3(b)(3) (1992). In short, one drug is not the same drug as another "if it does not have the same active moiety or is clinically superior." *Eagle Pharm., Inc. v. Azar*, 952 F.3d 323, 326 (D.C. Cir. 2020).

### 3.     2017 Amendments to the Orphan Drug Act

Judicial decisions prompted Congress to amend the Orphan Drug Act in 2017. One district court upheld FDA's interpretation of the statutory term "such drug." *See Baker Norton Pharm., Inc. v. FDA*, 132 F. Supp. 2d 30, 34-38 (D.D.C. 2001). Another district court declined to reach the issue, but some of its reasoning arguably expressed doubt about FDA's reading. *See Depomed, Inc. v. U.S. Dep't of Health & Human Servs.*, 66 F. Supp. 3d 217, 222-23, 232 (D.D.C. 2014). And multiple courts deemed unlawful FDA's separate, but closely related, practice of requiring a second-in-time drug's sponsor to demonstrate clinical superiority to claim its own period of exclusivity for a drug that is otherwise the same. *See Eagle Pharm., Inc. v.*

11

*Azar*, No. 16-cv-790, 2018 WL 3838265, at *5-10 (D.D.C. June 8, 2018), *aff'd*, 952 F.3d 323; *Depomed*, 66 F. Supp. 3d at 229-37.

Congress stepped in with the FDA Reauthorization Act of 2017, Pub. L. No. 115-52, 131 Stat. 1005, which made several relevant changes to the Orphan Drug Act.  In the exclusivity provision, Congress replaced "such drug" with the "same drug" terminology used in FDA's longstanding regulations.  *Id.* § 607(a)(1).  The operative text now provides that if FDA "approves an application . . . for a drug designated under section 360bb of this title for a rare disease or condition," FDA "may not approve another application . . . for the same drug for the same disease or condition" for another drug sponsor for seven years.  21 U.S.C. § 360cc(a).

Congress made similar revisions to the exclusivity exceptions in the next subsection.  Like § 360cc(a), § 360cc(b) originally used the phrase "for such drug for such disease or condition."  21 U.S.C. § 360cc(b) (1983).  The 2017 amendments did not alter the substance of the exceptions in any material respect, but they modified the lead-in language to conform with FDA's regulations and highlighted the Secretary's role in determining when drugs are the "same drug."  In its present form, the subsection spells out the two instances in which FDA "may approve an application . . . for a drug that

12

is otherwise the same, as determined by the Secretary, as the already approved drug for the same rare disease or condition" during an unexpired exclusivity period.  21 U.S.C. § 360cc(b).

Congress also enacted new subsections endorsing FDA's approach to clinical superiority.  *See Eagle Pharm.*, 952 F.3d at 329 n.9 (noting that the 2017 amendments "codify a clinical superiority requirement for exclusivity and supersede *Depomed*'s holding").  Under the first subsection, on a prospective basis, a sponsor seeking "exclusive approval" for a drug that "is otherwise the same, as determined by the Secretary, as an already approved . . . drug" for the same use or indication must "demonstrate that such drug is clinically superior to any already approved . . . drug that is the same drug." 21 U.S.C. § 360cc(c)(1), (3).  The statute defines "clinical superiority" in the same terms as FDA's regulations.  *Compare id.* § 360cc(c)(2), *with* 21 C.F.R. § 316.3(b)(3) (1992).  The statute further allows FDA to promulgate implementing regulations and to "apply any definitions set forth in regulations that were [previously] promulgated" where consistent with "the terms of this section, as amended."  21 U.S.C. § 360cc(d).

13

**B.**     **Factual Background and Agency Proceedings**

1.  Narcolepsy is a sleep disorder that affects the brain's ability to
regulate natural sleep and wake cycles.  J.A. 140.  Narcolepsy patients often
experience excessive daytime sleepiness, sudden onsets of sleep, and
temporary muscle weakness (cataplexy) that can cause collapse.  J.A. 140,
513-14.  At the time the drugs at issue here received orphan-drug
designation, approximately 180,000 individuals in the United States were
diagnosed with narcolepsy.  J.A. 123.  The prevalence of narcolepsy now
exceeds 200,000 and is no longer considered a rare disease.  The drugs that
contain oxybate, however, are still eligible to receive exclusivity under the
Orphan Drug Act.  *See* 21 C.F.R. § 316.29(c).

The main goal of narcolepsy treatment is to "promote normal sleep at
night" and "achieve normal alertness during conventional waking hours."
J.A. 140 (quotation marks omitted).  The molecule oxybate has been shown to
be effective in treating narcolepsy symptoms.  *See* J.A. 141.  When
developing an oxybate-based drug, a drug manufacturer can make changes
to the drug's composition that affect the rate at which the oxybate is
released.  For an immediate-release drug, the drug product is immediately
disintegrated, dissolved, and readily available for absorption through the

14

gastrointestinal tract into the bloodstream, with the plasma concentrations (which may correlate to the drug's effects) peaking in a short window of time. *See* James W. Wheless et al., *A Clinician's Guide to Oral Extended-Release Drug Delivery Systems in Epilepsy*, 23 J. Pediatric Pharmacology & Therapeutics 277, 278 (2018). To create an extended- or delayed-release drug, manufacturers typically add inactive ingredients that serve to slow or postpone release. *See id.*

One mechanism to achieve the desired release profile is to mix immediate-, extended-, and delayed-release components in specific proportions. The dosage form (e.g., tablet, capsule, suspension, injectable) may also affect the release profile. Manufacturers often undertake extensive testing to develop a drug with the requisite release characteristics. *See, e.g.*, FDA, *Adaptive Perfusion: A Novel In Vitro Drug Release Testing Method for Complex Drug Products*, https://perma.cc/WXC8-PNHS (explaining that "during drug development" manufacturers must conduct tests "to measure the extent and rate of drug release" in order "to create the optimal drug release profile"); FDA, *Guidance for Industry: Extended Release Oral Dosage Forms: Development, Evaluation, and Application of In Vitro/In Vivo Correlations*, https://perma.cc/Z5L3-8A4L (offering recommendations

15

to drug sponsors on using in vitro/in vivo correlations to support their drug applications).

2. In 1994, Jazz's predecessor received orphan-drug designation for the active moiety oxybate for narcolepsy. J.A. 141. Since that time, Jazz submitted several new drug applications for different uses of its first oxybate-based drug, Xyrem. FDA approved the drug for treatment of cataplexy in adult narcolepsy patients in July 2002, for treatment of excessive daytime sleepiness in adult narcolepsy patients in November 2005, and for treatment of cataplexy or excessive daytime sleepiness in pediatric narcolepsy patients in October 2018. J.A. 141. Each approval received its own seven-year period of exclusivity for the particular indication. *See* J.A. 141-42.

This case primarily concerns Jazz's later-developed drug, Xywav. Xywav contains the same active moiety (oxybate) as Xyrem. J.A. 142. Both drugs are immediate-release solutions with the same dosing regimen: patients take two doses at night, the first at bedtime and the second two-and-a-half to four hours later. J.A. 142. Xywav, however, has lower levels of sodium than Xyrem. J.A. 142-43. Jazz is the sponsor of both Xyrem and Xywav, and thus FDA did not need to consider whether § 360cc(a)'s bar on

16

approving another oxybate-based drug to treat certain narcolepsy symptoms applied when it approved Xywav for treatment of cataplexy and excessive daytime sleepiness in narcolepsy patients 7 years of age or older in July 2020. FDA also determined that Xywav was "clinically superior" to Xyrem because Xywav's reduced sodium content would help "reduc[e] cardiovascular morbidity in a substantial proportion of patients for whom the drug is indicated." J.A. 143. Xywav thus qualified for its own seven-year period of exclusivity under 21 U.S.C. § 360cc(c). J.A. 143.

