**ORAL ARGUMENT SET FOR MAY 5, 2025**
**No. 24-5262**

# United States Court of Appeals
# for the District of Columbia Circuit

JAZZ PHARMACEUTICALS, INC.,

*Plaintiff-Appellant*,

v.

ROBERT F. KENNEDY, JR., SECRETARY OF THE DEPARTMENT OF HEALTH AND HUMAN SERVICES; UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES; SARA BRENNER, M.D., M.P.H., ACTING COMMISSIONER OF FOOD AND DRUGS; UNITED STATES FOOD AND DRUG ADMINISTRATION,

*Defendants-Appellees.*

AVADEL CNS PHARMACEUTICALS, LLC,

*Intervenor for Defendants-Appellees.*

On Appeal from the United States District Court for the
District of Columbia, No. 1:23-cv-1819 (Mehta, J.)

## BRIEF OF INTERVENOR-DEFENDANT-APPELLEE
## AVADEL CNS PHARMACEUTICALS, LLC

Nicholas L. Schlossman
LATHAM & WATKINS LLP
300 Colorado Street
Suite 2400
Austin, TX 78701
(737) 910-7314

Philip J. Perry
John R. Manthei
Andrew D. Prins
Peter E. Davis
Richard Frohlichstein
LATHAM & WATKINS LLP
555 Eleventh Street, NW, Suite 1000
Washington, DC 20004
(202) 637-2200
philip.perry@lw.com

*Counsel for Intervenor-
Defendant-Appellee
Avadel CNS Pharmaceuticals, LLC*

March 24, 2025

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to Circuit Rule 28(a)(1), the undersigned counsel certify as follows:

### A.  Parties and Amici

Except for the following, all parties, intervenors, and amici appearing in this case are listed in the Briefs for Appellant and Appellees:

The following intend to participate as *amici curiae* in support of Defendants-Appellees:  Wendy E. Braun, Andrea K. Gunter, Daniel Liss, Katie O'Connell, Tara O'Connor, Generation Patient, Thomas Stern, Charles Duan, Aaron S. Kesselheim, Michael S. Sinha, David Stein, and S. Sean Tu.

### B.  Ruling Under Review

References to the rulings at issue appear in the Brief for Plaintiff-Appellant and Brief for Defendant-Appellee.

### C.  Related Cases

Reference to the related ruling appears in the Brief for Plaintiff-Appellant.

## RULE 26.1 CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and D.C. Circuit Rule 26.1, Intervenor-Defendant-Appellee Avadel CNS Pharmaceuticals, LLC ("Avadel") states as follows:

Avadel is a wholly owned subsidiary of Avadel US Holdings, Inc., which is a wholly owned subsidiary of Avadel Pharmaceuticals plc. Avadel Pharmaceuticals plc is a publicly traded company with no parent corporation. Janus Henderson Group plc, a publicly traded company, owns more than 10% of Avadel Pharmaceuticals plc's stock.

# TABLE OF CONTENTS

Page

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES .............i

RULE 26.1 CORPORATE DISCLOSURE STATEMENT.................................. ii

TABLE OF AUTHORITIES ........................................................................v

GLOSSARY .............................................................................................x

INTRODUCTION ....................................................................................1

ISSUES PRESENTED...............................................................................5

STATUTES AND REGULATIONS..............................................................5

STATEMENT OF THE CASE.....................................................................5

    A.    Legal Framework For Orphan Drugs....................................5

    B.    The 2017 Amendments To The Act.......................................8

    C.    Jazz's Xyrem And Xywav.....................................................10

    D.    Avadel's LUMRYZ.............................................................11

    E.    Jazz's Extensive Efforts To Keep LUMRYZ Off The Market...........11

    F.    FDA's Approval Of LUMRYZ As A Clinically Superior Drug ........12

    G.    Procedural History.............................................................13

SUMMARY OF ARGUMENT .................................................................14

ARGUMENT .........................................................................................15

I.    XYWAV AND LUMRYZ ARE NOT THE "SAME DRUG" UNDER
SECTION 360cc(a) ..........................................................................15

    A.    Congress's 2017 Amendments Ratified FDA's "Same Drug"
Regulatory Definition.........................................................15

**Page**

       1.    Congress Was Aware Of FDA's Longstanding Definition And Intentionally Employed It ..................................................16

       2.    Jazz's Anti-Ratification Arguments Are Unavailing................20

   B.   Even If Congress Did Not Fully "Ratify" FDA's "Same Drug" Definition, FDA Has Still Applied The Best Reading Of § 360cc(a) ...............................................................................27

II.   ALTERNATIVELY, LUMRYZ IS ENTITLED TO EXCLUSIVE APPROVAL UNDER SECTION 360cc(c) ...................................................37

CONCLUSION ........................................................................................39

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Baker Norton Pharmaceuticals, Inc. v. FDA,*
132 F. Supp. 2d 30 (D.D.C. 2001)........................................................20, 21, 36

*Bragdon v. Abbott*,
524 U.S. 624 (1998)..........................................................................20, 24

*Bruesewitz v. Wyeth LLC,*
562 U.S. 223 (2011)..........................................................................24

*Catalyst Pharmaceuticals, Inc. v. Becerra*,
14 F.4th 1299 (11th Cir. 2021) ...........................................................38

*City of Oberlin v. FERC*,
937 F.3d 599 (D.C. Cir. 2019)..............................................................39

*Depomed, Inc. v. HHS*,
66 F. Supp. 3d 217 (D.D.C. 2014)........................................................8, 26

*Doe v. Fitzgerald*,
102 F.4th 1089 (9th Cir. 2024) ...........................................................33

*Duarte v. Mayorkas*,
27 F.4th 1044 (5th Cir. 2022) ...........................................................24

*Eagle Pharmaceuticals, Inc. v. Azar*,
952 F.3d 323 (D.C. Cir. 2020)...........................................6, 9, 26, 32, 35

*Eagle Pharmaceuticals, Inc. v. Azar*,
No. 16-790, 2018 WL 3838265 (D.D.C. June 8, 2018), *aff'd*, 952
F.3d 323 (D.C. Cir. 2020)....................................................................9

*Envirocare of Utah, Inc. v. Nuclear Regulatory Commmission*,
194 F.3d 72 (D.C. Cir. 1999)..............................................................38

*Federal Express Corp. v. United States Department of Commerce*,
39 F.4th 756 (D.C. Cir. 2022)..............................................................24

*Authorities chiefly relied upon are marked with asterisks.

v

**Page(s)**

*Feng Wang v. Blinken*,
   3 F.4th 479 (D.C. Cir. 2021)..............................................................15

*\*Genentech, Inc. v. Bowen,*
   676 F. Supp. 301 (D.D.C. 1987).....................................................35, 36

*Genentech, Inc. v. Immunex R.I. Corp.*,
   395 F. Supp. 3d 357 (D. Del. 2019), *aff'd*, 964 F.3d 1109 (Fed. Cir.
   2020) ....................................................................................................24

*George v. McDonough*,
   596 U.S. 740 (2022).............................................................................20

*Hikvision USA, Inc. v. FCC*,
   97 F.4th 938 (D.C. Cir. 2024)..............................................................20

*Jazz Pharmaceuticals, Inc. v. Avadel CNS Pharmaceuticals, LLC*,
   60 F.4th 1373 (Fed. Cir. 2023) ............................................................11

*Lee v. Norfolk Southern Railway Co.*,
   802 F.3d 626 (4th Cir. 2015) ...............................................................33

*Loper Bright Enterprises v. Raimondo*,
   603 U.S. 369 (2024)..............................................................................34

*Lorillard v. Pons*,
   434 U.S. 575 (1978)..............................................................................23

*New York v. EPA*,
   413 F.3d 3 (D.C. Cir. 2005)..................................................................22

*NLRB v. Wyman-Gordon Co.*,
   394 U.S. 759 (1969)..............................................................................38

*NMC Group, Inc. v. Young Engineers, Inc.*,
   No. CV 11-4280, 2012 WL 13008456 (C.D. Cal. Aug. 23, 2012) ....33

*\*Serono Laboratories, Inc. v. Shalala*,
   158 F.3d 1313 (D.C. Cir. 1998).............................................................34

*Stone v. INS*,
   514 U.S. 386 (1995)..............................................................................22

Page(s)

*United States v. Generix Drug Corp.*,
  460 U.S. 453 (1983) ........................................................................27

*Washington Alliance of Technology Workers v. DHS*,
  50 F.4th 164 (D.C. Cir. 2022), *cert. denied*, 144 S. Ct. 78
  (2023) ......................................................................14, 15, 16, 22

