ORAL ARGUMENT SET FOR MAY 5, 2025

No. 24-5262

====

# In the United States Court of Appeals for the District of Columbia Circuit

————————————

JAZZ PHARMACEUTICALS, INC.,

*Plaintiff-Appellant,*

v.

ROBERT F. KENNEDY, JR., *et al.*,

*Defendants-Appellees,*

AVADEL CNS PHARMACEUTICALS, LLC,

*Intervenor for Defendants-Appellees,*

————————————

On Appeal from the United States District Court
for the District of Columbia, No. 1:18-cv-1819 (Mehta, J.)

————————————

## REPLY BRIEF FOR APPELLANT JAZZ PHARMACEUTICALS

————————————

Kwaku A. Akowuah
  *Counsel of Record*
Sean C. Griffin
Peter A. Bruland
Anna C. Burke
David H. Kinnaird
SIDLEY AUSTIN LLP
1501 K Street, NW
Washington, DC 20005
202.736.8000
kakowuah@sidley.com

*Counsel for Appellant*

# TABLE OF CONTENTS

TABLE OF CONTENTS ..................................................................i

TABLE OF AUTHORITIES ...................................................... iii

GLOSSARY ........................................................................vii

INTRODUCTION AND SUMMARY OF ARGUMENT ..........................1

ARGUMENT......................................................................4

I.    FDA lacked statutory authority to approve Lumryz......................4

      A.    During the moratorium, FDA may not approve a
            follow-on application to treat the designated condition
            using the designated drug........................................4

            1.    The meaning of §360cc(a) turns on context, not
                  chemistry...................................................5

                  a.    Only Jazz's contextual reading fits the
                        structure and purpose of §360cc(a)......................6

                  b.    FDA and Avadel's contrary arguments fail..........9

            2.    Properly read, §360cc(a) forbade FDA to approve
                  Lumryz during the moratorium..................................14

            3.    FDA and Avadel's policy arguments fail. ...................16

      B.    Congress did not ratify FDA's 1992 loophole when it
            changed "such" to "the same."...............................20

            1.    Subsection (a) lacks the hallmarks of legislative
                  ratification.................................................20

            2.    FDA's ratification theory is inconsistent with the
                  statute as a whole. ........................................27

a.   Congress did not ratify FDA's approach wholesale. ............................................................ 27

b.   FDA's ratification theory violates first principles of statutory interpretation. ................ 28

c.   FDA's approach would undermine the property right created by the Act. ...................... 30

II.   Avadel's attempt to invoke the district court's alternative theory also fails. ............................................................ 32

III.   FDA's error warrants vacatur ...................................... 34

CONCLUSION ........................................................................ 34

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alexander v. Sandoval,*
532 U.S. 275 (2001) ................................................................. 25

*Bank One Chi., N.A. v. Midwest Bank & Tr. Co.,*
516 U.S. 264 (1996) ................................................................. 24

*Bondi v. VanDerStok,*
2025 WL 906503 (Mar. 26, 2025) ........................................ 25

*Borden v. United States,*
593 U.S. 420 (2021) ................................................................... 9

*BP P.L.C. v. Mayor & City Council of Baltimore,*
141 S. Ct. 1532 (2021) ............................................................ 15

*Bragdon v. Abbott,*
524 U.S. 624 (1998) ................................................................. 22

* *Catalyst Pharms., Inc. v. Becerra,*
14 F.4th 1299 (11th Cir. 2021) ....................................... 6, 13

*Columbia Ry., Gas & Elec. Co. v. South Carolina,*
261 U.S. 236 (1923) ................................................................. 31

*CSX Corp. v. United States,*
18 F.4th 672 (11th Cir. 2021) ............................................... 21

*Duarte v. Mayorkas,*
27 F.4th 1044 (5th Cir. 2022) ........................................ 23, 24

* *Eagle Pharms., Inc. v. Azar,*
952 F.3d 323 (D.C. Cir. 2020) ................................... 7, 16, 17

*Authorities chiefly relied upon are marked with asterisks

*Env't Def. v. Duke Energy Corp.*,
549 U.S. 561 (2007)..............................................................2

*Fed. Express Corp. v. United States Dep't of Com.*,
39 F.4th 756 (D.C. Cir. 2022)............................................23

*Genentech, Inc. v. Immunex Rhode Island Corp.*,
395 F. Supp. 3d 357 (D. Del. 2019)....................................23

\* *Genus Med. Techs. LLC v. FDA*,
994 F.3d 631 (D.C. Cir. 2021) ....................................21, 28

*Johnson v. United States*,
559 U.S. 133 (2010)...........................................................26

*Kamen v. Kemper Fin. Servs., Inc.*,
500 U.S. 90 (1991)............................................................30

*Loper Bright Enters. v. Raimondo*,
603 U.S. 369 (2024)...........................................................21

*Nat'l Ass'n of Home Builders v. Defs. of Wildlife*,
551 U.S. 644 (2007)..............................................................8

*Neurelis, Inc. v. Brenner*,
2025 WL 506578 (D.D.C. Feb. 14, 2025) ............................6

*Niz-Chavez v. Garland*,
593 U.S. 155 (2021)...........................................................17

*Rawson v. Inhabitants of Sch. Dist. No. 5 in Uxbridge*,
89 Mass. (7 Allen) 125 (1863) ...........................................31

*S. Cal. Edison Co. v. FERC*,
603 F.3d 996 (D.C. Cir. 2010) ...........................................32

*Sigma-Tau Pharm., Inc. v. Schwetz*,
288 F.3d 141 (4th Cir. 2002).............................................13

iv

*Spectrum Pharm., Inc. v. Burwell,*
  824 F.3d 1062 (D.C. Cir. 2016) .................................................... 12, 13