Meanwhile, Avadel received orphan-drug designation for the active moiety oxybate for narcolepsy in January 2018. J.A. 145. Avadel's drug, Lumryz, contains the same active moiety (oxybate) as Jazz's drugs. J.A. 144. However, unlike Xyrem and Xywav, patients taking Lumryz do not need "to wake from sleep to take [a] second dose." J.A. 144 ("Lumryz's labeling does not advise an awakening to take a second dose for proper administration."). Because Lumryz is "an extended-release oral suspension" made up of a proprietary blend of immediate-release and delayed-release granules, it requires only one dose per night before going to sleep. *See* J.A. 144.

Avadel submitted a new drug application in December 2020 and an amendment in March 2023, seeking approval of Lumryz for treatment of

cataplexy or excessive daytime sleepiness in adult narcolepsy patients. J.A. 145. Because Xywav was approved for treating the same condition in this population, FDA had to determine whether Xywav's orphan-drug exclusivity blocked approval of Lumryz through the end of Xywav's exclusivity period in July 2027. That decision hinged on whether Xywav and Lumryz are the "same drug" for purposes of the exclusivity provision. *See* J.A. 145.

To answer that question, FDA's Office of Orphan Products Development "consulted with agency sleep experts and the Division of Neurology." J.A. 130. In response, the board-certified sleep specialists explained that Lumryz's "extended-release formulation" and "once-nightly dosing regimen" provide a significant therapeutic advantage over Jazz's drugs, Xyrem and Xywav, both of which are immediate-release formulations that require "waking up to take medication during the night after falling asleep." J.A. 155-57, 192-93. Scientific research shows that "disrupting sleep, even briefly, changes sleep architecture" and can lead to "impairment of alertness and decline in cognitive performance the following day." J.A. 156, 196-97. Having to "wak[e] up to take a second dose" of Xywav "is antithetical to the goal of improving sleep." J.A. 156.

18

By contrast, taking Lumryz "once daily at bedtime" facilitates "an opportunity for narcolepsy patients to achieve normal sleep architecture" by sleeping through the night. J.A. 156-57, 198-99. Although Lumryz contains more sodium than Xywav, the Division of Neurology concluded that "the benefit of Lumryz's once-nightly dosing outweighs the safety concern raised by its increased sodium content" for a substantial number of narcolepsy patients who are not sensitive to sodium. J.A. 175. For "a chronic neurological condition" like narcolepsy "that requires potentially lifelong treatment," it is "more convenient, easier, and less burdensome" for patients not to have to "awaken in the middle of sleep" on "a nightly basis." J.A. 157.

Based on these expert scientific opinions, as well as submissions from Jazz and Avadel, FDA found that Lumryz and Xywav are not the "same drug," with Lumryz being "clinically superior" because it is an extended-release formulation "dosed once nightly" whereas Xywav is an immediate-release formulation "dosed twice nightly." J.A. 170. Under the terms of the exclusivity provision, "Xywav's unexpired [orphan-drug exclusivity] does not block marketing approval" of the clinically superior Lumryz, which is "otherwise the same" as Xywav given their shared active moiety. J.A. 170. FDA therefore approved Lumryz in May 2023 for the treatment of cataplexy

19

or excessive daytime sleepiness in adults with narcolepsy, J.A. 127-28, and recognized Lumryz's own seven-year period of exclusivity, J.A. 471.[3]

## C.     District Court Proceedings

In June 2023, Jazz filed this lawsuit challenging FDA's approval of Avadel's drug application under the Administrative Procedure Act. J.A. 52. Although Jazz disputed FDA's finding that Lumryz is clinically superior to Xywav in district court, *see* J.A. 81-112, Jazz does not renew that contention on appeal. Rather, the sole claim at issue is Jazz's statutory assertion that the Orphan Drug Act prohibited FDA from approving Avadel's drug application. *See* J.A. 72-81.

On cross-motions for summary judgment, the district court rejected Jazz's statutory interpretation. Jazz sought a ruling that, under the Orphan Drug Act, it was entitled to exclude Avadel from marketing its extended-release, once-nightly drug because Jazz was approved to market an immediate-release, twice-nightly drug with the same active moiety. The district court disagreed with Jazz's interpretation of the Orphan Drug Act.

---

[3] In October 2024, FDA approved Lumryz for the treatment of pediatric narcolepsy patients, but this case involves the May 2023 approval.

As the court explained, the essential dispute is whether Lumryz and Xywav are the "same drug" for purposes of the exclusivity provision.  *See* J.A. 555.

The court recognized that it is natural to refer to two drugs as different from each other based on "the second drug's 'clinical superiority' over the first."  J.A. 555.  The court noted that, in the 2017 amendments, Congress "conform[ed] the [statutory] text to the FDA's longstanding definition of 'same drug'" that considers whether the later drug is clinically superior, even if it shares the same active moiety.  J.A. 560.  Other changes made in 2017 also "expressly import[ed] or acknowledge[d] the [a]gency's existing regulatory definitions."  J.A. 556-57.  The court thus concluded that FDA acted in accordance with the "statutory text, history, and purpose" in determining that Lumryz and Xywav are not the "same drug."  J.A. 558.

The court further explained that the statute does not support Jazz's argument that "the term 'drug' in [the exclusivity provision] can only mean 'active moiety'" and that drugs are the same whenever they have the same active moiety.  J.A. 554.  The court emphasized Congress's changes to the statute in 2017 that borrowed language directly from FDA's regulations and enshrined the agency's established practices regarding clinical superiority.  *See* J.A. 559-66.  The court questioned how Jazz's interpretation could be

21

squared with FDA's express authority to recognize "exclusive approval" upon a finding of clinical superiority. J.A. 567. And the court declined to credit Jazz's suggestion that, in endorsing FDA's longstanding regulatory actions, Congress nonetheless meant to "*roll*[] *back*" or "*constrain*[]" FDA's approval authority. J.A. 558, 566.

## SUMMARY OF ARGUMENT

This case concerns whether Jazz's and Avadel's narcolepsy drugs are the "same drug" within the meaning of the Orphan Drug Act's exclusivity provision. 21 U.S.C. § 360cc(a). Jazz's drug uses oxybate in an immediate-release formulation that requires a patient to take one dose at bedtime and then to disrupt sleep several hours later to take a second dose. Avadel's drug uses oxybate in an extended-release formulation that is taken once at bedtime. On appeal, Jazz does not challenge FDA's finding that Avadel's drug provides a significant therapeutic advantage by facilitating a full night's rest without having the narcoleptic patient awaken during sleep.

The district court correctly upheld FDA's approval of Avadel's drug application because Jazz's and Avadel's drugs are not the "same drug." For decades, FDA's regulations have compared both chemical structure and physical features to determine whether two drugs are the same for purposes

22

of determining whether orphan-drug exclusivity blocks approval. This definition reflects the ordinary meaning of "same drug," which involves more than checking for a match in the active moiety. Here, FDA credited the meaningful differences between Jazz's immediate-release narcolepsy medication that wears off in the middle of the night and Avadel's extended-release narcolepsy medication that lasts the entire duration of the night.