**STATUTES AND REGULATIONS**

21 U.S.C. § 321(g)(1) ......................................................................27

21 U.S.C. § 355(a) ............................................................................5

21 U.S.C. § 355(b) ........................................................................5, 33

21 U.S.C. § 355(b)(2) ......................................................................34

21 U.S.C. § 355(c)(3)(E)(ii) ............................................................28

21 U.S.C. § 355(c)(3)(E)(iii) ..........................................................28

21 U.S.C. § 355(c)(3)(E)(v) ............................................................28

21 U.S.C. § 355(d) ............................................................................5

21 U.S.C. § 355(j)(5)(F)(ii) ............................................................28

21 U.S.C. § 355(j)(5)(F)(iii) ..........................................................28

21 U.S.C. § 355(j)(5)(F)(v) ............................................................28

21 U.S.C. § 355(*l*)(2)(A)(i) ..........................................................28

21 U.S.C. § 355(s)(1)(A) ................................................................28

21 U.S.C. § 355(u)(1) ......................................................................28

21 U.S.C. § 360bb(a)(1) ................................................................6, 29

21 U.S.C. § 360bb(a)(1)(B) ............................................................31

21 U.S.C. § 360bb(b)(1) ..................................................................31

21 U.S.C. § 360cc ............................................................................9

21 U.S.C. § 360cc(a) ..............................................1, 3, 5, 6, 24, 33

**Page(s)**

21 U.S.C. § 360cc(a) (2016) ............................................................8

21 U.S.C. § 360cc(b)...............................................................3, 18

21 U.S.C. § 360cc(c)............................................................3, 29, 37

21 U.S.C. § 360cc(c)(1) .............................. 18, 21, 29, 30, 34, 37

21 U.S.C. § 360cc(c)(2) .........................................................17, 34

21 U.S.C. § 360cc(d)......................................................3, 9, 17, 22

21 U.S.C. § 360cc(e)........................................................3, 19, 30

21 U.S.C. § 360cc(e)(1) ...........................................................9

21 U.S.C. § 360ff(a)(4)(B)..........................................................28

Pub. L. No. 97-414, 96 Stat. 2049 (1983)....................1, 6, 35, 36

Pub. L. No. 115-52, 131 Stat. 1005 (2017)..........................9, 16

Pub. L. No. 117-9, 135 Stat. 256 (2021) ................................28

21 C.F.R. § 314.3 ......................................................................28

21 C.F.R. § 314.3(b) .............................................................7, 28

21 C.F.R. § 316.3 ......................................................................28

21 C.F.R. § 316.3(b)(3).....................................................7, 17, 18

21 C.F.R. § 316.3(b)(14)...........................................................9

21 C.F.R. § 316.3(b)(14)(i).............................3, 7, 16, 17, 18, 34

21 C.F.R. § 316.20 (1993) .........................................................5

21 C.F.R. § 316.20 (2024) .........................................................5

21 C.F.R. § 316.20(a)......................................6, 18, 19, 31, 32

21 C.F.R. § 316.20(b)(4).............................................................32

21 C.F.R. § 316.20(b)(5)................................6, 19, 31, 32

21 C.F.R. § 316.25(a)(3)...............................19, 31, 32

**Page(s)**

21 C.F.R. § 316.31 (1993) ............................................................5

21 C.F.R. § 316.31 (2024) .......................................................5, 16

21 C.F.R. § 316.31(a) (1993) ......................................................7

21 C.F.R. § 316.31(a) ...........................................................17, 24

21 C.F.R. § 316.34(c) ......................................................8, 17, 18

## OTHER AUTHORITIES

*Black's Law Dictionary* (10th ed. 2014).................................33, 34

56 Fed. Reg. 3,338 (Jan. 29, 1991) ............................................7

57 Fed. Reg. 62,076 (Dec. 29, 1992) ......................................3, 6

H.R. 386, 107th Cong. (2001)...................................................23

H.R. 4242, 106th Cong. (2000)..................................................23

*Hearings Before the Subcomm. on Agric., Rural Dev., Food & Drug Admin., & Related Agencies of the H. Comm. on Appropriations*, part 2, 106th Cong. (2000).........................................................23

*Merriam-Webster Dictionary* (2015).........................................33

*Merriam-Webster Dictionary* (2016)..........................................18

Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* (2012) ...........................14

## GLOSSARY

| Abbreviation/acronym | Description |
|---|---|
| Act | Orphan Drug Act, Pub. L. No. 97-414, 96 Stat. 2049 (1983) |
| Avadel | Avadel CNS Pharmaceuticals, LLC |
| FDA | Food and Drug Administration |
| FDCA | Federal Food, Drug, and Cosmetic Act |
| Jazz | Jazz Pharmaceuticals, Inc. |

## INTRODUCTION

Congress enacted the Orphan Drug Act, Pub. L. No. 97-414, 96 Stat. 2049, (the "Act") in 1983 to incentivize the development of orphan drugs—drugs that treat rare diseases and conditions.  A manufacturer's drug that obtains "orphan drug designation" and is approved by the Food and Drug Administration ("FDA") as "safe and effective" earns a 7-year period of orphan drug exclusivity.  *See* 21 U.S.C. § 360cc(a).  In 2017, Congress amended key provisions of the Act, inserting text drawn directly from FDA's 1992 orphan drug regulations.  In this case, Appellant Jazz Pharmaceuticals, Inc. ("Jazz") argues that, when Congress codified multiple key elements of FDA's 1992 regulatory text in its 2017 statutory amendments, Congress actually intended to silently undo FDA's longstanding "clinical superiority" regulatory framework governing exclusivity.

Jazz is wrong.  Contrary to Jazz's arguments, Congress's amendments throughout 21 U.S.C. § 360cc demonstrate overwhelmingly that Congress embraced FDA's "clinical superiority" framework for determining whether a new drug is the "same drug" as a prior drug, and thus within the scope of its exclusivity.

Here is the context.  In 2023, FDA approved Defendant-Intervenor Avadel CNS Pharmaceuticals, LLC's ("Avadel's") drug LUMRYZ as "clinically superior" to Jazz's drug Xywav.  LUMRYZ helps patients with narcolepsy sleep better at night, and thus helps them mitigate certain symptoms of narcolepsy during the day.

While both LUMRYZ and Xywav share a common "active moiety," oxybate, LUMRYZ is demonstrably better: Its unique extended-release formulation allows patients to take a single dose at bedtime and sleep through the night. By contrast, patients taking Xywav cannot sleep through the night—due to Xywav's immediate-release formulation, patients must set an alarm clock to forcefully awaken in the middle of the night (2.5 to 4 hours after going to bed) to take a second dose.

In this appeal, Jazz does not challenge FDA's conclusion that these differences make LUMRYZ clinically superior to Xywav. Jazz instead argues that FDA's finding of clinical superiority does not make LUMRYZ a different drug under the statute and therefore does not permit FDA to grant LUMRYZ approval. According to Jazz, despite important differences in their chemical formulations, LUMRYZ and Xywav are nevertheless the "same drug," and LUMRYZ must now be removed from the market after two years and despite use by thousands of patients.

Jazz has been trying for years to improperly leverage Xywav's exclusivity to forestall competition from Avadel. Initially, Jazz spent two years arguing to FDA that the "direct command of the statute is that the only way for Avadel to break [Xywav's] [exclusivity] . . . would be for Avadel to demonstrate that [LUMRYZ] is clinically superior to XYWAV." JA382-83; *see also* JA207-08. But when Avadel *did* show that LUMRYZ is safe and effective and clinically superior to Xywav— which, again, Jazz no longer contests—Jazz reversed course. Now, the "clinical

superiority" requirement that Jazz formerly claimed was the direct "command" of the statute is supposedly an unlawful "regulatory loophole" that allows FDA to unlawfully "disregard" Jazz's exclusivity.  Jazz Br. 1-3.

Jazz's convenient and abrupt about-face on statutory interpretation is wrong. The principal question here is Congress's intent, and there can be no serious dispute on that issue.  Congress embraced FDA's 1992 regulatory text repeatedly in its 2017 statutory amendments and provided that a clinically superior drug—like LUMRYZ, with its unique extended-release chemical formulation—is not the "same drug" as a prior drug, and is not blocked by its exclusivity.  *See* 21 U.S.C. § 360cc(a)-(e).

Since 1992, FDA has interpreted the Act to mean that a new drug is the "same drug" as the one subject to exclusivity when it contains the same "active moiety" as the prior drug, *unless the new drug is "clinically superior" to the prior drug*.  21 C.F.R. § 316.3(b)(14)(i); *see* 57 Fed. Reg. 62,076, 62,086 (Dec. 29, 1992).  As the district court correctly explained in its detailed opinion, Congress expressly adopted, and thereby ratified, FDA's regulatory interpretation when it amended the Act in 2017.  Specifically, Congress codified FDA's interpretation by replacing the statutory term "such drug" with FDA's defined regulatory term, "same drug."  And Congress made crystal clear that it was adopting FDA's clinical superiority framework, not overturning it, through other amendments to § 360cc—for example, authorizing FDA to continue applying its 25-year-old definitions of "same drug" and

"clinically superior" under § 360cc(d), and incorporating those defined terms into the new § 360cc(c) and (e).

Jazz's statutory argument ignores Congress's explicit choice to codify FDA's regulatory text, and instead asks the Court to conclude that Congress silently *overruled* 25 years of regulatory history by choosing to adopt the precise terminology from FDA's regulations. Rather than offer a coherent story for how Congress could have silently intended such a massive, counterintuitive change, Jazz argues that Congressional drafters inadvertently enacted FDA's defined term "same drug" by pure coincidence. That defies common sense and is not how Congress legislates. The district court correctly concluded that the Act's text, structure, and historical context all establish that in its 2017 amendments, Congress chose the key regulatory text on purpose and thereby "ratified and incorporated the existing regulatory definition of 'same drug' into the statute." JA555-56.

This makes perfect sense. The best reading of the statute is that FDA must consider, at all stages of the orphan drug process, *both* the drug's "active moiety," and *also* how the drug's broader formulation enhances its efficacy, safety, and impact on patient care. All FDA has done is apply that best reading: An extended-release drug (LUMRYZ) that is so chemically different from an immediate-release drug (Xywav) as to give rise to a significant therapeutic advantage is not the "same drug," even if the drugs contain a common active moiety.

The district court also offered an alternative, correct, and independently sufficient basis to affirm:  Regardless of the interpretation of § 360cc(a), FDA "nonetheless had authority under subsection (c) to grant 'exclusive approval' to Lumryz."  JA567.

For all of these reasons and those that follow, the Court should affirm.

## ISSUES PRESENTED

Whether a drug's exclusivity under 21 U.S.C. § 360cc(a) bars approval of a clinically superior drug.

## STATUTES AND REGULATIONS

All applicable statutes and regulations are contained in the Brief for Plaintiff-Appellant and Brief for Defendant-Appellee, except for the following, which are reproduced in the attached addendum:  21 C.F.R. §§ 316.20, 316.31 (1993); 21 C.F.R. §§ 316.20, 316.31 (2024).

## STATEMENT OF THE CASE

### A.    Legal Framework For Orphan Drugs

The Federal Food, Drug, and Cosmetic Act ("FDCA") generally prohibits the sale of a "new drug" unless it has been proven safe and effective.  21 U.S.C. § 355(a)-(b), (d).