*Star Athletica, L.L.C. v. Varsity Brands, Inc.,*
  580 U.S. 405 (2017) .............................................................................. 25

*Thaler v. Perlmutter,*
  130 F.4th 1039 (D.C. Cir. 2025) ......................................................... 25

*United States Ass'n of Reptile Keepers, Inc. v. Zinke,*
  852 F.3d 1131 (D.C. Cir. 2017) ........................................................... 21

*United States v. Bennett,*
  44 F.3d 1364 (8th Cir. 1995) ................................................................. 5

*Yee v. City of Escondido,*
  503 U.S. 519 (1992) .............................................................................. 30

\* *Yellen v. Confederated Tribes of Chehalis Rsrv.,*
  594 U.S. 338 (2021) ....................................................................... 24, 25

**Constitutional Provisions**

U.S. Const. amend. V ............................................................................... 4

U.S. Const. art. II, § 1 ............................................................................. 5

**Statutes**

\* 21 U.S.C. § 360cc ....................................... 1, 6, 8, 11, 12, 31

42 U.S.C. § 262(k)(3) ........................................................................... 23

42 U.S.C. § 12201(a) ............................................................................ 22

FDA Reauthorization Act of 2017,
  Pub. L. No. 115-52, 131 Stat. 1005 (2017) ......................................... 20

**Regulations**

21 C.F.R. § 312.82(b) ........................................................................... 20

21 C.F.R. § 315.2 .................................................................... 20

21 C.F.R. § 316.3(b)(14)(i) ..................................................... 27

21 C.F.R. § 601.31 .................................................................. 20

21 C.F.R. § 874.3300 ............................................................... 20

21 C.F.R. § 874.3305 ............................................................... 20

56 Fed. Reg. 3338 (Jan. 29, 1991) ......................................... 18

# GLOSSARY

FDA                Food and Drug Administration

## INTRODUCTION AND SUMMARY OF ARGUMENT

Congress spoke clearly. When FDA "designate[s]" a drug "for a rare disease" and then "approves an application" to use that drug to treat that disease, the agency must wait seven years before "approv[ing] another application" using "the same drug" to treat "the same disease." 21 U.S.C. §360cc(a). Properly read, "the same drug" refers back to the "designated" drug—the only other drug mentioned in §360cc(a)—and the statute includes no carveout for treatments FDA deems clinically superior.

That should resolve this case. FDA designated the drug oxybate to treat narcolepsy. It then approved Jazz's application for Xywav, which uses oxybate to treat narcolepsy—triggering the approval moratorium. FDA was thus forbidden to approve new treatments using oxybate to treat narcolepsy. If the Court reads the statute Jazz's way, FDA does not deny that its order approving Lumryz was unlawful and must be vacated.

1.    FDA chiefly argues that the statute calls for a totality-of-the-circumstances inquiry into whether two drugs are similar enough to count as "the same drug." But that reading runs aground on the text, structure, and purposes of §360cc(a). For one thing, FDA's approach would require courts to toggle back and forth between two senses of *same*

within a single clause—sometimes looking to context, sometimes looking to chemistry—and would turn the statute's parallel structure into a bizarre patchwork. Nor can FDA's approach be squared with the statute's mandatory "may not" prohibition or with Congress's stated goals. Congress sought to incentivize drugmakers to invest in treatments for rare diseases by granting marketing exclusivity to successful inventors. Only Jazz's interpretation provides certainty that those who earn orphan-drug exclusivity will *actually* enjoy exclusivity for *any* period of time.

**2.** Alternatively, FDA insists that Congress created a hidden clinical-superiority loophole when it amended the Orphan Drug Act in 2017. None of that is sound. Congress regularly incorporates FDA regulations expressly, and its "failure to use such an express incorporation" here "cuts against any suggestion that Congress intended to incorporate into the Act the preexisting regulatory definition." *Env't Def. v. Duke Energy Corp.*, 549 U.S. 561, 576 (2007) (cleaned up). Nor has FDA pointed to any legislative history supporting its theory. Instead, the agency asks the Court to infer that Congress ratified its clinical-superiority policy

because a Congress (purportedly) aware of that policy changed the adjective "such" to the adjectival phrase "the same."

There are many problems with that theory, but here are a few to which FDA has no sound answer:

- Congress expressly addressed clinical superiority in subsections (c) and (e)—but didn't mention it in subsection (a).

- Congress created two express exceptions to the moratorium in subsection (b), yet said nothing about clinical superiority.

- When Congress authorized FDA to approve new applications despite the moratorium in subsection (b), it created procedural protections for drugmakers. But it created no such protections in subsection (a), where FDA claims to find a hidden clinical-superiority loophole.

- There is nothing unusual about Congress's decision to replace "such" with "the same"—just like it replaced "such" with "the" in §360cc(b), and just like it has substituted "such" for "the same" in other statutes.

The best reading of the Orphan Drug Act's text is the one that Jazz offers. The Court should reverse and remand to the district court with instructions to vacate FDA's unlawful approval of Lumryz.

## ARGUMENT

## I.    FDA lacked statutory authority to approve Lumryz.

### A.    During the moratorium, FDA may not approve a follow-on application to treat the designated condition using the designated drug.

FDA now claims (at 23) that the "ordinary meaning of 'same drug'" compels its reading of the statute. That is not what the agency said below. In the district court, FDA argued (i) Congress ratified FDA's 1992 regulation and (ii) the agency should win under *Chevron*—not that ordinary English speakers would read §360cc(a) its way. Anyhow, FDA's newfound argument is wrong. Properly read, the statute shows that the scope of the moratorium turns on FDA's designation choice. If FDA designates drug *X* for condition *Y*, then the moratorium will block approval of follow-on applications that use *X* to treat *Y*. Applied here, FDA's moratorium-triggering approval of Xywav (designated for oxybate [*X*] to treat narcolepsy [*Y*]) means FDA lacked authority to approve a follow-on application for oxybate [*X*] to treat narcolepsy [*Y*] until the moratorium expires. That resolves the case.