Jazz lacks support for its assertion that active moiety is the only thing that matters for differentiating one drug from another. That interpretation would disregard that drugs with the same core molecule can be available in different dosage forms (e.g., tablet, capsule, or solution), have different routes of administration (e.g., intravenous or oral), and have different formulations (e.g., immediate- or extended-release), all of which can affect safety, efficacy, and patient care. Congress has never taken Jazz's counterintuitive approach to drug approvals, which would suggest that sponsors need identify only the active moiety. Instead, Congress requires sponsors seeking approval of a new "drug" to fully disclose and describe the drug's components and composition, as well as its dosage form and route of administration, in the applicable new drug application. In addition to conflicting with the ordinary meaning of "same drug," Jazz's reading also

23

cannot be squared with the overall statutory scheme, which recognizes exclusivity for clinically superior drugs, or with the congressional objective to encourage drug manufacturers to explore various forms and mechanisms for the treatment of rare diseases.

Furthermore, any lingering ambiguity on this issue was put to rest when Congress amended the statute in 2017. By that time, FDA's regulatory definition of "same drug" had been in place for nearly 25 years. And Congress modified the statute to include that very term, "same drug." As Jazz does not dispute, Congress simultaneously enacted new subsections endorsing a closely related agency framework. Jazz cannot dismiss the consequential addition of these amendments when Congress's action has all the hallmarks of validating FDA's established practices with respect to the interconnected provisions in this intricate statutory regime.

## STANDARD OF REVIEW

Under the Administrative Procedure Act, FDA's decision may not be set aside unless it is arbitrary, capricious, or contrary to law. 5 U.S.C. § 706(2)(A). This Court reviews questions of statutory interpretation de novo. *Blackman v. District of Columbia*, 456 F.3d 167, 174 (D.C. Cir. 2006).

24

## ARGUMENT

### THE DISTRICT COURT CORRECTLY UPHELD FDA'S APPROVAL OF AVADEL'S DRUG TO TREAT NARCOLEPSY

In this case, Avadel sought approval to market an extended-release oxybate-based medication requiring one dose per night for use in treating symptoms of the sleep disorder narcolepsy. The legal issue is whether the exclusivity provision in 21 U.S.C. § 360cc(a) precluded FDA from approving that application on the ground that less than seven years earlier FDA had approved Jazz's immediate-release oxybate-based medication requiring two doses per night for use in treating the same symptoms of narcolepsy.

As the district court correctly explained, orphan-drug exclusivity posed no bar to the subsequent approval: Avadel's extended-release, once-nightly medication is not the "same drug" as Jazz's immediate-release, twice-nightly medication for purposes of § 360cc(a) simply because they share the same active moiety. This conclusion follows naturally from the statutory text, context, and history. The court properly rejected Jazz's unsupported assertion that "same drug" can mean only "same active moiety" and nothing more. And Congress removed all doubt in 2017 when it amended the statute to expressly endorse FDA's longstanding view that two drugs with the same active moiety are not the same drug if one is clinically superior to the other.

25

A.    **Avadel's Drug Is Different than Jazz's Drug and the Orphan Drug Act Does Not Block Its Approval.**

1.    **Consistent with the Agency's Longstanding View, the Statute Permits FDA to Approve Avadel's Clinically Superior Drug.**

The exclusivity provision, codified in § 360cc(a), first describes the predicate for exclusivity, then describes the scope of exclusivity. The provision states that if FDA "approves an application . . . for a drug designated . . . for a rare disease or condition," FDA may not for seven years "approve another application . . . for the same drug for the same disease or condition" for a different drug sponsor. 21 U.S.C. § 360cc(a). The statutory language therefore calls for comparing the drug in a new drug application with another sponsor's previously approved drug with ongoing orphan-drug exclusivity to ensure that FDA does not approve a second application for "the same drug for the same disease or condition" during the seven-year exclusivity period.

In this case, all agree that Avadel's application sought approval to treat the same symptoms (excessive daytime sleepiness and cataplexy) of the same sleep disorder (narcolepsy) in a subset of the same population (adult patients) as Jazz's approved application. *See* 21 C.F.R. § 316.31(a) (defining scope of exclusivity with reference to "the same use or indication"); *see also id.*

26

§ 316.31(b) ("Orphan-drug exclusive approval protects only the approved indication or use of a designated drug.").  The operative question is therefore whether Avadel's application sought approval for the "same drug" as Jazz's approved application.  Based on a comprehensive analysis of the facts and the statute, the district court correctly answered that question in the negative.

Avadel's drug Lumryz is "an extended-release oral suspension version of sodium oxybate." J.A. 144.  A dose of Lumryz contains a specific blend of coated and uncoated granules of oxybate, the molecule responsible for helping to treat the symptoms of narcolepsy. *See* J.A. 198.  When mixed with water, the uncoated granules dissolve and that portion of the drug is absorbed immediately.  The remainder of the drug is not released until the coating on the other granules is dissolved in the patient's intestines.  This formulation allows sustained release over a longer period, rather than immediate release all at once.  For this reason, "Lumryz is dosed once per night before sleep." J.A. 144.  In Jazz's drug Xywav, oxybate is also the active moiety in each of the four active ingredients (calcium oxybate, potassium oxybate, magnesium oxybate, and sodium oxybate).  J.A. 142.  Unlike Lumryz, Xywav is a solution where all absorption by the body begins immediately after administration.  J.A. 198.  Because Xywav's immediate-

27

release formulation means that the effects wear off after several hours, two doses must be spread out over the night, with a patient taking the first at bedtime and the second two-and-a-half to four hours later.  J.A. 142.

FDA found that Lumryz's extended-release formulation provides a major contribution to patient care and thus a significant therapeutic advantage over Xywav.  Jazz does not challenge that finding on appeal.  Agency sleep experts explained that Lumryz aligns with the overarching goal of managing narcolepsy by facilitating sleep throughout the night and thereby promoting regular sleep cycles.  J.A. 156-57, 198-99.  By contrast, Xywav "is antithetical to" that objective because it requires patients to disrupt their sleep to take a second dose.  J.A. 156.  And that impact is lasting because narcolepsy patients generally have to take medication for the rest of their lives.  *See* J.A. 157.  Thus, although Lumryz and Xywav contain "the same active moiety," these different formulations using that molecule are not the "same drug" under FDA's longstanding regulations because Lumryz is "clinically superior" to Xywav.  21 C.F.R. § 316.3(b)(14)(i).

By considering both chemical structure and physical features, FDA's regulatory definition captures an important insight about the common-sense meaning of "same drug," as used in the Orphan Drug Act's text.  Drugs are

28

commonly understood to comprise more than just the molecule responsible for physiological or pharmacological action. For example, when deciding whether to approve a new drug application—a process expressly referenced in and central to the operation of the Orphan Drug Act's exclusivity provision—FDA considers information including about the drug's components, dosage form, route of administration, and formulation. *See* 21 C.F.R. § 314.50; 21 U.S.C. § 355(b); *see also id.* § 355(c)(3)(E)(ii) (recognizing difference between "a drug" and the drug's "active moiety"). As relevant to the orphan-drug context, two drug products may have the same core chemical component (active moiety) but nonetheless have very different clinical consequences. *See, e.g.*, Orphan Drug Regulations, 78 Fed. Reg. 35,117, 35,125 (June 12, 2013) (listing possible benefits of a different formulation of a drug, such as reducing the amount or the burden of treatment). Jazz's assertion (Br. 27-28) that physical features are completely irrelevant, and that active moiety is all that matters for differentiating one drug from another, is both counterintuitive and inconsistent with the way in which Congress has directed FDA to approve drugs for marketing.