In 1983, Congress passed the Act, which amended the FDCA to incentivize manufacturers to develop and market "orphan drugs" to treat rare diseases and

conditions that might not otherwise be profitable.  Pub. L. No. 97-414, § 1(b), 96 Stat. 2049, 2049 (1983) ("[S]ome promising orphan drugs will not be developed unless changes are made in the applicable Federal laws to reduce the costs of developing such drugs and to provide financial incentives to develop such drugs.").

Early in the drug development process, a sponsor can request that FDA grant an orphan drug designation, *i.e.*, "designate the drug as a drug for a rare disease or condition."  21 U.S.C. § 360bb(a)(1).  A designation "provides benefits . . . such as tax credits, assistance with investigations and the approval process and monetary grants."  *Eagle Pharms., Inc. v. Azar*, 952 F.3d 323, 325 (D.C. Cir. 2020).

If a drug "is otherwise the same drug as an already approved drug," the sponsor's designation request must present a "plausible hypothesis" that the new drug is "clinically superior" to the prior, approved drug to obtain designation.  21 C.F.R. § 316.20(a), (b)(5).

If the sponsor obtains a designation and completes the required studies to obtain approval of the drug under § 355(b)-(c) as safe and effective, the drug is entitled to a 7-year period of exclusivity—FDA "may not approve another application . . . for the same drug [*prior to 2017, 'such drug'*] for the same disease or condition . . . [for] seven years."  21 U.S.C. § 360cc(a).

In 1992, FDA promulgated regulations interpreting the undefined term "such drug."  57 Fed. Reg. at 62,078.  FDA explained that in determining the "[s]cope of

6

orphan-drug exclusive approval," it would "not approve another sponsor's marketing application for the same drug."  21 C.F.R. § 316.31(a) (1993).  FDA then defined "same drug" as—for small-molecule drugs, the class of drugs relevant here—the "same active moiety . . . except . . . if the subsequent drug can be shown to be clinically superior."  *Id.* § 316.3(b)(14)(i).

FDA defined "active moiety" to mean "the molecule or ion, excluding those appended portions of the molecule that cause the drug to be a[] . . . salt . . . responsible for the physiological or pharmacological action of the drug substance."  *Id.* § 316.3(b)(2).  "Drug substance" is common FDA parlance and means an "active ingredient."  *Id.* § 314.3(b).  Active and inactive ingredients together form the "finished dosage form," known as the "drug product."  *Id.*

FDA defined a "clinically superior" drug as one having a "significant therapeutic advantage over and above that provided by an approved drug (that is otherwise the same drug)"—*i.e.*, over and above any approved drug that contains the same active moiety—through "greater effectiveness," "greater safety," or "a major contribution to patient care."  *Id.* § 316.3(b)(3).  FDA explained that its interpretation fulfills Congress's purpose of incentivizing development of orphan drugs, while appropriately preventing exclusivity from "preclud[ing] significant improvements in treating rare diseases."  56 Fed. Reg. 3,338, 3,338 (Jan. 29, 1991).

### B.    The 2017 Amendments To The Act

In 2017, Congress amended the Act to codify FDA's existing clinical superiority regulatory framework across multiple separate provisions of § 360cc, in response to legal challenges to part of FDA's framework.

Prior to 2017, the Act formulaically provided that if FDA "approve[d]" an application for a "drug designated" as an orphan drug, then exclusivity attached. 21 U.S.C. § 360cc(a) (2016). This provision allowed sponsors to repeatedly obtain exclusivity by obtaining designation and then multiple subsequent approvals for a drug, even if the newly approved drug was only trivially different from prior iterations. *See Depomed, Inc. v. HHS*, 66 F. Supp. 3d 217, 235 (D.D.C. 2014). This practice was known as "serial exclusivity" or "evergreen[ing]." *See id.*

FDA tried to fix this problem by requiring that a newly approved orphan drug containing the same "active moiety" as a previously approved drug must demonstrate that it is "clinically superior" to the previously approved drug to obtain a new period of exclusivity. *See* 21 C.F.R. § 316.34(c).

*Depomed* rejected FDA's regulatory limitation on the circumstances where FDA would grant exclusivity, holding that the Act provided a clear "formula": if designation and approval, then exclusivity. 66 F. Supp. 3d at 230. Another district court reached the same conclusion in 2018, again applying the pre-amendment

version of the Act.  *Eagle Pharms., Inc. v. Azar*, No. 16-790, 2018 WL 3838265, at

*1 (D.D.C. June 8, 2018), *aff'd*, 952 F.3d 323 (D.C. Cir. 2020).

While *Eagle* was pending, Congress enacted its 2017 amendments to the Act

that "supersede[d] *Depomed*'s holding" by adding § 360cc(c) and thus codified

FDA's regulatory requirement to demonstrate clinical superiority to obtain a second

(or subsequent) round of exclusivity.  *Eagle*, 952 F.3d at 329 n.9.

The 2017 amendments also made other changes to conform the Act to FDA's

regulatory framework.  FDA Reauthorization Act of 2017, Pub. L. No. 115-52,

§ 607, 131 Stat. 1005, 1049-50 (codified at 21 U.S.C. § 360cc).  Especially relevant

here, Congress updated § 360cc(a)—which sets out the scope of exclusivity—to bar

approval of the "same drug," rather than "such drug."  *Id.* at 1049.

Although Congress did not expressly define the "same drug," Congress

permitted FDA to continue to "apply any definitions set forth in regulations" FDA

had previously promulgated.  21 U.S.C. § 360cc(d).  Those "definitions" include

FDA's longstanding definition of the "same drug."  21 C.F.R. § 316.3(b)(14).

Congress also amended the Act to provide that, at the designation stage, FDA

shall notify the sponsor of "any plausible hypothesis offered by the sponsor and

relied upon by the Secretary that the drug is clinically superior to a previously

approved drug."  21 U.S.C. § 360cc(e)(1).

9

## C.  Jazz's Xyrem And Xywav

Patients with narcolepsy have difficulty regulating their sleep-wake cycles. They therefore often have trouble sleeping at night and can experience excessive daytime sleepiness and cataplexy.  JA140.

Although there is no cure for narcolepsy, certain drugs containing salts of gamma-hydroxybutyrate ("oxybate") can treat its symptoms.  Since 2002, Jazz has marketed these drugs under the brand names Xyrem (active ingredient, sodium oxybate) and, since 2020, Xywav (active ingredients, potassium oxybate, magnesium oxybate, calcium oxybate, and sodium oxybate).  JA141-43.

In layman's terms, potassium, magnesium, calcium, and sodium are each elements (here, ions) that can bond to the oxybate ion to create a salt.  *See* JA141. In the body, the salt breaks down, and the oxybate becomes free of the elemental ion and provides a therapeutic effect as the active moiety.  JA142-44.  Xywav contains reduced sodium levels relative to Xyrem, and FDA granted Xywav exclusivity on that basis.  *Id.*  Jazz's immediate-release drug Xywav includes:

- <u>Active Ingredients/Drug Substances/Salts</u>:     Potassium   Oxybate; Magnesium Oxybate; Calcium Oxybate; Sodium Oxybate

- <u>Inactive Ingredients (For Immediate Release)</u>:  Purified Water, Sucralose

- <u>Active Moiety</u>:  Oxybate

AR2247 (D. Ct. Dkt. 81-5).  Xywav's exclusivity expires in July 2027.  JA143.

### D.     Avadel's LUMRYZ

For over a decade, Avadel has focused on developing and bringing to market LUMRYZ, a once-nightly sodium oxybate product.   JA144.   LUMRYZ uses a proprietary extended-release formulation of sodium oxybate and inactive ingredients to achieve this benefit.  *See* JA198.

FDA designated LUMRYZ as an orphan drug on January 8, 2018, as "sodium oxybate extended-release oral suspension," based on Avadel's plausible hypothesis of clinical superiority to Xyrem[1] in light of LUMRYZ's anticipated extended-release formulation and once-nightly dosing regimen.  JA203.

On December 15, 2020, Avadel submitted a new drug application seeking final approval for LUMRYZ.  JA444.

### E.     Jazz's Extensive Efforts To Keep LUMRYZ Off The Market

Jazz has been engaged in a multi-year, multi-front campaign to keep LUMRYZ off the market, despite federal law authorizing its entry.

Jazz first abused its purported patent rights to block entry of LUMRYZ.  The Federal Circuit concluded that, in doing so, Jazz violated federal law.  *Jazz Pharms., Inc. v. Avadel CNS Pharms., LLC*, 60 F.4th 1373, 1375-76 (Fed. Cir. 2023).

Meanwhile, between 2021 and 2023, Jazz petitioned FDA with dozens of pages of submissions to keep LUMRYZ off the market.  *See* JA205-376, 377-426,

---

[1]   Xywav had not yet been approved in 2018.

582.  Jazz argued the "direct command" of the Act was that Avadel would need to prove LUMRYZ "[i]s [c]linically [s]uperior to XYWAV" to gain approval.  JA382-83; *see also* JA207-08.  Jazz also argued that once-nightly dosing would not actually benefit patients (*e.g.*, JA220-23) and that LUMRYZ was unsafe in light of its sodium content—the same sodium content as Jazz's Xyrem (*e.g.*, JA225-26, 379-82).

### F.    FDA's Approval Of LUMRYZ As A Clinically Superior Drug

On May 1, 2023, FDA approved LUMRYZ as safe and effective.  JA129-30.  Avadel's extended-release drug LUMRYZ includes:

- Active Ingredients/Drug Substances/Salts:  Sodium Oxybate

- Inactive Ingredients (For Extended Release):  Carrageenan, Hydrogenated Vegetable Oil, Hydroxyethyl Cellulose, Magnesium Stearate, Malic Acid, Methacrylic Acid Copolymer, Microcrystalline Cellulose, Povidone, Xanthan Gum.

- Active Moiety:  Oxybate

AR289 (D. Ct. Dkt. 81-2).

Concurrently, FDA issued a letter-decision to Avadel and Jazz explaining that Xywav's exclusivity did not block LUMRYZ's approval and that LUMRYZ was entitled to its own 7-year exclusivity.  JA155-58, 170.