4

### 1.     The meaning of §360cc(a) turns on context, not chemistry.

The statutory-interpretation debate boils down to which sense of *same* Congress used in §360cc(a). According to FDA (at 22), the phrase "the same drug" calls for an outside-the-statute inquiry about whether two treatments share relevant "structur[al] and physical features." That's the Double Jeopardy Clause sense of *same*. *See* U.S. Const. amend. V ("[N]or shall any person be subject for the same offense to be twice put in jeopardy of life or limb."). To apply that clause, a court must look outside the Constitution and ask whether two offenses are "the same offense" by comparing their elements. *Cf. United States v. Bennett*, 44 F.3d 1364, 1374 (8th Cir. 1995) ("Although [the] test is easily recited, it is not so easily applied.").

Our reading is simpler—both linguistically and in application. Jazz contends that "the same drug" refers back to the "drug" mentioned earlier in §360cc(a): the "drug designated under [21 U.S.C.§360bb]." That's the Article II, section 1 sense of *same*. The President "shall hold his Office during the Term of four Years," along with a "Vice President, chosen for the same Term." Determining the Vice President's tenure is easy. It

doesn't require looking outside the text and pondering what characteristics make "Term[s]" alike. It just requires the reader to refer back to the prior mention of "Term." Then the answer is clear: "the same Term" means the "Term of four Years" the President will serve.

Statutory structure and purpose confirm that §360cc(a) uses *same* in Jazz's Article II sense, not FDA's Double Jeopardy sense. In other words, "the same drug" calls for an internal, linguistic inquiry within a single sentence—not an external, chemistry-focused inquiry about how "granules [are] dissolved in [a] patient's intestines." FDA Br. 27.

> ### a. Only Jazz's contextual reading fits the structure and purpose of §360cc(a).

*i.*    Statutory structure favors Jazz's reading. Section 360cc(a) involves two parallel clauses, both of which mention a "drug" used to treat a "disease or condition."

| | |
|---|---|
| Clause 1: | If the Secretary "approves an application … for a drug designated under [21 U.S.C. §360bb] for a rare disease or condition …" |
| Clause 2: | Then the Secretary "may not approve another application … for the same drug for the same disease or condition" for seven years. |

On our reading, the Clause 2 phrase "same drug for the same disease or condition" refers back to the Clause 1 phrase "drug designated under [21 U.S.C. §360bb] for a rare disease or condition." Two courts have now agreed that "the same disease or condition" refers back to the "rare disease or condition," and neither FDA nor Avadel has advanced a contrary reading here. *See Catalyst Pharms., Inc. v. Becerra*, 14 F.4th 1299, 1308 (11th Cir. 2021); *Neurelis, Inc. v. Brenner*, 2025 WL 506578, at *7–8 (D.D.C. Feb. 14, 2025) (Mehta, J.). Read most naturally, "the same drug" follows suit—referring back to the "drug designated under [21 U.S.C. §360bb]."

FDA's contrary reading would turn the statute into a bizarre patchwork, requiring courts to toggle between two senses of *same* within a single, unified clause. ("[T]he same [*look at chemistry*] drug for the same [*look within the sentence*] disease or condition.") And the statute's parallel structure makes that reading stranger still. If Congress mentioned a "rare disease or condition" and then used the phrase "same disease or condition" to refer back to it, it would be quite the plot twist for Congress to mention a "drug designated under [21 U.S.C. §360bb]" and then use

7

the phrase "the same drug" to tell the reader to sit down and think hard about science.

*ii.*     Statutory purpose supports Jazz's reading too. Section 360cc(a) "provide[s] financial incentives" by temporarily forbidding FDA to approve certain rival drug applications, thereby granting marketing exclusivity for a fixed time period. *Eagle Pharms., Inc. v. Azar*, 952 F.3d 323, 325 (D.C. Cir. 2020) (citation omitted). Under Jazz's reading, that moratorium has a clear, fixed scope from the outset. When FDA designates a drug for a rare disease and then approves an application to use that drug, the agency must wait seven years before approving a rival application "for the [designated] drug for the [designated] disease." 21 U.S.C. §360cc(a). That reading provides certainty and predictability for both the agency and drugmakers.

FDA's reading eliminates predictability. According to the agency, the phrase "the same drug" grants it discretion to approve rival applications whenever it decides that two products are not "the same." That means no one can know the scope of the moratorium at the start, since no one can know what the agency might deem "superior" when it reviews

other applications later. Still more, FDA's discretion-granting reading conflicts with the mandatory language "may not," which "indicates a command that admits of no discretion on the part of the person instructed to carry out the directive." *Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 661 (2007).

### b. FDA and Avadel's contrary arguments fail.

*i.*    A clear sign that FDA's statutory interpretation has taken a wrong turn is that the agency's "ordinary meaning" argument barely mentions the text or structure of §360cc(a). *See* FDA Br. 26–43.

FDA chiefly relies on the agency's own "regulatory definition," *id.* at 28, and "longstanding position," *id.* at 31, plus "the pharmacologic action" of Xywav and Lumryz, *id.* "That is no way to do statutory construction." *Borden v. United States*, 593 U.S. 420, 435 (2021). The question here is which sense of *same* Congress used in §360cc(a)—so the inquiry should start with the statutory text.

When the agency finally does turn to §360cc, it skips past the text and structure of subsection (a)—the provision it agrees is central—to focus on "[t]he remaining provisions" of the statute. Br. 32. That too is a red flag. There's no question that surrounding subsections may shed light

on the meaning of an ambiguous phrase. But a clear phrase is different: no one attempting to find the meaning of *same* in Article II, section 1 would begin by asking how the Double Jeopardy Clause (or some other constitutional provision) uses that term. The best place to find clues about the meaning of "the same drug" in subsection (a) is subsection (a) itself, a provision that FDA barely mentions. *See* Br. 26, 34 n.4, 38.