Even outside the context of orphan drugs, it is natural not to equate two drugs that have the same active moiety. For example, Tylenol contains

29

the active moiety acetaminophen and is available over the counter in pill form that can be taken orally at home.  FDA approved another acetaminophen drug, Ofirmev, a prescription intravenous infusion administered directly into a patient's veins, typically by doctors at the hospital.  Both under the statute and as a matter of everyday usage, these two medications are treated as two different drugs.  FDA approved them separately on the basis of different applications, and a person experiencing pain and fever would undoubtedly perceive a difference if her local pharmacist handed over Ofirmev instead of Tylenol.

In the context of orphan drugs, FDA recognizes this same essential principle that two drugs can share the same active moiety and still differ in significant ways that can be consequential for patients.  FDA regularly approves orphan drugs with the same active moiety where a change in physical features provides some valuable improvement for the target population.  *See, e.g.*, J.A. 136 (discussing FDA's approval of drug to treat a type of multiple sclerosis that resulted in fewer relapses than earlier approved drug); FDA, *Clinical Superiority Findings*, https://perma.cc/W3LZ-HKUL (reciting examples, such as where oral formulation offered advantage over injectable formulation and where liquid

30

formulation was safer for children than solid formulation).  Jazz's blinkered

definition of what constitutes a drug would deprive patients of materially

improved treatments of sometimes severe and life-threatening diseases,

whether by providing greater safety, greater efficacy, or a major contribution

to patient care.

A similar scenario unfolded here.  Jazz's drug Xywav is an immediate-

release formulation, where the entire dose is available for absorption almost

instantly upon ingestion.  Because the pharmacologic action does not last

throughout the night, a patient must awaken in the middle of sleep to take

another dose.  J.A. 142.  By contrast, due to its physically distinct

composition, Lumryz maintains a relatively stable level of medication in the

body for nearly the full duration of the night.  This extended-release

formulation means that a patient need only take one dose before bed without

having to wake up deliberately during the night.  J.A. 156-57.  FDA simply

credited these meaningful therapeutic differences that show Lumryz and

Xywav are not the same drug.

This conclusion represents a straightforward application of FDA's

formal and longstanding position that a drug "shown to be clinically

superior" to another drug "will not be considered to be the same drug" for

31

purposes of § 360cc(a). 21 C.F.R. § 316.3(b)(14)(i); *id.* § 316.3(b)(13)(i) (1992). As Jazz admits (Br. 49), "Congress was writing against the backdrop of FDA's prior actions." The fact that Congress modified the Orphan Drug Act's exclusivity provision in 2017 to precisely match the "same drug" language in FDA's regulations provides a powerful reason to preserve, not upset, the agency's established regulatory definition. Indeed, the 2017 amendments as a whole demonstrate congressional endorsement of FDA's operationalization of the intricate statutory framework. *See* J.A. 555-58 (discussing the statutory text in light of its "historical context"); *infra* Part B.

The remaining provisions of § 360cc corroborate FDA's understanding. In enumerating two exceptions to exclusivity for the same drug "as determined by the Secretary" as an approved drug with ongoing exclusivity, § 360cc(b) recognizes FDA's central role in making the comparative determination about which drugs are to be treated as the same. Similarly, § 360cc(c) provides that a designated drug that is "otherwise the same, as determined by the Secretary," as an already approved drug must demonstrate clinical superiority over the already approved drug to be eligible for exclusivity. In using the phrase "otherwise the same" in § 360cc(c),

Congress acknowledged that a "clinically superior" drug is *not* "the same" as the already approved drug.

Lumryz's status as a different drug is also consistent with the statutory design.  Because other oxybate-based drugs had already been approved to treat symptoms of narcolepsy by the time Avadel sought orphan-drug designation, Avadel had to present a "plausible hypothesis" that its drug would be "clinically superior."  21 U.S.C. § 360cc(e)(1); 21 C.F.R. § 316.20(a). When Avadel later sought "exclusive approval," Avadel had to prove that Lumryz is "clinically superior" to Xyrem and Xywav.  21 U.S.C. § 360cc(c)(1). Once Avadel did so, the statute authorized a seven-year period of exclusivity to market Avadel's differently formulated drug that offers a significant therapeutic advantage over Xyrem and Xywav.  As the district court observed, it would be odd for Congress to specify that a "clinically superior" drug like Lumryz qualifies for "exclusive approval" despite an "already approved drug" "for the same rare disease or condition" that "is otherwise the same," *id.*, but then to withhold any form of approval of that drug until a clinically inferior drug's exclusivity period ends.  *See* J.A. 567-69.

By contrast, the consequence of Jazz's position is that, based on FDA's designation of oxybate for Jazz's predecessor over 30 years ago, only Jazz

can avail itself of the statutory rewards under § 360cc(a) and § 360cc(c) for developing and improving an oxybate-based narcolepsy drug.  Specifically, Jazz argues that any time it develops a new oxybate-based narcolepsy drug that is clinically superior to the earlier versions, there is no barrier to Jazz receiving marketing approval and securing a new period of exclusivity for its improved version.  That is precisely what happened with Xywav—Jazz obtained approval for Xywav in July 2020 and Xywav received its own seven-year period of exclusivity based on Jazz's showing under § 360cc(c) that Xywav is clinically superior to Xyrem.  J.A. 141-42.[4]  But in Jazz's view, § 360cc(a) precludes any other sponsor for oxybate from receiving marketing approval for a clinically superior oxybate-based narcolepsy drug while any one of Jazz's exclusivity periods is in effect.

In other words, Jazz's proposed regime in which "same drug" means "same active moiety" would allow Jazz to perpetually keep all new oxybate-

---

[4] Although § 360cc(a)'s exclusivity provision bars approvals only for "a person who is not the holder of [the] approved application" for an orphan drug, § 360cc(c) makes clear that a new exclusive-approval period cannot be approved for anyone, even the current exclusivity holder, absent a showing of clinical superiority over the previously approved drug (and regardless of whether the previously approved drug's period of exclusivity has expired). Accordingly, to secure exclusive approval for Xywav, Jazz had to demonstrate Xywav's clinical superiority over Xyrem.  *See* J.A. 143.

34

based narcolepsy drugs off the market by stringing together periods of
exclusivity for each successive approval of a clinically superior drug. Under
Jazz's reading of the statute, by adding § 360cc(c), Congress enabled *one*
manufacturer to daisy chain exclusivity to shut out *all* competitors with
oxybate-based narcolepsy drugs, despite this Court's recognition that
§ 360cc(c) eradicated a similar phenomenon where "the same manufacturers
or multiple manufacturers c[ould] obtain multiple periods of sequential
exclusivity." *Eagle Pharm., Inc. v. Azar*, 952 F.3d 323, 334 (D.C. Cir. 2020).
Rather than read this incongruence into "the overall statutory scheme," *FDA
v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000) (quotation
marks omitted), FDA has continued to recognize—as it always has—that a
manufacturer may be granted approval for a clinically superior drug because
it is not the "same drug" for purposes of § 360cc(a).

This conception of "same drug" also accords with the goal of
stimulating the development of orphan drugs. *See* Orphan Drug Act
§ 1(b)(2), (4)-(6) (providing "incentives for the development of orphan drugs"
for which pharmaceutical companies would otherwise "incur a financial
loss"). Under FDA's interpretation, drug companies have latitude to
innovate and create drugs that provide a marked improvement in the

35

treatment of rare diseases and conditions.  Jazz's newfound interpretation, on the other hand, closes off these avenues for further progress in ways that are at odds with congressional intent to "incentivize orphan drug development."  *Eagle Pharm.*, 952 F.3d at 334.  In Jazz's view, no other company can market any other oxybate-based drug for the main symptoms of narcolepsy until July 2027, no matter how different the physical features of that competing drug or how successfully such differences improve efficacy, improve safety, or contribute to patient care.  Jazz's position thus threatens to stifle the very therapeutic advances that Congress sought to promote.