FDA found that LUMRYZ's unique formulation and resulting once-nightly dosing regimen provide a "major contribution to patient care," rendering LUMRYZ

12

"clinically superior" to Xywav (and Xyrem).  JA155-58.  FDA explained that once-nightly LUMRYZ eliminates the nocturnal awakening required to take Jazz's drugs, "minimizing disturbances" and improving "sleep consolidation," which advances the "goal" of oxybate treatment, better sleep.  JA141, 156-57, 167-68.

### G.    Procedural History

On June 22, 2023, Jazz sued FDA in the district court, raising a litany of meritless arguments.  *See* JA28-114.  Jazz claimed that because LUMRYZ and Xywav contain the same "active moiety," they are the "same drug," and thus LUMRYZ could not be approved until July 2027.  JA72-81, 112.  Jazz also reprised its arguments to FDA that once-nightly dosing does not actually provide any meaningful benefit to patients, JA101-12, and falsely claimed that LUMRYZ's sodium levels—again, the same levels as Xyrem—will harm patients, JA98-JA101.  Avadel intervened to defend FDA's approval.

On cross motions, the district court granted FDA and Avadel summary judgment and denied it to Jazz, holding that FDA had not erred in approving LUMRYZ.  The district court held that the Act, as amended in 2017, permitted FDA to approve a clinically superior drug as outside the scope of a prior drug's exclusivity.  The court found it "obvious" that Congress "ratified and incorporated the existing regulatory definition of 'same drug' into the statute," as demonstrated

by "the statute's words, structure, and historical context." JA555-56, 560.  The court also rejected Jazz's other arguments—which Jazz has abandoned on appeal.

## SUMMARY OF ARGUMENT

Xywav's exclusivity does not block approval of the undisputedly clinically superior drug LUMRYZ.

I.A.  The key question is Congress's intent.  Where, as here, Congress "uses words or phrases that have already received authoritative construction by . . . a responsible administrative agency, they are to be understood according to that construction." *Wash. All. of Tech. Workers v. DHS*, 50 F.4th 164, 180 (D.C. Cir. 2022) (quoting Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 322 (2012)), *cert. denied*, 144 S. Ct. 78 (2023).  The district court correctly held that Congress's 2017 amendments "ratified and incorporated the existing regulatory definition of 'same drug' into the statute." JA555-56.

I.B.  Even if there were some doubt as to ratification (there should not be), under the best reading of § 360cc(a), a clinically superior drug is not the "same drug" as a previously approved drug.  Jazz's contrary interpretation affirmatively violates the statutory text.

II.  Section 360cc(c) provides an alternative basis to affirm.  Under § 360cc(c), once Avadel demonstrated clinical superiority, FDA was authorized to grant "exclusive approval" to LUMRYZ.

14

## ARGUMENT

## I. XYWAV AND LUMRYZ ARE NOT THE "SAME DRUG" UNDER SECTION 360cc(a)

The district court correctly held that Congress adopted FDA's "same drug" interpretation across multiple provisions when it amended the Act in 2017. Congress thus "codified the FDA's regulatory definition of 'same drug.'" JA555. That is clearly correct, and this Court's analysis can and should end there. But even if the Court were to question whether Congress ratified FDA's interpretation of "same drug" (it should not), FDA's interpretation is also the best reading of the statute.

### A. Congress's 2017 Amendments Ratified FDA's "Same Drug" Regulatory Definition

The district court correctly held that Congress chose to embrace FDA's regulatory regime and "ratified and incorporated the existing regulatory definition of 'same drug' into the statute." JA556. This Court has repeatedly recognized that where, as here, Congress "uses words or phrases that have already received authoritative construction by . . . a responsible administrative agency, they are to be understood according to that construction." *Wash. All. of Tech. Workers*, 50 F.4th at 180; *Feng Wang v. Blinken*, 3 F.4th 479, 483 (D.C. Cir. 2021) (same).

That is exactly what happened here: Congress used the key term "same drug" drawn directly from FDA's regulations. And Congress's 2017 changes to § 360cc(a) were part of a package of changes to § 360cc. Collectively, those amendments make

15

clear that Congress was fully aware of, and intended to adopt, FDA's "clinical superiority" framework, including FDA's definition of the "same drug."

### 1.    Congress Was Aware Of FDA's Longstanding Definition And Intentionally Employed It

Congress ratified FDA's "same drug" interpretation by plucking the term "same drug" out of FDA's 25-year-old regulations and inserting it into § 360cc(a). Pub. L. No. 115-52, § 607, 131 Stat. 1005, 1049 (2017).   Congress modified § 360cc(a) as follows:

> [I]f the Secretary . . . approves an application . . . for a drug designated . . . for a rare disease or condition, the Secretary may not approve another application . . . for ~~such~~ **the same** drug for ~~such~~ **the same** disease or condition for a person who is not the holder of such approved application . . . until the expiration of seven years . . . .

*Id.* (modifications added).

Since 1992, FDA had interpreted "such drug" to mean "same drug," and defined "same drug" by regulation to mean a drug (1) with the same active moiety, (2) that is not clinically superior to the prior drug.  21 C.F.R. §§ 316.3(b)(14)(i), 316.31.  Rather than stick with the prior term "such drug," Congress elected to utilize the defined term from FDA's regulations, "same drug."

Here, the case for ratification is at its apex:   There is "no need for presumptions" about Congress's intent to codify an agency's defined term where Congress was "aware of the prior [agency] practice."  *Wash. All. of Tech. Workers*, 50 F.4th at 181.  This is not a case where one need rely on vague fragments of

Congress's intent expressed through legislative history and the like. Congress—right in the text—expressly provided that FDA "may apply any definitions set forth in regulations that were promulgated" prior to the amendments' enactment. 21 U.S.C. § 360cc(d). That alone should be dispositive that Congress was aware of the "definition[]" of "same drug" in FDA's "regulations." *See id.*

As the district court correctly explained, numerous other textual clues confirm this awareness. JA555. In § 360cc(c), Congress gave "clinically superior" a meaning that closely mirrors FDA's longstanding definition of that term. *Compare* 21 U.S.C. § 360cc(c)(2), *with* 21 C.F.R. § 316.3(b)(3). As noted, the key regulatory function of clinical superiority is to determine whether two drugs are the same, or different. *See* 21 C.F.R. §§ 316.31(a), 316.34(c). Contrary to Jazz's suggestions, it is not plausible that Congress was sufficiently aware of FDA's definition of "clinically superior" to insert that definition into the statute, but (i) unaware that FDA used that term to identify the "same drug," *and* (ii) unaware of the "same drug" definition located in the same regulatory section, *id.* § 316.3(b)(3), (14)(i).

Moreover, § 360cc(c)(1) shows Congress viewed a clinically superior drug as *not* the "same drug":

> If a sponsor of a *drug that is designated* under section 360bb of this title and is *otherwise the same*, as determined by the Secretary, as an already approved or licensed drug is seeking exclusive approval or exclusive licensure described in subsection (a) for the same rare disease or condition as the already approved drug, the Secretary shall require such sponsor, as a condition of such exclusive approval or licensure, to

17

*demonstrate that such drug is clinically superior to any already approved or licensed drug that is the same drug.*

21 U.S.C. § 360cc(c)(1) (emphases added).  Correctly reading this provision, as FDA does, a sponsor must "demonstrate" that its "drug" (LUMRYZ) is "clinically superior" to any previously approved "drug" (Xywav) that is "[otherwise] the same" drug, *i.e.*, contains the same active moiety without regard to clinical superiority.  21 C.F.R. § 316.3(b)(3), (14)(i).  That is the only reading that accounts for the word "otherwise," which means "in other respects."  Otherwise, *Merriam-Webster Dictionary* (2016).  For example, a white iPhone 16 and a silver iPhone 16 that differ only as to color are "otherwise the same."  In § 360cc(c)(1), a drug that is "otherwise the same" is one that differs on the dimension of clinical superiority.  21 U.S.C. § 360cc(c)(1).  Again, Congress plucked this "otherwise the same" terminology for a clinically superior drug directly from FDA's regulations.  *See, e.g.*, 21 C.F.R. §§ 316.3(b)(3), 316.20(a), 316.34(c).[2]

Jazz argues (at 51) that reading § 360cc(c) as Avadel and FDA do renders circular the requirement for an applicant to demonstrate that a new drug that "is otherwise the same . . . as an already approved or licensed drug . . . is clinically superior to any already approved or licensed drug that is the *same drug.*"  That is

---

[2]    And as FDA correctly explains (FDA Br. 12, 47), Congress further provided that the question of whether two drugs are "otherwise the same" shall be "determined by the Secretary."  21 U.S.C. § 360cc(b).

wrong, as the district court explained:  "[O]therwise the same" drug in § 360cc(c) refers to a new drug that contains the same active moiety as the previously approved drug and has "not *yet* [been] deemed to be 'clinically superior' to the approved drug." JA564 (emphasis added).  The final reference to "same drug" at the end of § 360cc(c)(1) thus refers to the prior, approved drug containing the same active moiety, as to which the new drug has not *yet* been shown to be clinically superior. *Id.*  In sum:  FDA's process *initially* treats two drugs containing the same active moiety as the same drug, *and only later* considers clinical superiority as a potential differentiator.  *See id.*

In the 2017 amendments, Congress also codified FDA's clinical superiority requirement at the designation stage, providing:

> [T]he Secretary . . . upon the designation of any drug under section 360bb of this title, shall notify the sponsor of such drug in writing of the basis for the designation, including, as applicable, any plausible hypothesis offered by the sponsor and relied upon by the Secretary that the drug is clinically superior to a previously approved drug.

21 U.S.C. § 360cc(e).  Congress was clearly aware of FDA's designation regulations, under which FDA will designate a drug that is "*otherwise the same* as an already approved drug," *i.e.*, containing the same active moiety, if the sponsor "can present a plausible hypothesis that its drug may be clinically superior to the first drug."  21 C.F.R. § 316.20(a) (emphasis added); *see also id.* §§ 316.20(b)(5), 316.25(a)(3) (similar).  Again, it is implausible that Congress was aware of these

19

designation regulations, but unaware of the definition of "same drug" that is embedded within them, and required to apply them.