*ii.* FDA and Avadel are also wrong that other provisions of §360cc undermine Jazz's reading of §360cc(a).

For example, Avadel points to subsection (c)(1), claiming the clinical superiority language of that provision "requires that the 'drug' 'designated' have an identity that is broader than an active moiety standing alone" because "[a]n active moiety standing alone cannot be clinically superior to the same active moiety alone." Avadel Br. 29–30. Avadel is wrong—and not just because subsection (c)(1) does not use the phrase "drug designated" at all. (Avadel patches that together.)

Avadel overlooks that subsection (c)(1) calls for *two different* comparisons. In the opening stanza, subsection (c)(1) is asking whether two different treatments are "otherwise the same." Only if they are "the

10

same"—borrowing the sense of sameness used in subsection (a)—is it necessary to conduct a clinical superiority analysis to determine if the follow-on drug is eligible for a serial exclusivity period. This is the sense of "otherwise the same" used in subsection (b) as well—only if the second drug is "the same," and thus blocked by the moratorium, is it necessary to consider whether shortages or consent nonetheless allow approval.

Only if the two drugs are the same drug at the designation level is it necessary to conduct a clinical superiority analysis in subsection (c)(1). And in that *second* phase, the comparison occurs at the finished drug product level. We know this because the final clause of (c)(1) asks whether "such drug is clinically superior," and subsection (c)(2) defines clinical superiority in terms that only make sense for a finished drug product—in terms of "provid[ing] a significant therapeutic advantage over and above an already approved or licensed drug in terms of greater efficacy, greater safety, or by providing a major contribution to patient care." 21 U.S.C. §360cc(c)(2).

Avadel's arguments thus fall flat. For example, it is no mystery (*contra* Avadel Br. 30) why Jazz demonstrated the clinical superiority of

11

Xywav over a predecessor Jazz drug by showing that the comparative 92% reduction in dietary sodium intake made Xywav significantly safer at the finished drug product level. Subsection (c)(2) calls for that comparison. Likewise for Avadel's subsection (e) argument (at 31). That provision incorporates the subsection (c) standards by reference, and thus embraces clinical superiority in the finished-drug product manner described in subsection (c)(2). And section 360bb(b)(1) creates no conundrum either. It is saying that the designation (made by FDA, at a level determined in accordance with FDA regulations) carries collateral obligations that will kick in if the sponsor's application for a finished drug product someday wins approval.

    ***iii.***    FDA and Avadel also spend pages attacking a position Jazz has not advanced: "that 'same drug' can only mean 'same active moiety' and nothing more." FDA Br. 25; *see also id.* at 29, 34, 36; Avadel Br. 27–36. That is a strawman. As our opening brief explained (at 26–27), the phrase "the same drug" refers to the "drug designated under [21 U.S.C. §360bb]." *See also* Jazz D.D.C. MSJ Br. 20; MSJ Reply 9–13; Oral Arg. Tr. 4:15–21. The meaning of that phrase—and hence the scope of what

12

FDA "may not approve," §360cc(a)—depends on what FDA itself designates. If FDA designates drug *X* for condition *Y*, then the moratorium will block approval of follow-on applications that use *X* to treat *Y*.

Under FDA policy, "[o]rphan drug designation is generally granted to the active moiety." FDA Br. 6. And FDA did designate the active moiety here. But the statute leaves that up to the agency. (FDA is wrong (at 40) that Jazz's theory pegs "the scope of exclusivity" to a drugmaker's "designation request." What matters is FDA's designation *order*.)

*iv.*    No precedent rejects Jazz's reading. *Contra* FDA Br. 40 (citing *Spectrum Pharm., Inc. v. Burwell*, 824 F.3d 1062, 1067 (D.C. Cir. 2016); *Sigma-Tau Pharm., Inc. v. Schwetz*, 288 F.3d 141, 145 (4th Cir. 2002)). Those cases addressed whether FDA may approve the "same drug" for a concededly *different* disease or condition, in the face of a twist. The exclusivity-holders there suspected the applicants' real intent was to (i) end-run the moratorium by gaining approval to use the same drug to treat a different (and thus unprotected) condition and then (ii) sell to people who would use the product to treat the *protected* condition. *Spectrum* and *Sigma-Tau* held that FDA may lawfully proceed by focusing on the

13

formal approval request stated in the application. *See Catalyst*, 14 F.4th at 1311 (distinguishing *Spectrum* and *Sigma-Tau* on this basis). That holding is irrelevant here because the Lumryz application openly sought approval to treat the same disease for which Xywav was approved—narcolepsy. JA145.

### 2. Properly read, §360cc(a) forbade FDA to approve Lumryz during the moratorium.

**a.** When *same* is read in its proper sense—as calling for an internal, linguistic inquiry—the meaning and application of §360cc(a) fall swiftly into place. The phrase "the same drug" refers back to the "drug designated." Here, FDA designated the drug oxybate to treat narcolepsy and then approved Jazz's application for Xywav, which uses oxybate to treat narcolepsy. It follows that FDA may not approve Avadel's application to use oxybate to treat narcolepsy during the moratorium.

**b.** Avadel protests that the agency "designates a broader 'drug'" than the "'active moiety' alone." Avadel Br. 31. That would be news to FDA, which concedes that "[o]rphan drug designation is generally granted to the active moiety," FDA Br. 6, and that "Avadel received orphan-drug designation for the active moiety oxybate," *id.* at 17.