### 2.    Jazz Lacks Support for Its View that Exclusivity Blocks Any Drug with the Same Active Moiety.

As the district court noted, Jazz's entire argument (Br. 27-28) rests on the flawed premise that "same drug" in the exclusivity provision can mean only "same active moiety."  J.A. 554.  Jazz offers no support for that unduly cramped understanding.  Jazz simply assumes that a "drug" in this context must be conceived of as a single component and nothing more.  Jazz's definition of "drug" ignores everything other than the molecule directly responsible for producing a physiological or pharmacological effect in the patient, in direct contravention of the way that Congress itself has used that term in the provisions at issue.  The unremarkable notion that assessing

36

whether two drugs are the same involves more than merely checking for a match in their active moiety disposes of Jazz's case.

Jazz also seeks to obscure that its position selectively endorses some aspects of FDA's decades-old understanding of "same drug" but not others. Since 1992, FDA has consistently held the view that a drug is "the same as a previously-approved drug if it shares the same active moiety and is not otherwise clinically superior." *Eagle Pharm.*, 952 F.3d at 326. Jazz now embraces the first half of that definition but disregards the second half, even though both halves together give shape to the meaning of "same drug." Jazz effectively argues that the Orphan Drug Act "expressly delegate[s]" to FDA "the authority" to define this "particular statutory term" only to the extent helpful to Jazz's case. *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 394 (2024) (quotation marks omitted).

Jazz's attempt to rehabilitate its active-moiety-only reading by reference to other statutory provisions only highlights what is missing in the provision at issue here. Jazz points (Br. 36-37) to 21 U.S.C. § 360ff, in which Congress provided sponsors of rare pediatric disease product applications with a voucher that can be used to expedite review of a subsequent drug application. An application can qualify if it is for "a drug" that "contains no

37

active moiety . . . that has been previously approved in any other application."
21 U.S.C. § 360ff(a)(4)(B)(i)(I).  As with § 355's requirements for drug
approval, *see supra* pp. 29-30, that language shows that Congress recognizes
a difference between a "drug" and its "active moiety."  It also highlights that
Congress knows how to tie the applicability of a provision to a drug's active
moiety rather than to the drug as a whole.  That Congress chose to follow
that course in § 360ff but not in § 360cc(a) underscores the propriety of
FDA's challenged regime.

The scope of exclusivity turns on whether the subsequent application
seeks approval for the "same drug" and for the "same disease or condition."
21 U.S.C. § 360cc(a).  This case involves the former component.  Jazz cites
(Br. 27) the Eleventh Circuit's decision in *Catalyst Pharmaceuticals, Inc. v.
Becerra*, 14 F.4th 1299 (11th Cir. 2021), but that decision involved the latter
component and had no occasion to address the former component because
"the parties agreed that the two drugs at issue were the same," J.A. 561.
Rather, the question presented was what it means for FDA to "approve
another application . . . for the same disease or condition" under § 360cc(a) in
a context where one company was approved to market a drug for a rare
disease in adults and another company sought approval to market the same

38

drug for the same disease in children.  *See Catalyst*, 14 F.4th at 1304-05.[5]

Focusing on the phrase "same disease or condition" divorced from the

context in which that phrase appears, the court concluded that the scope of

exclusivity is tied to the entire disease that has been designated even if the

company eventually receives approval to market its drug for only a subset of

the affected population.  *See id.* at 1307-13.  In *Catalyst*, moreover, the court

deemed it significant that Congress had not adopted FDA's regulatory

language regarding this latter component.  *See id.* at 1309.  That reasoning is

faulty on its own terms, but it has no application here because Congress took

the step of "amend[ing] § 360cc(a) to include the very term that the FDA had

coined and defined—'same drug.'"  J.A. 562; *see infra* Part B.

Relying on *Catalyst*'s erroneous reasoning, Jazz urges (Br. 27) that

FDA's designation of oxybate is dispositive because the statutory term "same

drug" is simply a reference to the earlier phrase "a drug designated under

section 360bb."  This argument ignores not only the established regulatory

---

[5] The pending appeal in *Neurelis Inc. v. Brenner*, No. 25-5031 (D.C. Cir. filed Feb. 18, 2025), raises the distinct legal issue decided in *Catalyst*. Although the government respectfully disagrees with the *Catalyst* decision, *see* Clarification of Orphan-Drug Exclusivity Following Catalyst Pharms., Inc. v. Becerra; Notification, 88 Fed. Reg. 4086 (Jan. 24, 2023), it has no relevance here.

definition of "same drug" under § 360cc, but also the practical realities of the drug-development process. Designation typically takes place early in development, and a broad designation encourages sponsors to explore various forms of the drug. *See* 21 U.S.C. § 360bb(a)(1)-(2) (explaining that designation is based on "the facts and circumstances as of the date [of] the request"). By the time of the request for approval of the developed drug, the sponsor must submit studies and data about the drug, its active and inactive components, and its dosage form and route of administration. *See id.* § 355(b); 21 C.F.R. § 314.50(a). Jazz's suggestion that the scope of exclusivity—a determination made at the approval stage for a new drug application—is set by the designation request—often made at a nascent development stage—contravenes § 360cc(a)'s text, which tethers exclusivity to the time of approval and focuses on "application[s] under section 355" seeking approval to market drugs. *See Spectrum Pharm., Inc. v. Burwell*, 824 F.3d 1062, 1067 (D.C. Cir. 2016) (noting that § 360cc(a) refers to "an 'application,' which by implication directs FDA to evaluate what is written on the application"); *Sigma-Tau Pharm., Inc. v. Schwetz*, 288 F.3d 141, 145 (4th Cir. 2002) (similar).

40

Jazz also errs in discounting (Br. 50-51) the import of the clinical-superiority framework in § 360cc(c).  Like the substitution of the term "same drug" in the exclusivity provision in § 360cc(a), the addition of § 360cc(c) in 2017 imported the concept from FDA's longstanding regulations implementing § 360cc(a).  *Compare* 21 U.S.C. § 360cc(c)(2) (defining "clinically superior"), *with* 21 C.F.R. § 316.3(b)(3) (1992) (providing materially identical definition).  It is therefore odd for Jazz to invoke § 360cc(c) as a reason to overturn FDA's practice under § 360cc(a), rather than to accept FDA's established position.  Although FDA has described § 360cc(a) as governing the scope of exclusivity and § 360cc(c) as governing the eligibility for exclusivity, *see* J.A. 134, that does not mean that these neighboring subsections do not work in tandem and help shed light on each other.

There is also no merit to Jazz's broader suggestion (Br. 29) that FDA's interpretation somehow grafts an additional exception onto the statutorily specified circumstances in which a subsequent drug may be approved during an ongoing period of orphan-drug exclusivity.  The question presented here concerns the scope of orphan-drug exclusivity in the first instance based on the meaning of the term "same drug" in the exclusivity provision.  Construing the statutory language to determine this threshold issue is not

41

akin to creating a new avenue for a second applicant to break an approved sponsor's exclusivity. *See Republic of Argentina v. NML Capital, Ltd.*, 573 U.S. 134, 142-43 (2014) (disfavoring an interpretation that in effect reads an additional provision into the statute).