In short, "'[a]ll indications' here are that Congress was 'well aware' of [this] legal and administrative landscape," *Hikvision USA, Inc. v. FCC*, 97 F.4th 938, 947 (D.C. Cir. 2024), and "intended to give that position its active endorsement," *Bragdon v. Abbott*, 524 U.S. 624, 645 (1998).  Because Congress enacted the "same drug" language without a new "'definition'" or "indicating any departure from the 'same meaning' that the [agency] ha[s] long applied," it is clear that "Congress 'codif[ied]'" the term.  *George v. McDonough*, 596 U.S. 740, 746 (2022).

## 2. Jazz's Anti-Ratification Arguments Are Unavailing

Jazz's case against ratification rests on the extraordinary contention that Congress meant to undo FDA's longstanding "same drug" interpretation by adopting the precise phrase FDA employed to implement it.  Only the most compelling account of Congressional intent could justify that entirely counterintuitive notion.  But Jazz has no coherent, much less persuasive, story for why Congress chose to replace the phrase "such drug" with "same drug" in defining the scope of exclusivity.

1. Below, Jazz claimed that Congress "amended the text 'to resolve a specific grammatical ambiguity' identified by the court in *Baker Norton*."  JA565 (quoting Jazz Opp'n 18, Dkt. 59-2).  *Baker Norton Pharmaceuticals, Inc. v. FDA* found the meaning of "drug" ambiguous, and found FDA's "same drug" construction

reasonable.  132 F. Supp. 2d 30, 37-38 (D.D.C. 2001).  Jazz argued that Congress

changed the phrase "'such drug' to 'same drug'" in reaction to *Baker Norton*'s

finding of ambiguity, to more clearly "'tether[]' the word drug to its immediate

antecedent—the 'drug designated.'"  JA566 (quoting Jazz Opp'n 18).  The district

court correctly rejected Jazz's argument, which would mean Congress intended to

constrain FDA's authority by adding the term "same drug" despite *knowing*

Congress was enacting the exact regulatory term that FDA had long applied and that

*Baker Norton* had upheld as reasonable.  JA565.  In the court's words, Jazz's

argument "makes little sense."  JA566.

Jazz understandably abandons that argument on appeal and now raises (at 44)

a new argument that the change from "such drug" to "same drug" is a product of a

1997 Senate Legislative Drafting Manual advising staffers not to use the term

"'such' if 'the' or 'that' works equally well."  But of course, Congress did not replace

"such" with "the" or "that" in § 360cc(a); it replaced "such" with "same."  And

elsewhere, Congress chose to use the phrase "such drug" in the new § 360cc(c) as

distinct from the "same drug" in that very provision.  21 U.S.C. § 360cc(c)(1)

(providing that a sponsor must "demonstrate that *such drug* is clinically superior to

any already approved or licensed drug that is the *same drug*" (emphases added)).

The latter reference clearly invokes FDA's longstanding "same drug" definition.

The most Jazz can say is that Congress's decision to employ FDA's longstanding defined term, fully aware of that term's definition and even while referencing existing regulatory definitions, is an incredible coincidence.  That is at odds with common sense, basic principles of statutory interpretation, and numerous decisions applying the legislative ratification doctrine in similar circumstances.  *See, e.g.*, *Stone v. INS*, 514 U.S. 386, 397 (1995) ("When Congress acts to amend a statute, we presume it intends its amendment to have real and substantial effect.").

2.  Without any coherent account for Congress's choice of language, Jazz conjures (at 36) a list of "hallmarks" of legislative ratification that it claims the 2017 amendment does not satisfy.  Jazz's arguments all fail.

*First*, Jazz argues (at 36-37) that the ratification doctrine does not apply because Congress did not "express[ly] incorporat[e]" FDA's "same drug" definition through an express cross-reference to 21 C.F.R. § 316.3.  That assertion is puzzling: Congress provided that FDA "may apply any definitions set forth in regulations that were promulgated" prior to the amendments, 21 U.S.C. § 360cc(d), including FDA's "same drug" definition.  In any event, no cross-reference is required:  What matters is whether there are "indications in the statutory language or history to infer that Congress intended to incorporate into a statute a preexisting regulatory definition." *New York v. EPA*, 413 F.3d 3, 19 (D.C. Cir. 2005).  For that reason, numerous courts have found ratification without regard to any cross-reference.  *See, e.g.*, *Wash. All.*

22

*of Tech. Workers*, 50 F.4th at 180-82; *Lorillard v. Pons*, 434 U.S. 575, 580-81 (1978).

*Second*, Jazz argues (at 38-39) that an absence of legislative history weighs against ratification. But while such evidence can be helpful, it is in no way required—and certainly not in a case where Congress knowingly incorporates into the statute a long-defined regulatory term. Again, the text of § 360cc shows that Congress understood FDA's regulatory concept of clinical superiority, embraced it, and carried forward existing agency regulations. *Supra* at 16-20.

Moreover, most of the legislative proposals Jazz points to (at 31-34) are totally unrelated to the issues in this case—except for two bills that clearly cut against Jazz. In 2000-2001, Congress considered bills that showed awareness of and *assumed the validity* of FDA's construction of exclusivity over the "same drug," without seeking to amend or override that construction. *See* H.R. 4242, 106th Cong. (2000); H.R. 386, 107th Cong. (2001). Congress was clearly aware that "FDA policy currently rewards an 'improved' orphan drug by allowing it on the market immediately alongside the pioneer orphan drug, thus cutting short the pioneer's exclusivity." *Hearings Before the Subcomm. on Agric., Rural Dev., Food & Drug Admin., & Related Agencies of the H. Comm. on Appropriations*, part 2, 106th Cong. 561 (2000) (statement of Rep. Rosa L. DeLauro), and did not seek to unwind that interpretation.

23

*Third*, Jazz argues (at 43-48) that "linguistic evidence"—particularly the ostensibly "ubiquitous" nature of the word "same"—weighs against ratification. But the key phrase here is not "same" standing alone, but "same drug"—a term FDA has defined since 1992. Courts have routinely applied the ratification doctrine where the term used is far more commonplace. *See, e.g.*, *Bragdon*, 524 U.S. at 631-32, 644-45 (adopting another statute's construction of "handicap"); *Duarte v. Mayorkas*, 27 F.4th 1044, 1059 (5th Cir. 2022) ("admitted"); *Genentech, Inc. v. Immunex R.I. Corp.*, 395 F. Supp. 3d 357, 364 (D. Del. 2019) ("supplement"), *aff'd*, 964 F.3d 1109 (Fed. Cir. 2020); *cf. Fed. Express Corp. v. U.S. Dep't of Com.*, 39 F.4th 756, 769 (D.C. Cir. 2022) (applying old-soil canon to "aiding and abetting").

These circumstances contrast this case with *Bruesewitz v. Wyeth LLC*, where the Supreme Court held that Congress's term "unavoidable" in "side effects that were unavoidable" did not invoke the Restatement of Torts' distinct reference to "unavoidab*ly* unsafe products." 562 U.S. 223, 233-35 (2011). But a different term in a Restatement is much further afield than the exact term ("same drug") in the statute's own implementing regulations that Congress itself referenced in the statute.

Nor does it matter that Congress used solely the defined term, "same drug," without also copying over a broader regulation in which that term is used. Jazz notes (at 45-47) that § 360cc(a) describes "the same drug" for "the same disease or condition," while one of FDA's regulations, 21 C.F.R. § 316.31(a), describes "the

same drug" for "the same use or indication."  But Jazz attacks a strawman—neither FDA nor the district court claimed the 2017 amendments ratified FDA's approach to orphan drugs in its entirety.  What matters is that Congress incorporated the defined term "same drug"; that the remaining (undefined) language is different is immaterial.

3.  Jazz also casts about for its own structural clues to support its view that Congress did not ratify FDA's term "same drug."  Jazz Br. 28-31.  None is persuasive.

*First*, Jazz argues that because Congress combined a "'may not' command with the phrase '[e]xcept as provided in subsection (b),' . . . Congress considered the need to make an exception, and determined that only two were necessary."  *Id.* at 29.  In short, Jazz casts clinical superiority as a "*de facto*" impermissible "third exception."  *Id.* at 1.  But that simply assumes the conclusion Jazz seeks.  Because Congress handled the question of whether a clinically superior drug is the "same drug" as a matter of definition in § 360cc(a), clinical superiority is a threshold determination of sameness under § 360cc(a), not an exception to sameness in § 360cc(b).  Here, LUMRYZ and Xywav are not the same drug under § 360cc(a), and so the exceptions in § 360cc(b) do not even come into play.

*Second*, Jazz argues (at 30) that because Congress referred to clinical superiority in subsections (c) and (e), it "intentionally limited" clinical superiority

"to the serial exclusivity question."  Jazz also makes the related argument (at 50) that Congress would not have addressed clinical superiority expressly in subsection (c) and implicitly in subsection (a).  But the way Congress made these changes reflects its goal:  Section 360cc(c) countermands *Depomed*'s rejection of FDA's approach to clinical superiority for purposes of serial exclusivity, while § 360cc(a) codifies FDA's existing definition of "same drug"—which *Baker Norton* upheld and *Depomed* left in place.  *Depomed*, 66 F. Supp. 3d at 232.  And because FDA did not acquiesce to *Depomed*'s requirement to grant exclusivity to any approved, designated drug, *Eagle* threatened to expand the scope of the *Depomed* precedent unless Congress made significant changes to the statute.  Congress enacted the 2017 amendments while *Eagle* remained pending.  *Eagle*, 952 F.3d at 340 n.9. There was no similar reason to re-write § 360cc(a) wholesale in response to *Depomed* (or *Eagle*), which did not call into question *Baker Norton* and FDA's longstanding construction of § 360cc(a).