14

Avadel's claim also runs aground on the record. When FDA approved Lumryz, it explained that the agency had "granted [orphan-drug designation] to Jazz's predecessor … for *oxybate*." JA440 (emphasis added); *see also* JA442 ("Xywav is covered by Jazz's [orphan-drug designation] for oxybate."). It then noted that "Avadel requested [orphan-drug designation] for *oxybate* …." JA443 (emphasis added). In fact, when FDA was considering Avadel's orphan-drug designation request, it asked whether the "same drug" was "already approved for the same indication." JA118. The answer was "Yes." JA118.

Against all that, Avadel points to a single place where FDA described the Lumryz designation as "sodium oxybate for extended-release oral suspension." JA203. But the agency record already explains why that document is not telling. "At the time, Avadel referred to its product as … sodium oxybate for extended-release oral suspension." JA443 n.107. And while FDA records "often refer to the generic name of the drug the sponsor uses in its request for designation rather than the active moiety," FDA was clear that "the [designation] applies to the active moiety." JA440 n.84.

### 3.   FDA and Avadel's policy arguments fail.

FDA and Avadel insist Jazz's reading will produce bad policy. Of course, "even the most formidable policy arguments cannot overcome a clear statutory directive." *BP P.L.C. v. Mayor & City Council of Baltimore*, 141 S. Ct. 1532, 1542 (2021) (cleaned up). And these policy arguments are not formidable. They are exaggerated and ignore countervailing policy interests central to the Act's design.

a.   FDA claims (at 33–34) that an upshot of Jazz's position is that "only Jazz can avail itself of the statutory rewards … for developing and improving an oxybate-based narcolepsy drug." False. Outside of a moratorium period, any sponsor that meets the requirements of subsection (c) can obtain a serial exclusivity.

FDA next claims (at 34–35) that on Jazz's reading, a single drugmaker could "perpetually keep all new oxybate-based narcolepsy drugs off the market by stringing together periods of exclusivity for each successive approval of a clinically superior drug." FDA fails to mention that *it* holds the keys. For any such "daisy chain" to unfold, the drugmaker would have to convince FDA, per subsection (c), that each innovation it devised is clinically superior to "*any* already approved or licensed drug

16

that is the same drug." So—like the bar in a pole-vault competition—the clinical-superiority bar would go up each time it was cleared.

FDA is also wrong to suggest (at 32) that Jazz's interpretation would reinstate the pre-amendment status quo, which "allow[ed] drugs that may not end up being clinically superior to earlier versions of the same drug to obtain exclusivity." *Eagle Pharms.*, 952 F.3d at 334. Congress fixed that. Under subsection (c), a sponsor must actually "*demonstrate*" clinical superiority, to the agency's satisfaction, to earn exclusivity.

Finally, FDA asserts that its conception of "same drug," which allows the agency to approve applications despite the moratorium whenever it credits a "clinical superiority" claim, "accords with the goal of stimulating the development of orphan drugs" by giving "drug companies … latitude" to bring new drugs to market during a competitor's exclusivity period. Br. 35. "As usual," however, "there are (at least) two sides to the policy questions," *Niz-Chavez v. Garland*, 593 U.S. 155, 171 (2021), as this Court knows well. "[I]nherent in any sort of exclusivity period is a

17

tradeoff between incentivizing research and development and promoting competition." *Eagle Pharms.*, 952 F.3d at 337.

The flip side of FDA's "latitude" approach is thus clear. It disincentives investment by undermining the Act's chief "incentiv[e]"—the promise of marketing exclusivity for seven years. *Id.* at 325 (citation omitted). On FDA's view, there is no *guarantee* of marketing exclusivity because the agency could always approve any treatment that it deems "clinically superior." FDA may think that tradeoff is worth it. But the statute doesn't create a "clinical superiority" loophole—although not, as our opening brief shows (at 31–33) for lack of congressional consideration. No bill that calls the question has ever made it across the line.

**b.**    Avadel's objections fare no better.

Avadel first claims (at 36) that "Jazz has strung together repeated terms of exclusivity for its oxybate products since [its original oxybate] approval in 2002." Yet from 2012 through 2020, Jazz held no exclusivity for any use of oxybate to treat adults. JA141–43. Avadel just did not win approval for any relevant oxybate treatment during that period.

18

Avadel also warns (at 36) that a treatment that extends life by six months (or is unusable by half the patient population) could block a treatment that extends life by five years (or is usable by all). The most telling thing about these hypotheticals is that they are *hypothetical*. Avadel does not cite a single real-world example of such dramatic differential effects in treatments that share the same active moiety. Small wonder. Per FDA, it is "*difference[s]* in the chemical structures of [treatments'] active moieties" that ordinarily "lead to pharmacologic differences." 56 Fed. Reg. 3338, 3341 (Jan. 29, 1991) (emphasis added).

This case illustrates the point. While Avadel now touts Lumryz as "demonstrably better" than Xywav, Br. 2, during agency proceedings it offered "no evidence" that Lumryz is more effective at treating narcolepsy. JA454. The agency also shot down Avadel's claim that Lumryz is safer than Xywav. JA454. FDA instead acknowledged that Lumryz is *less safe* than Xywav. JA458. And while FDA ultimately deemed Lumryz "clinically superior" to Xywav, that finding was based on dosing-schedule changes—not evidence of better treatment outcomes. *See* FDA Br. 19.

19

Along similar lines, *amici* are wrong to suggest (at 24) that Xywav was a minor "product-hopping" innovation that carried "little patient benefit." Jazz earned a serial exclusivity period under subsection (c) by showing that "the differences in the sodium content of" Xywav, as compared to prior oxybate treatments, "will be clinically meaningful in reducing cardiovascular morbidity in a substantial proportion of patients." JA484. *Amici* ignore this factual determination by FDA.