Lacking any textual footing in the statute that Congress has enacted, Jazz embarks (Br. 31-33) on a misguided effort to reimagine the statutory language based on legislation that Congress has not enacted. Courts have highlighted the dangers of attempting to draw inferences from "a proposal that does not become law." *Pension Benefit Guar. Corp. v. LTV Corp.*, 496 U.S. 633, 650 (1990); *United States v. Wise*, 370 U.S. 405, 411 (1962). Jazz's own precedent (Br. 33-34) declined to "rely on Congress' failure to act," instead emphasizing the substance of what "Congress ha[d] enacted." *Brown & Williamson*, 529 U.S. at 155. Jazz's approach is especially dubious because all of the unenacted bills that it identifies predate the 2017 amendments to the Orphan Drug Act. Jazz never explains how pre-2017 failed legislative proposals—none of which even purported to alter the scope of exclusivity set forth in § 360cc(a)—inform the meaning of the statutory language in its current form.

42

In another departure from the statutory text, and for the first time on appeal, Jazz argues (Br. 53-57) that FDA's interpretation implicates protected property interests and due process.  Jazz failed to preserve this issue for appeal, as Jazz's summary-judgment reply contained only a fleeting aside that orphan-drug exclusivity is "a statutory entitlement if not a vested property right."  Dkt. No. 63, at 7.  In any event, this newly asserted theory falters on multiple grounds.  As an initial matter, FDA long ago explained that "[t]here is no property right to exclusive approval under the Orphan Drug Act."  57 Fed. Reg. at 62,083.  Even assuming there were such a right, the statute would delimit its scope, and Jazz cannot claim an entitlement to exclude from the market a drug that is not the "same drug."  In all events, Jazz has no basis to complain when it received robust process in this case: before deciding whether to approve Avadel's drug, FDA accepted written submissions from Jazz and heard a presentation from Jazz's lawyers, J.A. 131, and FDA thoroughly engaged with Jazz's statutory and factual arguments in determining that Xywav's exclusivity did not bar approval of Avadel's clinically superior drug Lumryz, *see* J.A. 146-55, 161-70.

43

**B.      Congress Endorsed FDA's Regulatory Definition When It Amended the Orphan Drug Act in 2017.**

For the reasons already explained, Jazz's and Avadel's drugs are not the "same drug" under a straightforward reading of the statutory text. The district court's judgment can be affirmed on that basis alone. But Congress's amendments to the Orphan Drug Act in 2017 remove any doubt that FDA properly approved Lumryz despite Xywav's exclusivity.

**1.      Congress Modified the Statutory Language to Incorporate the Term "Same Drug" from FDA's Regulations.**

As provided in the original version of the Orphan Drug Act enacted in 1983, approval of a designated drug to treat a rare disease or condition would block approval of another application "for such drug for such disease or condition" for a period of seven years. 21 U.S.C. § 360cc(a) (1983). In 1992, FDA promulgated regulations equating the terms "such drug" and "same drug" and defining a drug as the "same drug" when it "contains the same active moiety" and is not "shown to be clinically superior." 21 C.F.R. § 316.3(b)(13)(i) (1992). Congress then changed the statutory language in 2017 to provide a seven-year marketing exclusivity as against "the same drug for the same disease or condition." 21 U.S.C. § 360cc(a).

44

This is a paradigmatic case in which Congress "ratified and incorporated the existing regulatory definition of 'same drug' into the statute." J.A. 556. When Congress revised the Act in 2017, FDA's interpretation of "same drug" had been on the books for nearly 25 years. In amending the statute, Congress did not merely decline to disturb "the longstanding administrative construction of the statute" that had invariably engendered "substantial reliance interests" by drug companies making financial commitments and investments, a fact that on its own would be significant in the statutory analysis. *Zenith Radio Corp. v. United States*, 437 U.S. 443, 457 (1978). Congress went even further and modified the statutory language to mirror FDA's decades-old regulatory language. *See Commodity Futures Trading Comm'n v. Schor*, 478 U.S. 833, 846 (1986) ("Where, as here, Congress has not just kept its silence by refusing to overturn the administrative construction, but has ratified it with positive legislation, [courts] cannot but deem that construction virtually conclusive." (quotation marks omitted)).

There can be no real debate about what Congress meant to achieve when it copied FDA's terminology into the Act. "All indications are that Congress was well aware of [FDA's] position . . . and intended to give that

45

position its active endorsement." *Bragdon v. Abbott*, 524 U.S. 624, 645 (1998). At the time Congress acted, the term "same drug" had a well-established regulatory meaning in this context. *See* J.A. 556. Even Jazz concedes (Br. 49) that "Congress was writing against the backdrop of FDA's prior actions." Congress's decision to adopt the precise phrase that FDA had "authoritative[ly] constru[ed]" is striking. *Washington All. of Tech. Workers v. U.S. Dep't of Homeland Sec.*, 50 F.4th 164, 180 (D.C. Cir. 2022) (quotation marks omitted); *see Bragdon*, 524 U.S. at 645 (holding that "repetition of the same language in a new statute indicates, as a general matter, the intent to incorporate its administrative . . . interpretations").

Contrary to Jazz's assertion (Br. 34), the evidence of congressional endorsement is not limited to "a single line" or a single change in the 2017 amendments. The whole thrust of these statutory revisions was to validate FDA's established administrative practices that had been overturned or questioned by courts. Most directly, Congress added § 360cc(c) in response to judicial decisions declaring unlawful FDA's practice of requiring a second-in-time drug's sponsor to demonstrate clinical superiority to be eligible for its own period of exclusivity for a drug that is otherwise the same. *See, e.g.*, *Depomed, Inc. v. U.S. Dep't of Health &*

*Human Servs.*, 66 F. Supp. 3d 217, 229-37 (D.D.C. 2014).  As this Court has observed, the 2017 amendments "codify a clinical superiority requirement for exclusivity and supersede *Depomed*'s holding."  *Eagle Pharm.*, 952 F.3d at 329 n.9.

The 2017 amendments signal Congress's approval of FDA's views at every turn.  In addition to replacing "such drug" with "same drug" in § 360cc(a), Congress inserted language reminiscent of FDA's regulations in § 360cc(b) and (c)(1) indicating that whether a drug is "otherwise the same" as another is to be "determined by the Secretary."  *See* J.A. 148.  In § 360cc(e)(1), Congress referenced FDA's practice of requiring a drug sponsor seeking designation for an already approved drug to present a "plausible hypothesis" of clinical superiority.  In § 360cc(c)(2), Congress defined "clinically superior" in terms materially identical to FDA's regulatory definition.  On top of all that, § 360cc(d) authorized FDA to apply existing regulatory definitions regarding clinical superiority so long as they "are not inconsistent with the terms of this section, as amended."  Notably, each change embraces FDA's understanding of this intricate and interconnected statutory scheme.

47

Both before and after the 2017 amendments, Congress has also made technical changes to § 360cc(a) and (c) without disturbing FDA's "same drug" interpretation.  *See* Consolidated Appropriations Act, 2021, Pub. L. No. 116-260, div. BB, tit. III, subtitle C, § 323, 134 Stat. 1182, 2933 (2020); Rare Diseases Orphan Product Development Act of 2002, Pub. L. No. 107-281, § 4, 116 Stat. 1992, 1993; Food and Drug Administration Modernization Act of 1997, Pub. L. No. 105-115, § 125(b)(2)(J)-(K), 111 Stat. 2296, 2326.  It is notable that, despite making periodic modifications "including [to] the specific provision at issue" here, *Washington All.*, 50 F.4th at 183 (quotation marks omitted), Congress has never registered any objection to or expressed any disapproval of FDA's regulatory definition of "same drug."  Instead, in 2017, Congress wrote the term into the statute.