*     *     *

Jazz ultimately cannot dispute that Congress knew that FDA had for 25 years applied its consistent regulation providing that a clinically superior drug is not the "same drug" as a previously approved drug.  And Jazz cannot dispute Congress decided to use the exact term that FDA had long so defined.  Jazz's only claim is that this change was a remarkable coincidence that upended 25 years of regulatory

history in a set of amendments clearly intended by Congress to *convey* authority to FDA.  That is not how Congress legislates, and it is not what happened here.

**B.** **Even If Congress Did Not Fully "Ratify" FDA's "Same Drug" Definition, FDA Has Still Applied The Best Reading Of § 360cc(a)**

Even if the Court were to question the district court's ratification holding, FDA has still implemented the best reading of the statute.  And Jazz's contrary reading renders multiple statutory provisions nonsensical.

1. Jazz insists that the meaning of "same drug," at least for small molecule drugs, is just the "same active moiety."  The gist of Jazz's argument is that (i) the "designated" "drug" in § 360cc(a) is just an "active moiety," and (ii) the only meaning of "same" in "same drug" is to refer back to the "designated drug," *i.e.*, active moiety.  Jazz's theories require both (i) and (ii) to be correct.  Neither is.

(i) The Act makes clear that a "designated" "drug" has a chemical identity extending well beyond the "active moiety" alone.

Before delving into the Act, consider the broader structure of the statute.  The FDCA contains a range of definitions of "drug" that apply throughout the Act.  21 U.S.C. § 321(g)(1).  Most commonly, a "drug" refers to the final dosage form or formulation ("drug product"), which includes at least one active ingredient ("drug substance"), plus any inactive ingredients. *See United States v. Generix Drug Corp*., 460 U.S. 453, 459 (1983) ("The term 'drug' is plainly intended throughout the Act to include entire drug products, complete with active and inactive ingredients.").

27

However, in some contexts, a "drug" can also refer to an "active ingredient," *i.e.*, a "drug substance" standing alone. *See* 21 C.F.R. § 314.3(b) (defining terms).

An "active moiety" is different:  The "oxybate" ion is the "active moiety" in sodium oxybate (sodium oxybate being the drug substance/active ingredient), but oxybate is not itself the "drug substance" or "drug product." *See id.* §§ 314.3, 316.3. That is because an "[a]ctive moiety," like oxybate, is defined as "the molecule or ion, *excluding those appended portions of the molecule that cause the drug to be a[] . . . salt . . .* responsible for the physiological or pharmacological action *of the drug substance*." *Id.* § 316.3 (emphases added).  That is, *putting aside the sodium ion,* the remaining molecule or ion, oxybate, is the drug's active moiety. *Id.*

Congress clearly distinguishes between "drug" and "active moiety":  A "drug . . . includes an active moiety," but a drug is not *itself* the active moiety.  21 U.S.C. § 355(c)(3)(E)(iii); *see also id.* § 355(c)(3)(E)(ii), (v) (a "drug, which includes an active moiety"); *id.* § 355(j)(5)(F)(ii)-(iii), (v) (similar); *id.* § 355(*l*)(2)(A)(i) (similar); *id.* § 355(s)(1)(A) (similar); *id.* § 355(u)(1) (discussing a "drug containing [] an active moiety"); *see also* Pub. L. No. 117-9, § 1(a)(1)(A), 135 Stat. 256, 256 (2021) (striking "active ingredient" and replacing it with "active moiety").  The Act also makes this express:  A "drug" may "contain[]" an "active moiety." 21 U.S.C. § 360ff(a)(4)(B).  So when Congress intends to refer to the "same active moiety," it uses that phrase expressly. *See id.* § 355(u)(1).

Importantly, within the context of the Act's drug development and approval framework, the details of a "drug" can also evolve over time. (Much like a child grows into an adult, but is still the same person.) At the designation stage, sponsors generally do not know the full identity of the final "drug product," which remains under development. *See id.* § 360bb(a)(1) (a drug can be designated if it "is being or *will be investigated* for a rare disease" (emphasis added)). But even if the final drug product's properties have not all been discovered at the time of designation, the Act makes clear that, even at the designation stage, the designated "drug" is not an active moiety standing alone. Instead, the designated "drug" is the broader drug that will, over time, become known as the final "drug product."

For example, Section 360cc(c) provides that if a "sponsor of a *drug that is designated* under section 360bb of this title and is *otherwise the same*, as determined by the Secretary, as an already approved or licensed drug is seeking exclusive approval . . . the Secretary shall require such sponsor . . . to *demonstrate that such drug is clinically superior to any already approved or licensed drug that is the same drug*." *Id.* § 360cc(c)(1) (emphases added). The requirement to show that a "drug" "designated" is "clinically superior" to a prior "approved . . . drug" necessarily requires that the "drug" "designated" have an identity that is broader than an active moiety standing alone. *Id.* An "active moiety" standing alone cannot be "clinically

superior" to the same "active moiety" alone:  "Oxybate" is not superior to "oxybate," because they refer to the identical ion.

Jazz's contrary reading that a designated "drug" is solely an "active moiety" renders § 360cc(c) unintelligible:

> If a sponsor of a ~~drug~~ [**active moiety**] that is ***designated*** under section 360bb of this title and is otherwise the same . . . as an already approved . . . drug is seeking exclusive approval . . . the Secretary shall require such sponsor, as a condition of such exclusive approval or licensure, to demonstrate that such ~~drug~~ [**active moiety**] is clinically superior to any already approved or licensed drug that is the same ~~drug~~ [**active moiety**].

*Id.* (modifications added).  Jazz cannot explain how *anyone* could prove an "active moiety" superior to the "same" "active moiety."  Contrary to Jazz's arguments, Congress's required demonstration of "clinical superiority" for a "designated" "drug" only makes sense if that drug carries with it a broader identity, beyond just an active moiety, that can give rise to clinical superiority.

Jazz knows this:  In obtaining exclusivity for Xywav pursuant to § 360cc(c), Jazz purported to show that its subsequent, immediate-release drug *product*, Xywav, was clinically superior to its original, immediate-release drug *product*, Xyrem, due to Xywav's lower sodium content, not a distinction in the "active moiety."  JA505.

Moreover, Congress's 2017 amendments codified that at the "*designation*" stage, FDA shall provide notice of "any plausible hypothesis offered by the sponsor and relied upon by the Secretary that *the drug is clinically superior to a previously approved drug*."  21 U.S.C. § 360cc(e) (emphases added).  For the same reasons

30

above, *supra* at 29-30, the designated "drug" cannot mean "active moiety" alone in § 360cc(e). Clearly, FDA designates a broader "drug."

FDA's designation regulations mirror § 360cc(e): FDA will designate a drug that is "otherwise the same as an already approved drug," *i.e.*, containing the same active moiety, where, and only where, the sponsor "can present a plausible hypothesis that its drug may be clinically superior to the first drug." 21 C.F.R. § 316.20(a); *see also id.* §§ 316.20(b)(5), 316.25(a)(3). Again, "drug" cannot mean "active moiety" alone: A "plausible hypothesis" of "clinical superiority" demands a broader identity of the designated "drug" than "active moiety."

Critically, when FDA designated LUMRYZ as an orphan drug, it did so based on LUMRYZ's unique extended-release formulation, which gave rise to its clinical superiority, designating LUMRYZ as "sodium oxybate for extended-release oral suspension." JA203. That is a broader identity than "oxybate" alone. *Id.*

Section 360bb, which governs designations, reinforces all of this. It provides that the "*designation of a drug* . . . shall be subject to the condition" that "if an application was approved for the drug . . . the manufacturer of the drug will notify the Secretary of any discontinuance of the *production of the drug* at least one year before discontinuance." 21 U.S.C. § 360bb(b)(1) (emphases added); *see also id.* § 360bb(a)(1)(B). But a drug sponsor does not "discontinu[e]" "production" of an "active moiety," because sponsors produce complete drug products. Similarly, to

31

obtain designation of a "drug," a sponsor must describe the "drug, *to include*" the active moiety *and* any other known "physical and chemical properties" of the drug. 21 C.F.R. § 316.20(b)(4) (emphasis added).  All of this reinforces that the "drug" subject to "designation" is not an active moiety standing alone.  *See id.*

Reinforcing as much:  FDA employs its regulatory definitions of "same drug" and "clinically superior" at *both* the designation and approval stages.  FDA promulgated its designation regulations pursuant to its unchallenged "ability to control" the drug designation process under its expressly delegated authority in § 360bb(d).  *Eagle*, 952 F.3d at 335.  For example, FDA provides that "a sponsor of a drug that is otherwise the *same drug* as an already approved drug may seek and obtain orphan-drug *designation* for the subsequent drug for the same rare disease or condition if it can present a plausible hypothesis that its drug *may be clinically superior* to the first drug."  21 C.F.R. § 316.20(a) (emphases added); *see also id.* §§ 316.20(b)(5), 316.25(a)(3) (similar).  All FDA has done is apply a *consistent* definition of "same drug" and "clinically superior" at both the designation and approval stages—considering, at both stages, the entire drug, not just the "active moiety" it contains.

Finally, at the approval stage, Congress provided that if FDA "approves an *application* filed pursuant to section 355 . . . for a drug designated under section 360bb," then FDA cannot "approve another *application* under section 355 . . . *for*

*the same drug* for the same disease or condition." 21 U.S.C. § 360cc(a) (emphases added). An "application" for new drug approval is made for a final drug product, not for an active moiety alone. *Id.* § 355(b). So at the approval stage, just like the designation stage, FDA undertakes a "same drug" analysis of a broader drug (at approval, the final drug product); FDA does not just compare "active moieties."

(ii) Turning to the term "same," "same" means "resembling in every relevant respect." Same, *Black's Law Dictionary* (10th ed. 2014); *see also* Same, *Merriam-Webster Dictionary* (2015) ("resembling in every relevant respect"); *Lee v. Norfolk S. Ry. Co.*, 802 F.3d 626, 632 (4th Cir. 2015) (applying these definitions); *Doe v. Fitzgerald*, 102 F.4th 1089, 1099 (9th Cir. 2024) (same).