In all events, if Avadel's hypotheticals materialized, the Orphan Drug Act offers a path that could facilitate resolution. Under §360cc(b)(2), an exclusivity-holder may consent "in writing" to the "approval of other applications" that its exclusivity would block.

**B. Congress did not ratify FDA's 1992 loophole when it changed "such" to "the same."**

**1. Subsection (a) lacks the hallmarks of legislative ratification.**

**a.** As our opening brief explained (at 36–41), courts infer ratification only under narrow circumstances. Proponents of ratification must show (i) an express cross-reference, (ii) decisive legislative history, or (iii) compelling linguistic evidence. FDA doesn't seriously claim that Congress expressly ratified the policy at issue here—nor would such a claim

20

be plausible when the same 2017 statute elsewhere expressly cross-referenced FDA's regulatory definitions. *See* FDA Reauthorization Act of 2017, Pub. L. No. 115-52, §503(a), 131 Stat. 1005, 1038–39 (2017) (cross-referencing 21 C.F.R. §312.82(b)); §706(a), *id.* at 1059 (cross-referencing 21 C.F.R. §§315.2, 601.31); §709(a), *id.* at 1066 (cross-referencing 21 C.F.R. §874.3300, 3305). Nor does it offer any legislative history to support its reading. Instead, it chiefly asks this Court to lower the linguistic-evidence threshold enough that its ratification theory can slip over the bar. The Court should decline that invitation.

*i.*     According to FDA, courts must infer ratification whenever (i) an agency has language "on the books," (ii) a Congress "familiar" with that language enacts a statute, and (iii) the agency can find a two-word overlap between the statute and the regulation (here: "same drug")—never mind how common those words are. Br. 45, 49. That is wrong.

No decision from this Court supports such a sweeping rule, which would effectively require a court to find ratification anytime Congress legislates in a field where the agency has expressed views. To the contrary, when FDA has claimed ratification that would wring "a major

grant of regulatory discretion" from a "narrow ... amendment," this Court has been "skeptical that the Congress would grant the FDA such vast authority 'in so cryptic a fashion.'" *Genus Med. Techs. LLC v. FDA*, 994 F.3d 631, 642 (D.C. Cir. 2021) (citation omitted); *cf. Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 401 (2024) (questions about "an agency's own power" are "perhaps the occasion on which abdication in favor of the agency is *least* appropriate").

If FDA is right, stacks of cases should have come out the other way. Take *CSX Corp. v. United States*, 18 F.4th 672, 681 (11th Cir. 2021), which FDA barely addresses and Avadel ignores altogether. The statute and regulation there overlapped by far more than two words, so (on FDA's view) Chief Judge Pryor's opinion for the Eleventh Circuit must be wrong. *See* Jazz Br. 40. Or consider *United States Association of Reptile Keepers, Inc. v. Zinke*, 852 F.3d 1131, 1142 (D.C. Cir. 2017), where this Court rejected a ratification argument because there was "no evidence ... that Congress affirmatively considered" the question at issue or embraced the position the agency later advanced in litigation. These decisions and others we have cited show FDA is wrong. Strong evidence of

congressional intent is needed to displace ordinary language and support ratification.

*ii.*    Avadel tries to rehabilitate FDA's argument with a string-cite of cases supposedly showing that "[c]ourts have routinely applied the ratification doctrine" to "commonplace" terms. Avadel Br. 24. That is not what the cases show.

*Bragdon v. Abbott* does not help Avadel. As our opening brief explained (at 39), the Supreme Court there relied on legislative history decisively showing that the Americans with Disabilities Act incorporated administrative practice under the Rehabilitation Act. But that was not all. "The ADA's definition of disability [wa]s drawn almost verbatim from the definition of 'handicapped individual' included in the Rehabilitation Act …." 524 U.S. 624, 631 (1998) (citations omitted). And Congress expressly directed courts to apply the judicial and administrative glosses previously put on that term, "[e]xcept as otherwise provided" in the ADA. *See* 42 U.S.C. § 12201(a); *Bragdon*, 524 U.S. at 631–32. *Bragdon* was not dealing with the situation here, where the agency posits that Congress's intent to ratify should be inferred from familiarity and overlap alone.

23

Avadel next suggests that *Federal Express Corp. v. United States Department of Commerce*, 39 F.4th 756, 769 (D.C. Cir. 2022), helps FDA because it applied the "old-soil canon to 'aiding and abetting.'" Avadel Br. 24. Just the opposite. The verb "abet" is hardly a "commonplace" word—indeed, the phrase "aiding and abetting" is probably responsible for over 90% of its usage. Moreover, the old-soil canon is of a piece with the rule from *George*—it only applies "when a statutory term is *obviously* transplanted from another legal source." *FedEx*, 39 F.4th at 772 (emphasis added) (quoting *Taggart v. Lorenzen*, 587 U.S. 554, 560 (2019)). The age of the soil is of no matter if the transplantation is not obvious.

The remaining out-of-circuit cases serve Avadel no better. In *Genentech, Inc. v. Immunex Rhode Island Corp.*, 395 F. Supp. 3d 357, 364 (D. Del. 2019), the relevant statutory term was not simply "supplement," as Avadel suggests, but "supplement to an application." 42 U.S.C. § 262(k)(3). Nor did *Genentech* involve an administrative gloss overriding a statutory term's ordinary meaning. *Duarte v. Mayorkas*, 27 F.4th 1044 (5th Cir. 2022), does not warrant Avadel's conclusion either. As Judge Willett explained, the Fifth Circuit's reading "r[an] counter to regulations

24

written by agencies who [we]re familiar with th[e] statutory framework." *Id.* at 1065 (Willett, J., concurring in part and dissenting in part). To the extent *Duarte* even supports FDA, it is not persuasive authority.

**b.** Under the standards that this Court and the Supreme Court ordinarily apply, ratification is not a plausible inference here.