### 2. Jazz Misunderstands the Nature of the Changes that Congress Made to the Statute.

Although Congress's activity in this space has all the hallmarks of endorsing FDA's views, Jazz insists (Br. 57-58) that Congress sought to reject FDA's views.  In Jazz's telling, "Congress *rolled back* the FDA's approval authority" when it incorporated FDA's regulatory language into the statutory text.  J.A. 558.  That contention is implausible.

48

Jazz does not dispute (Br. 48-49) that Congress was familiar with FDA's regulatory definition of "same drug" or that Congress added that exact term into the Orphan Drug Act.  Jazz nonetheless observes (Br. 41) that § 360cc(a) as amended does not expressly mention FDA's regulations.  But no case holds that any specific wording is necessary for Congress to accept a regulatory interpretation.  Nor is there support for Jazz's assertion (Br. 35) that the language lifted from agency regulations must be sufficiently "unusual."  As the district court correctly explained, the proper inquiry is "whether there are 'indications in the statutory language or history to infer that Congress intended to incorporate into a statute a preexisting regulatory definition.'"  J.A. 559 (quoting *New York v. U.S. Envtl. Prot. Agency*, 413 F.3d 3, 19 (D.C. Cir. 2005) (per curiam)).  Here, there are overwhelming indicia that Congress did so, particularly by "conform[ing] the [statutory] text to the FDA's longstanding definition of 'same drug.'"  J.A. 560.

Jazz also seeks (Br. 45) to downplay the addition of "same drug" because Congress did not simultaneously insert a separate regulatory phrase—"same use or indication"—in place of "such disease or condition."  It is difficult to see how the fact that Congress did *not* incorporate other regulatory language about the scope of orphan-drug exclusivity has any

49

bearing on Congress's intentions with respect to the defined term that it *did*

incorporate.  In any event, Congress had no reason to amend § 360cc(a) to

clarify that exclusivity is tied to approved uses or indications because there

was no legal challenge to FDA's approved-use interpretation pending at that

time.[6]  By contrast, the issue of what constitutes "such drug" had been raised

in multiple cases, and a court had arguably expressed doubt regarding

FDA's reading.  *See Depomed*, 66 F. Supp. 3d at 222-23, 232.

Indeed, Jazz never develops any consistent theory as to why Congress

changed "such drug" to "the same drug."  In some places, Jazz appears to

suggest (Br. 15-16) that the change may have been meaningless.  In other

places, Jazz gestures (Br. 44) to legislative drafting guidance that expresses

a preference for the words "the" or "that" over "such."  In still other places,

Jazz speculates (Br. 43-44) that Congress has sometimes replaced "such"

with "the same" to "clarify the modified phrases."  Despite all of these

---

[6] That interpretation was later challenged in *Catalyst*, 14 F.4th 1299. Here, this Court has no need to address that interpretive issue—which is the subject of the pending appeal in *Neurelis Inc. v. Brenner*, No. 25-5031 (D.C. Cir. filed Feb. 18, 2025)—because, as the district court recognized, this case is "fundamentally different than *Catalyst*."  J.A. 562.  Jazz's arguments on this score also fail to mention that Jazz's drugs have benefited from the agency's approved-use interpretation that was rejected in *Catalyst*, as Xyrem received successive periods of exclusivity for different uses and subpopulations.  *See* J.A. 141.

proffered alternatives, Jazz does not explain which is relevant here, much less provide any persuasive rationale for why Congress would have employed the term "same drug" that appears in FDA's regulations if Congress disagreed with the substance of FDA's definition of that term.

Jazz's resort (Br. 40-41, 44-45) to inapposite case law is equally unavailing. Jazz cites cases where there was a material linguistic variation between the statutory and regulatory text. *See CSX Corp. v. United States*, 18 F.4th 672, 681 (11th Cir. 2021) (discussing words present in statute and absent from regulation, and vice versa); *cf. Bruesewitz v. Wyeth LLC*, 562 U.S. 223, 233-34 (2011) (rejecting argument that the statutory word "unavoidably" was a "term of art" drawn from a legal source that used a different word, "unavoidable"). Here, Congress adopted the relevant language—"same drug"—used in FDA's regulations without change. That Congress saw no need to enact distinct aspects of FDA's regulatory definition does not undercut that Congress "pluck[ed] language from FDA's regulation and transplant[ed] it verbatim into the statute." Jazz Br. 44.

Nor does the issue presented in *Environmental Defense v. Duke Energy Corp.*, 549 U.S. 561 (2007), *cited in* Jazz Br. 42, resemble the issue presented here. There, Congress used the same definition for the same

51

statutory term in two different schemes enacted years apart. *See* J.A. 559-60 (summarizing background of case). The Supreme Court explained that the "common statutory definition" did not preclude the agency from construing the term differently depending on the surrounding context. *Duke Energy*, 549 U.S. at 574. Here, FDA is not faced with implementing one defined statutory term across two distinct schemes. Rather, Congress replaced the language in the statute with the defined term "same drug" from FDA's regulations. At the same time, Congress enshrined in the statute FDA's related regulatory framework for clinical superiority that is closely intertwined with the regulatory definition of "same drug." This is precisely the sort of evidence—which was absent in *Duke Energy*—"that Congress had details of regulatory implementation in mind." *Id.* at 576.

Jazz also repeatedly fails to acknowledge the 2017 amendments as a cohesive package in which Congress made multiple changes to bring the statute in line with FDA's regulatory approach to interrelated issues of approval and exclusivity. In these circumstances, Jazz's explanation (Br. 35) that Congress revised every statutory subsection but nonetheless endorsed only "FDA's approach to serial exclusivity" falls flat. Jazz also posits (Br. 49) that "Congress anticipated conflicts between the 1992 regulations and the

2017 amendments." But Jazz's only support is a provision empowering FDA to promulgate new regulations related to clinical superiority and allowing FDA to apply its existing regulatory definitions on that score "to the extent such definitions are not inconsistent with" the amended statute. 21 U.S.C. § 360cc(d). That provision hardly calls into question Congress's approval of FDA's regulatory definition of "same drug."

Finally, Jazz questions (Br. 50-52) how to plug FDA's regulatory definition of "same drug" into various places in § 360cc. That argument fails to account for the context in which the words are used and misses the forest for the trees. FDA's regulations define "same drug" as a drug that contains the same active moiety and is not clinically superior. That definition is in harmony with the provision on which Jazz fixates—§ 360cc(c)(1)—which also draws a distinction "between an approved drug and a subsequent drug based on 'clinical superiority.'" J.A. 564-65. At base, Congress embraced the notion rooted in FDA's longstanding regulations and applied in this case that drugs sharing the same active moiety are not necessarily the "same drug," and that differences beyond the active moiety can render a drug like Avadel's clinically superior to, and thus different from, other drugs with the same active moiety.

53

## CONCLUSION

For the foregoing reasons, the judgment of the district court should be affirmed.