For example, two diners might say they ordered the "same meal," even if there might be some minor variation in the dimensions or "doneness" of two steaks. Or, at a wedding reception, two guests might remark "we're wearing the same dress" even if one person is a size 6 and one is a size 10. But if the steaks are two different cuts of meat, or two dresses have different colors and patterns, they are, in ordinary language, not the same. So "[i]t is the context in which the word 'same' is used that provides the 'respects' that are 'relevant' to determining whether two things are 'the same.'" *NMC Grp., Inc. v. Young Eng'rs, Inc.*, No. CV 11-4280, 2012 WL 13008456, at *6 (C.D. Cal. Aug. 23, 2012).

Critically, the term "same" does not require two drugs to have "complete

33

chemical identity." *See Serono Laboratories, Inc. v. Shalala*, 158 F.3d 1313, 1320 (D.C. Cir. 1998). Instead, the question is what are the "relevant" aspects of an orphan "drug." It is clearly "relevant" to patients if, for example, the chemical differences in a drug make it safer, more effective, or better for patient care. *See id.* at 1319-21 (finding "sameness" appropriately considers "pharmacological activity" and "clinical equivalence," *i.e.*, any "'differences in safety and efficacy'"). FDA adopted that construction, *see* 21 C.F.R. § 316.3(b)(14)(i), and FDA's determination of the relevant characteristics of an orphan drug serve as a useful "interpretive aid" that "'can inform [the court's] determination'" of the meaning of "same drug." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 386 (2024).

Congress concurred with FDA, providing that a "clinically superior" drug is "otherwise the same" (*i.e.*, not the same) as a previously approved drug; "clinically superior" in turn "means that the drug provides a significant therapeutic advantage over and above an already approved . . . drug in terms of greater efficacy, greater safety, or by providing a major contribution to patient care." 21 U.S.C. § 360cc(c)(1)-(2). Congress did not adjudge to be relevant immaterial variations in ingredients that might give rise to a technically distinct "new drug," *id.* § 355(b)(2), with no "significant" clinical benefit, *id.* § 360cc(c)(2). So a clinically superior drug does not "resembl[e] in every relevant respect" a previously approved drug: They are not the same. Same, *Black's Law Dictionary*, *supra*.

This ordinary-meaning interpretation of "same" is not novel:  Five years before FDA set forth its reading of "same drug," the court in *Genentech, Inc. v. Bowen* found that the best reading of the statute was that two drugs were "not the same drug" at the designation stage where a "synthetic" version of the drug (*i.e.*, with a difference in composition and manufacturing) removed the "risk" of "contamination" and "side effects" in the non-synthetic version of the drug.  676 F. Supp. 301, 312-13 (D.D.C. 1987).  That is, the court identified the concept of clinical superiority as the best reading of § 360bb(a), making two drugs "different" at the designation stage, 5 years before FDA issued its "same drug" regulations.  *Id.*

2.  FDA's interpretation also fulfills Congress's express purpose.  Congress sought to provide "financial incentives to develop [orphan] drugs."  *Eagle*, 952 F.3d at 325 (quoting Pub. L. No. 97-414, § 1, 96 Stat. at 2049).  If "same drug" were defined too narrowly, as the exact identity of two drug products, a sponsor of a subsequent drug could avoid exclusivity by altering trivial components of an approved drug with no clinical benefit, providing few "financial incentives" to market the prior drug.  Pub. L. No. 97-414, § 1, 96 Stat. at 2049.  But if "same drug" were defined too broadly, it would create a vast scope of exclusivity—blocking even those new drugs reflecting exceptional advances.  *See id.*  The statute itself makes clear that Congress worried such "promising orphan drugs will not be developed."  *Id*.  For example, in *Baker Norton*, the court analyzed the Act and found that the

35

"interests of patients who need such drugs are served by the approval of drugs which have the same active moiety but are clinically superior."  132 F. Supp. 2d at 38; *see also Genentech*, 676 F. Supp. at 312 (similar).

Meanwhile, Jazz's construction would mean that, if exclusivity covers Drug 1 that extends the life of a patient with a rare cancer by 6 months, while Drug 2 uses the same active moiety to extend life by 5 years, Drug 2's approval would be blocked for 7 years.  Or, according to Jazz, if Drug 1 contains an allergen that makes the drug unusable (unsafe) for 50% of patients, and Drug 2 does not, Drug 2's approval would be blocked for 7 years.  Such outcomes would lead to the very problem Congress sought to address:  Promising orphan drugs would "not be developed."  Pub. L. No. 97-414, § 1, 96 Stat. at 2049.

As FDA has explained at length, Jazz's interpretation would also mean that the first-in-time drug's sponsor would be incentivized to delay its *own* innovations and, at most, roll out one new innovation every 6 or 7 years, so as to maintain its statutory monopoly indefinitely, while foreclosing any competitive entry.  FDA Br. 33-36.  This concern is not hypothetical:  Jazz has strung together repeated terms of exclusivity for its oxybate products since Xyrem's approval in 2002.[3]

---

[3]    Jazz also raises for the first time on appeal an argument about due process. Jazz never raised this argument below and so has forfeited it.  In any event, Avadel joins in FDA's arguments, FDA Br. 43, without repeating them.

## II.    ALTERNATIVELY, LUMRYZ IS ENTITLED TO EXCLUSIVE APPROVAL UNDER SECTION 360cc(c)

The district court offered an alternative and independently sufficient basis to affirm:  Section 360cc(c) authorizes FDA's approval of LUMRYZ.  The district court explained that "even under Jazz's preferred reading" of § 360cc(a), FDA "nonetheless had authority under subsection (c) to grant 'exclusive approval' to Lumryz based on its 'clinical superiority.'"  JA567.  The court was correct.

As a reminder, § 360cc(c)(1) provides:

> If a sponsor of a *drug that is designated* under section 360bb of this title and is otherwise the same, as determined by the Secretary, as an already approved or licensed drug *is seeking exclusive approval or exclusive licensure described in subsection (a)* for the same rare disease or condition as the already approved drug, the Secretary shall require such sponsor, as a *condition of such exclusive approval or licensure*, to demonstrate that such drug is clinically superior to any already approved or licensed drug that is the same drug.

21 U.S.C. § 360cc(c)(1) (emphasis added).  As the district court correctly explained, § 360cc(c) applies to a situation where a second drug seeks "exclusive approval" under "subsection (a)" based on "clinical superiority," regardless of whether there is an ongoing period of exclusivity for another drug.  *Id.*  Section 360cc(c) makes no distinction between a new drug sponsor facing an unexpired period of exclusivity versus one that does not.  *See id.*  Because Avadel sought "exclusive approval" based on LUMRYZ's "clinical superiority," § 360cc(c) authorized FDA to grant "exclusive approval" under "subsection (a)" upon making that showing.  *See id.*

37

The district court's approach follows the Eleventh Circuit's explanation in *Catalyst Pharmaceuticals, Inc. v. Becerra* that under § 360cc(c), exclusivity does not preclude approval of a drug if the "second manufacturer demonstrates that its drug 'provides a significant therapeutic advantage over and above an already approved [drug].'"  14 F.4th 1299, 1304 (11th Cir. 2021).  Avadel argued this interpretation of § 360cc(c) to the district court.  D. Ct. Dkt. 87 at 19-20.  And while Jazz now calls *Catalyst*'s explanation a "mistake," Jazz Br. 63, Jazz previously urged FDA to adopt *Catalyst*'s interpretation of § 360cc(c), JA382-84, 582.

Jazz's one-sentence suggestion (at 60) that this theory is "*Chenery*-barred" is incorrect.  *Chenery* does not prevent a court from affirming an agency's authority under a different statutory analysis than the agency's.  *See, e.g.*, *NLRB v. Wyman-Gordon Co.*, 394 U.S. 759, 766 n.6 (1969) (*Chenery* does not apply where "remand would be an idle and useless formality"); *Envirocare of Utah, Inc. v. Nuclear Regul. Comm'n*, 194 F.3d 72, 79 (D.C. Cir. 1999) ("When 'there is not the slightest uncertainty as to the outcome of a proceeding' on remand, courts can affirm an agency decision on grounds other than those provided in the agency decision.").  It is undisputed that LUMRYZ is clinically superior, so the result on remand is not in doubt.

Alternatively, if the Court were inclined to allow FDA to address this issue in the first instance, the Court could simply remand without vacatur, given the obvious

38

path for FDA to update its statutory analysis and the highly "disruptive consequences" to thousands of patients that would result from vacating LUMRYZ's approval. *City of Oberlin v. FERC*, 937 F.3d 599, 611 (D.C. Cir. 2019).

## CONCLUSION

For the foregoing reasons, the Court should affirm.

Dated:  March 24, 2025                    Respectfully submitted,

                                          */s/ Philip J. Perry*
                                          Philip J. Perry
                                          John R. Manthei
                                          Andrew D. Prins
                                          Peter E. Davis
                                          Richard Frohlichstein
                                          LATHAM & WATKINS LLP
                                          555 Eleventh Street, NW
                                          Suite 1000
                                          Washington, DC 20004
                                          (202) 637-2200
                                          philip.perry@lw.com

                                          Nicholas L. Schlossman
                                          LATHAM & WATKINS LLP
                                          300 Colorado Street
                                          Suite 2400
                                          Austin, TX 78701
                                          (737) 910-7314

                                          *Counsel for Intervenor-*
                                          *Defendant-Appellee*
                                          *Avadel CNS Pharmaceuticals, LLC*

## CERTIFICATE OF COMPLIANCE

This brief complies with Federal Rule of Appellate Procedure 32(f) and (g), and D.C. Cir. Rule 32(e)(2), because it contains 9,082 words.

This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word and Times New Roman 14-point font.

*/s/ Philip J. Perry*
Philip J. Perry

## CERTIFICATE OF SERVICE

I hereby certify that on March 24, 2025, I electronically filed the foregoing brief with the United States Court of Appeals for the District of Columbia Circuit through the Court's CM/ECF system. All parties are represented by registered CM/ECF users and will be served by the CM/ECF system.