As in *Reptile Keepers*, there is "no evidence … that Congress affirmatively considered" the specific regulatory question at issue. In fact, "it is a fiction of Jack-and-the-Beanstalk proportions to assume that more than a handful of those Senators and Members of the House who voted for the final version of [a given statute], and the President who signed it, were, when they took those actions," even aware that FDA had claimed the power to bypass the approval moratorium based on clinical superiority. *Bank One Chi., N.A. v. Midwest Bank & Tr. Co.*, 516 U.S. 264, 279 (1996) (Scalia, J., concurring in the judgment).

Nor does the linguistic overlap between the 1992 regulation and the 2017 amendments warrant FDA's conclusion. FDA must show that "statutory context supports reading [the relevant language] as a term of art rather than according to its plain meaning." *Yellen v. Confederated Tribes*

25

*of Chehalis Rsrv.*, 594 U.S. 338, 351 (2021). But "the same" is simply "too common and context dependent a [phrase] to bear" the weight that FDA puts on it here. *Id.* at 353. To see why, just pick up any one of this Court's recent cases. *Thaler v. Perlmutter*, 130 F.4th 1039 (D.C. Cir. 2025)—which has nothing to do with FDA or hidden loopholes—uses the phrase eight times. Or consider the Supreme Court's decision in *Bondi v. VanDerStok*, 2025 WL 906503 (Mar. 26, 2025): twenty-five times. Or skim the transcript from any recent argument. *E.g.*, Tr. of Oral Arg., *EPA v. Calumet Shreveport Refining, L.L.C.*, No. 23-1229 (U.S. Mar. 25, 2025) (twenty-seven times). So too, "the same drug," which Congress has often used in other contexts. *See* Jazz Br. 43.

**c.**    Congress did not acquiesce in FDA's approach after the 2017 amendments either. *Contra* FDA Br. 48. Congressional inaction typically "lacks persuasive significance." *Star Athletica, L.L.C. v. Varsity Brands, Inc.*, 580 U.S. 405, 424 (2017) (citation omitted). That's especially true when, as in those statutes, "Congress has not comprehensively revised a statutory scheme but has made only isolated amendments." *Alexander v. Sandoval*, 532 U.S. 275, 292 (2001).

26

### 2. FDA's ratification theory is inconsistent with the statute as a whole.

FDA's ratification theory also runs aground on contrary textual evidence. Courts "do not force term-of-art definitions into contexts where they plainly do not fit." *Johnson v. United States*, 559 U.S. 133, 139–40 (2010) (citations omitted). Here, far from ratifying FDA's approach across the board, Congress carefully considered which aspects of that approach to embrace and which to reject. FDA's ratification theory would create chaos in §360cc(c) and surplusage in subsection (a). And it cannot be squared with the property right created by the Act.

### a. Congress did not ratify FDA's approach wholesale.

FDA insists (at 46–47) that the "whole thrust" of the 2017 amendments was to "validate FDA's established administrative practices" and "embrac[e]" the agency's approach. But that ignores the ways in which Congress declined to ratify FDA's approach across the board. *See* Jazz Br. 48–49. Instead of borrowing FDA's entire regulatory phrase "same drug for the same use or indication," Congress sliced more finely. *See id.* at 35. And instead of ratifying the regulations wholesale, Congress authorized FDA to apply only those consistent with the new statute. *Id.* Even Avadel

27

recognizes this—disclaiming the idea that "the 2017 amendments ratified FDA's approach to orphan drugs in its entirety." Br. 25.

### b. FDA's ratification theory violates first principles of statutory interpretation.

*i.*    FDA needs this Court to accept three implausible implications of its theory. *First*, the agency needs the Court to hold that Congress approached the concept of clinical superiority in radically different ways in subsections (a) and (c). Jazz Br. 50–51. If FDA is right, then Congress created an elaborate, reticulated scheme to address clinical superiority in subsection (c), while silently slipping it into subsection (a) by changing "such" to "the same." Likewise, clinical superiority presupposes that two drugs are the same in subsection (c), whereas sameness *defeats* clinical superiority under FDA's reading of subsection (a).

*Second*, subsection (c) "makes no sense" when FDA's definition of "same drug" is plugged into that provision, as the district court itself conceded. JA564; *see* 21 C.F.R. §316.3(b)(14)(i). On FDA's reading, subsection (c) would require a drugmaker to prove that its treatment is "clinically superior to any already approved or licensed drug that [contains the same active moiety and is intended for the same use, unless the

28

subsequent drug can be shown to be clinically superior to the first drug]." That simply does not parse.

*Finally*, FDA's theory makes part of subsection (a) redundant. Plugging FDA's regulatory definition of "same drug" into the phrase "same drug for the same disease or condition" renders the latter half of that phrase superfluous. On FDA's reading, the phrase becomes: "a drug that … is intended for the same use as the previously approved drug" "for the same disease or condition."

**ii.** FDA has no response. It sputters, in the final paragraph of its brief, that this argument "misses the forest for the trees." FDA Br. 53. But courts do not treat statutes as wild-grown forests. They presume that the trees matter—that Congress has ordered the orchard in a coherent way, such that the relationship of words and phrases and provisions is meaningful, contributing as a whole to a proper understanding of the statute's command. *See, e.g.*, *Genus*, 994 F.3d at 641 (citing the "fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme" (citation omitted)). FDA first claims that "Congress

'ratified and incorporated the existing regulatory definition of "same drug" into the statute,'" FDA Br. 45 (quoting JA556), but then pages later asks the Court to ignore that the definition does not fit parts of the statute. That is a singularly damning admission.

### c.    FDA's approach would undermine the property right created by the Act.

It is also implausible that Congress would have authorized FDA to deprive drugmakers of exclusive approval without cementing a statutory right to be heard, in advance, on the agency's reasons for its proposed course of action. FDA has no sound response.