Respectfully submitted,

*Of Counsel:*

SEAN R. KEVENEY
   *Acting General Counsel, HHS*

ROBERT FOSTER
   *Deputy General Counsel, HHS*
   *Chief Counsel for Food, Research,*
   *and Drugs*

WENDY VICENTE
   *Deputy Chief Counsel, Litigation*

LEAH A. EDELMAN
   *Associate Chief Counsel*
   *U.S. Food and Drug Administration*

March 2025

YAAKOV M. ROTH
   *Acting Assistant Attorney*
   *General*

MELISSA N. PATTERSON

 /s/ Brian J. Springer
BRIAN J. SPRINGER
   *Attorneys, Appellate Staff*
   *Civil Division, Room 7537*
   *U.S. Department of Justice*
   *950 Pennsylvania Avenue NW*
   *Washington, DC 20530*
   *(202) 616-5446*
   *brian.j.springer@usdoj.gov*

54

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 10,991 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in CenturyExpd BT 14-point font, a proportionally spaced typeface.

*/s/ Brian J. Springer*
Brian J. Springer

## CERTIFICATE OF SERVICE

I hereby certify that on March 17, 2025, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit by using the appellate CM/ECF system. Service will be accomplished by the appellate CM/ECF system.

*/s/ Brian J. Springer*
Brian J. Springer

**ADDENDUM**

# TABLE OF CONTENTS

21 U.S.C. § 360cc ................................................................A1

21 U.S.C. § 360cc (1983) ....................................................A3

21 C.F.R. § 316.3 ...............................................................A4

21 C.F.R. § 316.3 (1992) .....................................................A4

**21 U.S.C. § 360cc**

**§ 360cc. Protection for drugs for rare diseases or conditions**

**(a) Exclusive approval, certification, or license**

Except as provided in subsection (b), if the Secretary—

(1) approves an application filed pursuant to section 355 of this title, or

(2) issues a license under section 262 of title 42

for a drug designated under section 360bb of this title for a rare disease or condition, the Secretary may not approve another application under section 355 of this title or issue another license under section 262 of title 42 for the same drug for the same disease or condition for a person who is not the holder of such approved application or of such license until the expiration of seven years from the date of the approval of the approved application or the issuance of the license. Section 355(c)(2) of this title does not apply to the refusal to approve an application under the preceding sentence.

**(b) Exceptions**

During the 7-year period described in subsection (a) for an approved application under section 355 of this title or license under section 262 of title 42, the Secretary may approve an application or issue a license for a drug that is otherwise the same, as determined by the Secretary, as the already approved drug for the same rare disease or condition if—

(1) the Secretary finds, after providing the holder of exclusive approval or licensure notice and opportunity for the submission of views, that during such period the holder of the exclusive approval or licensure cannot ensure the availability of sufficient quantities of the drug to meet the needs of persons with the disease or condition for which the drug was designated; or

(2) the holder provides the Secretary in writing the consent of such holder for the approval of other applications or the issuance of other licenses before the expiration of such seven-year period.

**(c) Condition of clinical superiority**

**(1) In general**

If a sponsor of a drug that is designated under section 360bb of this title and is otherwise the same, as determined by the Secretary, as an already approved or licensed drug is seeking exclusive approval or exclusive

A1

licensure described in subsection (a) for the same rare disease or condition as the already approved drug, the Secretary shall require such sponsor, as a condition of such exclusive approval or licensure, to demonstrate that such drug is clinically superior to any already approved or licensed drug that is the same drug.

### (2) Definition

For purposes of paragraph (1), the term "clinically superior" with respect to a drug means that the drug provides a significant therapeutic advantage over and above an already approved or licensed drug in terms of greater efficacy, greater safety, or by providing a major contribution to patient care.

### (3) Applicability

This subsection applies to any drug designated under section 360bb of this title for which an application was approved under section 355 of this title or licensed under section 262 of title 42 after August 18, 2017, regardless of the date on which such drug was designated under section 360bb of this title.

### (d) Regulations

The Secretary may promulgate regulations for the implementation of subsection (c).  Beginning on August 18, 2017, until such time as the Secretary promulgates regulations in accordance with this subsection, the Secretary may apply any definitions set forth in regulations that were promulgated prior to such date, to the extent such definitions are not inconsistent with the terms of this section, as amended by such Act.

### (e) Demonstration of clinical superiority standard

To assist sponsors in demonstrating clinical superiority as described in subsection (c), the Secretary—

(1) upon the designation of any drug under section 360bb of this title, shall notify the sponsor of such drug in writing of the basis for the designation, including, as applicable, any plausible hypothesis offered by the sponsor and relied upon by the Secretary that the drug is clinically superior to a previously approved drug; and

(2) upon granting exclusive approval or licensure under subsection (a) on the basis of a demonstration of clinical superiority as described in subsection (c), shall publish a summary of the clinical superiority findings.

**21 U.S.C. § 360cc (1983)**

**§ 360cc. Protection for drugs for rare diseases or conditions**

**(a) Exclusive approval, certification, or license**

Except as provided in subsection (b) of this section, if the Secretary—

(1) approves an application filed pursuant to section 355 of this title, or

(2) issues a certification under section 357 of this title, or

(3) issues a license under section 262 of Title 42

for a drug designated under section 360bb of this title for a rare disease or condition, the Secretary may not approve another application under section 355 of this title, issue another certification under section 357 of this title, or issue another license under section 262 of Title 42 for such drug for such disease or condition for a person who is not the holder of such approved application, of such certification, or of such license until the expiration of seven years from the date of the approval of the approved application, the issuance of the certification, or the issuance of the license. Section 355(c)(2) of this title does not apply to the refusal to approve an application under the preceding sentence.

**(b) Exceptions**

If an application filed pursuant to section 355 of this title is approved for a drug designated under section 360bb of this title for a rare disease or condition, if a certification is issued under section 357 of this title for such a drug, or if a license is issued under section 262 of Title 42 for such a drug, the Secretary may, during the seven-year period beginning on the date of the application approval, of the issuance of the certification under section 357 of this title, or of the issuance of the license, approve another application under section 355 of this title, issue another certification under section 357 of this title, or issue a license under section 262 of Title 42, for such drug for such disease or condition for a person who is not the holder of such approved application, of such certification, or of such license if—

(1) the Secretary finds, after providing the holder notice and opportunity for the submission of views, that in such period the holder of the approved application, of the certification, or of the license cannot assure the availability of sufficient quantities of the drug to meet the needs of persons with the disease or condition for which the drug was designated; or

A3

(2) such holder provides the Secretary in writing the consent of such holder for the approval of other applications, issuance of other certifications, or the issuance of other licenses before the expiration of such seven-year period.

**21 C.F.R. § 316.3**

**§ 316.3. Definitions.**

. . .

**(b)** The following definitions of terms apply to this part:

. . .

(14) **Same drug** means:

(i) If it is a drug composed of small molecules, a drug that contains the same active moiety as a previously approved drug and is intended for the same use as the previously approved drug, even if the particular ester or salt (including a salt with hydrogen or coordination bonds) or other noncovalent derivative such as a complex, chelate or clathrate has not been previously approved, except that if the subsequent drug can be shown to be clinically superior to the first drug, it will not be considered to be the same drug.

. . .

. . .

**21 C.F.R. § 316.3 (1992)**

**§ 316.3. Definitions.**

. . .

**(b)** The following definitions of terms apply to this part:

. . .

(13) Same drug means:

(i) If it is a drug composed of small molecules, a drug that contains the same active moiety as a previously approved drug and is intended for the same use as the previously approved drug, even if the particular ester or salt

A4

(including a salt with hydrogen or coordination bonds) or other noncovalent derivative such as a complex, chelate or clathrate has not been previously approved, except that if the subsequent drug can be shown to be clinically superior to the first drug, it will not be considered to be the same drug.

. . .

. . .