*/s/ Philip J. Perry*
Philip J. Perry

# ADDENDUM
**Pursuant to Rule 28(a)(5)**

## TABLE OF CONTENTS

| Description | Page |
|---|---|
| 21 C.F.R. § 316.20 (1993) | ADD-1 |
| 21 C.F.R. § 316.20 (2024) | ADD-3 |
| 21 C.F.R. § 316.31 (1993) | ADD-5 |
| 21 C.F.R. § 316.31 (2024) | ADD-6 |

## 21 C.F.R. § 316.20 (1993)

**§ 316.20.  Content and format of a request for orphan-drug designation.**

(a) A sponsor that submits a request for orphan-drug designation of a drug for a specified rare disease or condition shall submit each request in the form and containing the information required in paragraph (b) of this section.  A sponsor may request orphan-drug designation of a previously unapproved drug, or of a new orphan indication for an already marketed drug.  In addition, a sponsor of a drug that is otherwise the same drug as an already approved orphan drug may seek and obtain orphan-drug designation for the subsequent drug for the same rare disease or condition if it can present a plausible hypothesis that its drug may be clinically superior to the first drug.  More than one sponsor may receive orphan-drug designation of the same drug for the same rare disease or condition, but each sponsor seeking orphan-drug designation must file a complete request for designation as provided in paragraph (b) of this section.

(b) A sponsor shall submit two copies of a completed, dated, and signed request for designation that contains the following:

(1) A statement that the sponsor requests orphan-drug designation for a rare disease or condition, which shall be identified with specificity.

(2) The name and address of the sponsor; the name of the sponsor's primary contact person and/or resident agent including title, address, and telephone number; the generic and trade name, if any, of the drug or drug product; and the name and address of the source of the drug if it is not manufactured by the sponsor.

(3) A description of the rare disease or condition for which the drug is being or will be investigated, the proposed indication or indications for use of the drug, and the reasons why such therapy is needed.

(4) A description of the drug and a discussion of the scientific rationale for the use of the drug for the rare disease or condition, including all data from nonclinical laboratory studies, clinical investigations, and other relevant data that are available to the sponsor, whether positive, negative, or inconclusive.  Copies of pertinent unpublished and published papers are also required.

(5) Where the sponsor of a drug that is otherwise the same drug as an already-approved orphan drug seeks orphan-drug designation for the subsequent drug for the same rare disease or condition, an explanation of why the proposed variation may be clinically superior to the first drug.

(6) Where a drug is under development for only a subset of persons with a particular disease or condition, a demonstration that the subset is medically plausible.

(7) A summary of the regulatory status and marketing history of the drug in the United States and in foreign countries, e.g., IND and marketing application status and dispositions, what uses are under investigation and in what countries; for what indication is the drug approved in foreign countries; what adverse regulatory actions have been taken against the drug in any country.

(8) Documentation, with appended authoritative references, to demonstrate that:

(i) The disease or condition for which the drug is intended affects fewer than 200,000 people in the United States or, if the drug is a vaccine, diagnostic drug, or preventive drug, the persons to whom the drug will be administered in the United States are fewer than 200,000 per year as specified in § 316.21(b), or

(ii) For a drug intended for diseases or conditions affecting 200,000 or more people, or for a vaccine, diagnostic drug, or preventive drug to be administered to 200,000 or more persons per year in the United States, there is no reasonable expectation that costs of research and development of the drug for the indication can be recovered by sales of the drug in the United States as specified in § 316.21(c).

(9) A statement as to whether the sponsor submitting the request is the real party in interest of the development and the intended or actual production and sales of the product.

(c) Any of the information previously provided by the sponsor to FDA under Subpart B of this part may be referenced by specific page or location if it duplicates information required elsewhere in this section.

## 21 C.F.R. § 316.20 (2024)

### § 316.20.  Content and format of a request for orphan-drug designation.

(a) A sponsor that submits a request for orphan-drug designation of a drug for a specified rare disease or condition shall submit each request in the form and containing the information required in paragraph (b) of this section.  A sponsor may request orphan-drug designation of a previously unapproved drug, or of a new use for an already marketed drug.  In addition, a sponsor of a drug that is otherwise the same drug as an already approved drug may seek and obtain orphan-drug designation for the subsequent drug for the same rare disease or condition if it can present a plausible hypothesis that its drug may be clinically superior to the first drug.  More than one sponsor may receive orphan-drug designation of the same drug for the same rare disease or condition, but each sponsor seeking orphan-drug designation must file a complete request for designation as provided in paragraph (b) of this section.

(b) A sponsor shall submit two copies of a completed, dated, and signed request for designation that contains the following:

(1) A statement that the sponsor requests orphan-drug designation for a rare disease or condition, which shall be identified with specificity.

(2) The name and address of the sponsor; the name of the sponsor's primary contact person and/or resident agent including title, address, telephone number, and email address; the generic and trade name, if any, of the drug, or, if neither is available, the chemical name or a meaningful descriptive name of the drug; and the name and address of the source of the drug if it is not manufactured by the sponsor.

(3) A description of the rare disease or condition for which the drug is being or will be investigated, the proposed use of the drug, and the reasons why such therapy is needed.

(4) A description of the drug, to include the identity of the active moiety if it is a drug composed of small molecules, or of the principal molecular structural features if it is composed of macromolecules; its physical and chemical properties, if these characteristics can be determined; and a discussion of the scientific rationale to establish a medically plausible basis for the use of the drug for the rare disease or condition, including all relevant data from in vitro laboratory studies, preclinical efficacy studies conducted in an animal model for the human disease or condition, and clinical experience with the drug in the rare disease or condition that are available to the sponsor, whether positive, negative, or inconclusive.  Animal toxicology studies are generally not relevant to a request for orphan-drug designation.  Copies of pertinent unpublished and published papers are also required.

ADD-3

(5) Where the sponsor of a drug that is otherwise the same drug as an already approved drug seeks orphan-drug designation for the subsequent drug for the same rare disease or condition, an explanation of why the proposed variation may be clinically superior to the first drug.

(6) Where a sponsor requests orphan-drug designation for a drug for only a subset of persons with a particular disease or condition that otherwise affects 200,000 or more people ("orphan subset"), a demonstration that, due to one or more properties of the drug, the remaining persons with such disease or condition would not be appropriate candidates for use of the drug.

(7) A summary of the regulatory status and marketing history of the drug in the United States and in foreign countries, e.g., IND and marketing application status and dispositions, what uses are under investigation and in what countries; for what indication is the drug approved in foreign countries; what adverse regulatory actions have been taken against the drug in any country.

(8) Documentation, with appended authoritative references, to demonstrate that:

(i) The disease or condition for which the drug is intended affects fewer than 200,000 people in the United States or, if the drug is a vaccine, diagnostic drug, or preventive drug, the persons to whom the drug will be administered in the United States are fewer than 200,000 per year as specified in § 316.21(b), or

(ii) For a drug intended for diseases or conditions affecting 200,000 or more people, or for a vaccine, diagnostic drug, or preventive drug to be administered to 200,000 or more persons per year in the United States, there is no reasonable expectation that costs of research and development of the drug for the indication can be recovered by sales of the drug in the United States as specified in § 316.21(c).

(c) Any of the information previously provided by the sponsor to FDA under subpart B of this part may be referenced by specific page or location if it duplicates information required elsewhere in this section.

## 21 C.F.R. § 316.31 (1993)

### § 316.31.  Scope of orphan-drug exclusive approval.

(a) After approval of a sponsor's marketing application for a designated orphan-drug product for treatment of the rare disease or condition concerning which orphan-drug designation was granted, FDA will not approve another sponsor's marketing application for the same drug before the expiration of 7 years from the date of such approval as stated in the approval letter from FDA, except that such a marketing application can be approved sooner if, and such time as, any of the following occurs:

(1) Withdrawal of exclusive approval or revocation of orphan-drug designation by FDA under any provision of this part; or

(2) Withdrawal for any reason of the marketing application for the drug in question; or

(3) Consent by the holder of exclusive approval to permit another marketing application to gain approval; or

(4) Failure of the holder of exclusive approval to assure a sufficient quantity of the drug under section 527 of the act and § 316.36.

(b) If a sponsor's marketing application for a drug product is determined not to be approvable because approval is barred under section 527 of the act until the expiration of the period of exclusive marketing of another drug product, FDA will so notify the sponsor in writing.

## 21 C.F.R. § 316.31 (2024)

**§ 316.31.  Scope of orphan-drug exclusive approval.**

(a) FDA may approve a sponsor's marketing application for a designated orphan drug for use in the rare disease or condition for which the drug was designated, or for select indication(s) or use(s) within the rare disease or condition for which the drug was designated.  Unless FDA previously approved the same drug for the same use or indication, FDA will not approve another sponsor's marketing application for the same drug for the same use or indication before the expiration of 7 years from the date of such approval as stated in the approval letter from FDA, except that such a marketing application can be approved sooner if, and at such time as, any of the following occurs:

(1) Withdrawal of exclusive approval or revocation of orphan-drug designation by FDA under any provision of this part; or

(2) Withdrawal for any reason of the marketing application for the drug in question; or

(3) Consent by the holder of exclusive approval to permit another marketing application to gain approval; or

(4) Failure of the holder of exclusive approval to assure a sufficient quantity of the drug under section 527 of the act and § 316.36.

(b) Orphan-drug exclusive approval protects only the approved indication or use of a designated drug.  If such approval is limited to only particular indication(s) or uses(s) within the rare disease or condition for which the drug was designated, FDA may later approve the drug for additional indication(s) or uses(s) within the rare disease or condition not protected by the exclusive approval.  If the sponsor who obtains approval for these new indication(s) or uses(s) has orphan-drug designation for the drug for the rare disease or condition, FDA will recognize a new orphan-drug exclusive approval for these new (not previously approved) indication(s) or use(s) from the date of approval of the drug for such new indication(s) or use(s).

(c) If a sponsor's marketing application for a drug product is determined not to be approvable because approval is barred under section 527 of the Federal Food, Drug, and Cosmetic Act until the expiration of the period of exclusive marketing of another drug, FDA will so notify the sponsor in writing.