*i.*    As our opening brief explained (at 53–54), exclusive approval under §360cc closely resembles governmental conferrals that historically have been recognized as granting a form of intangible property. Further, the exclusivity exceptions in subsection (b)—consent and failure to supply the market—mirror the grounds for divestiture of a government-granted franchise at common law. *Id.* at 54. And Congress protected exclusivity-holders against erroneous deprivations by requiring that the existence of shortage be determined through a hearing, and that any claim of consent be supported by a writing from the exclusivity-holder.

30

Congress would not have included an additional ground for divestiture—clinical superiority—without providing similar safeguards or a mechanism for just compensation. Jazz Br. 55–57.

### ii.  FDA's responses fail.

FDA is wrong (at 43) that Jazz did not "preserve this issue for appeal." Our property-rights argument is a statutory *argument* in support of the same *claim* that Jazz has made all along: that FDA exceeded its statutory authority in approving Lumryz. *See Yee v. City of Escondido*, 503 U.S. 519, 534 (1992). Congress's failure to expressly provide for safeguards or compensation in cases of clinical-superiority breakthroughs is yet another reason to doubt that Congress authorized FDA to exercise the power it claims here. In all events, the Court may reach the argument because it "retains the independent power to identify and apply the proper construction of governing law." *Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 99 (1991).

FDA's response (at 43) that Jazz "received robust process in this case" is wrong and irrelevant. It is wrong because FDA kept Jazz in the dark about its clinical-superiority reasoning until it dropped a 42-page

31

memo hours before it approved Lumryz. Jazz Br. 55–56. On those facts, Jazz obviously had no opportunity to engage with FDA's erroneous reasoning before it became *fait accompli*. It is also a non sequitur. The *statutory* point is that Congress wouldn't have left FDA to its own devices if it were creating a clinical-superiority carve-out to the subsection (a) exclusivity. With due process concerns in mind, it likely would have spelled out the necessary safeguards. The absence of such safeguards is another tell that Congress did not grant FDA the power it claims, particularly through the subtle device of replacing "such" with "the same." *See Rawson v. Inhabitants of Sch. Dist. No. 5 in Uxbridge*, 89 Mass. (7 Allen) 125, 131 (1863) ("Language so equivocal cannot be construed as a condition subsequent," since "conditions subsequent which defeat an estate are not to be favored or raised by inference or implication."); *accord Columbia Ry., Gas & Elec. Co. v. South Carolina*, 261 U.S. 236, 248–49 (1923) (discussing this rule with respect to incorporeal franchises).

## II.  Avadel's attempt to invoke the district court's alternative theory also fails.

In closing, Avadel parrots the district court's alternative theory that even if the §360cc(a) moratorium blocked FDA from approving Lumryz,

§360cc(c) somehow lifted the moratorium and authorized approval. *See* Avadel Br. 37. Jazz's opening brief explains at length (at 60–63) why that is wrong. Avadel responds to *none* of those arguments and has thus forfeited the point. *See S. Cal. Edison Co. v. FERC*, 603 F.3d 996, 1000 (D.C. Cir. 2010).

Forfeiture aside, Avadel cannot rely (at 38) on "the Eleventh Circuit's explanation in [*Catalyst*]." There was no explanation: the Eleventh Circuit did not analyze the question and its statement was dicta. Jazz Br. 63. Avadel does not contest this either. The most Avadel can say is that Jazz cited that portion of *Catalyst* in a submission to FDA. Avadel Br. 38. But Avadel correctly does not argue waiver or nonexhaustion. As FDA recognized, Jazz later "changed its position" and squarely told the agency that §360cc(c) "cannot be read as a third exception to [orphan drug exclusivity]." JA444. And on that issue, at least, FDA agrees with Jazz. JA445; *see also* Jazz Br. 23.

The district court's alternative theory therefore should not detain the Court long. The district court did not rest on it; it is wrong; the agency has consistently rejected it; and Avadel does not meaningfully defend it.

33

## III. FDA's error warrants vacatur.

Our opening brief showed (at 63–66) that vacatur is the proper remedy for FDA's unlawful approval of Lumryz. FDA does not contest that vacatur must follow if the Court agrees with Jazz. Avadel largely cedes this ground as well, offering only a one-sentence argument that the Court could consider remanding without vacatur, in light of the district court's alternative theory, "to allow FDA to address this issue in the first instance." Avadel Br. 38–39. That makes no sense because the agency *has* addressed that theory. It rejected it during agency proceedings, reiterated that position in the district court, and has not contested Jazz's explanation of why the district court's theory is wrong. Vacatur is the proper remedy.

## CONCLUSION

The Court should reverse and remand with instructions to enter summary judgment for Jazz and vacate FDA's approval order.

34

Dated: April 7, 2025          Respectfully submitted,

*/s/ Kwaku A. Akowuah*

Kwaku A. Akowuah
  *Counsel of Record*
Sean C. Griffin
Peter A. Bruland
Anna C. Burke
David H. Kinnaird
SIDLEY AUSTIN LLP
1501 K Street, NW
Washington, DC 20005
202.736.8000
kakowuah@sidley.com

*Counsel for Appellant*

35

## CERTIFICATE OF COMPLIANCE

This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Century Schoolbook font.

This brief complies with the type-volume requirements of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 6,492 words, not counting the parts excluded by Federal Rule of Appellate Procedure 32(f) and Circuit Rule 32(e)(1).

*/s/ Kwaku A. Akowuah*

## CERTIFICATE OF SERVICE

I certify that on April 7, 2025, I electronically filed the foregoing brief and following addendum with the Clerk of the Court using the CM/ECF System, which will send notice to all registered CM/ECF users.

*/s/ Kwaku A. Akowuah*